# EXHIBIT B



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
### CIVIL ACTION NO. 4:09-CV-3-BR

| | | |
|---|---|---|
| BENJAMIN G. HINES, JR., | ) | VIDEOTAPED |
| | ) | |
| PLAINTIFF, | ) | D-E-P-O-S-I-T-I-O-N |
| | ) | |
| VS. | ) | OF |
| | ) | |
| TRIAD MARINE CENTER, INC., ET | ) | BENJAMIN G. HINES, JR. |
| AL, | ) | |
| DEFENDANTS. | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SEPTEMBER 29, 2009, AT THE LAW OFFICES OF WHEATLY, WHEATLY, WEEKS & LUPTON, P.A., 710 CEDAR STREET, BEAUFORT, NORTH CAROLINA

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF    -    STEVENSON L. WEEKS, ESQ.

                                        WHEATLY, WHEATLY, WEEKS & LUPTON, P.A.
                                        ATTORNEYS AT LAW
                                        710 CEDAR STREET
                                        BEAUFORT, NC  28516

                                        CHARLES R. HARDEE, ESQ.

                                        HARDEE & HARDEE
                                        ATTORNEYS AT LAW
                                        202 EAST ARLINGTON BLVD.
                                        GREENVILLE, NC

FOR THE DEFENDANTS   -    JOHN T. PION, ESQ.
                                        J. LAWSON JOHNSTON, ESQ.

                                        DICKIE, MCCAMEY & CHILCOTE, P.C.
                                        ATTORNEYS AT LAW
                                        TWO PPG PLACE, SUITE 400
                                        PITTSBURGH, PA  15222

COURT REPORTER      -    SHERRY HOPKINS

---

**COASTAL COURT-REPORTING AGENCY, INC.**
P.O. BOX 788
NEWPORT, NORTH CAROLINA  28570
TEL: (252) 223-4045
FAX: (252) 223-3663

MARINA AND STUFF, IT'S NOT MUCH DIFFERENT THAN HERE. THERE'S A LITTLE LESS TO DO THAN THERE IS HERE, BUT IT'S JUST A CHANGE OF SCENERY.

Q.   HOW FAR CAN YOU RIDE YOUR BIKE?

A.   PROBABLY - I HAVEN'T RIDDEN IT, MORE THAN BEING AROUND THE DOCK AND AROUND THE MARINA, MORE THAN A MILE.

Q.   WHY DO YOU NEED A GIRL'S BIKE?

A.   IT'S HARD TO GET ON AND OFF OF THE BIKE.

Q.   WHY IS THAT?

A.   THAT HORIZONTAL BAR, IT'S DIFFICULT TO PRESS DOWN ON THE ANKLE TO GET UP IF YOU USE YOUR LEFT ANKLE, AND IF YOU DON'T AND YOU'RE GETTING OFF THE BIKE, IT'S UNSTABLE TO RELY ON ONE ANKLE ALL OF A SUDDEN. IT'S JUST EASIER WITHOUT THAT BAR IN THE WAY. YOU HAVE LESS OF A SPACE FOR YOUR ANKLE TO HAVE TO HIT BEFORE BOTH FEET ARE ON THE GROUND, DOES THAT MAKE SENSE?

Q.   UH-HUH.

A.   OKAY.

Q.   WHEN DID YOU START LEARNING ABOUT BOATS, WHAT AGE WERE YOU?

A.   A KID.

Q.   DID YOUR FATHER BOAT AS WELL?

A.   HE DIDN'T, BUT MY UNCLE DID.

Q.   YOU WERE HOW OLD, ABOUT?

A.   TEN.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

```
 1        Q.   WHEN DID YOU FIRST OWN YOUR OWN BOAT?

 2        A.   AS SOON AS I GOT OUT OF SCHOOL, RESIDENCY, SO

 3   SINCE '88.

 4        Q.   HOW MANY BOATS HAVE YOU OWNED?

 5        A.   AT LEAST HALF A DOZEN TO TEN.

 6        Q.   BEFORE THESE LAST FOUR THAT WE DISCUSSED?

 7        A.   PROBABLY FOUR MORE.

 8        Q.   WHAT KIND OF BOATS?

 9        A.   PROBABLY THE LARGEST WAS ABOUT A 38, 40 FOOT

10   BOAT.

11        Q.   ALL MOTORIZED?

12        A.   YES, ALL MOTOR BOATS.  I KNOW NOTHING ABOUT

13   SAILING, DIDN'T GROW UP WITH SAILBOATS.

14        Q.   DID YOU EVER TAKE ANY KIND OF COURSES, OR

15   INSTRUCTION . . .

16        A.   YES, SIR.

17        Q.   WHAT DID YOU TAKE?

18        A.   POWER SQUADRON COURSES.

19        Q.   SAY IT AGAIN?

20        A.   POWER SQUADRON COURSES.

21        Q.   WHAT IS THAT?

22        A.   IT'S AN ASSOCIATION, VOLUNTEERS, SORT OF LIKE A

23   PSEUDO AUXILIARY COAST GUARD, FOR TEACHING.

24        Q.   FOR TEACHING?

25        A.   TEACHING, AND RECREATION, SOCIALIZATION, AND YOU
```

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1  TAKE COURSES, AND YOU TAKE COURSES FOR NAVIGATION, AND

2  MECHANICS, AND I'VE TAKEN ALL OF THOSE, SEAMANSHIP.

3       Q.   HAVE YOU TAUGHT?

4       A.   NO, I HAVE NOT TAUGHT.

5       Q.   DO YOU HAVE ANY SORT OF CERTIFICATE OF ANY KIND?

6       A.   YES, UH-HUH.

7       Q.   WHAT DO YOU HAVE?

8       A.   DON'T KNOW THE NAMES ANYMORE, BUT SEAMANSHIP,

9  AND PROBABLY NAVIGATION, AND ADVANCED NAVIGATION, AND

10  MECHANICS, AND I'M NOT SURE WHAT ELSE, BUT THERE'S QUITE A

11  FEW OF THEM.

12       Q.   WHO GRANTS THOSE TO YOU, WHAT ORGANIZATION?

13       A.   THE COURSE INSTRUCTOR THAT IS TEACHING UNDER THE

14  AUSPICES OF THE POWER SQUADRON.

15       Q.   THIS POWER SQUADRON IS A . . .

16       A.   THAT WAS A GREENVILLE BASED POWER SQUADRON, MOST

17  COUNTIES, I THINK, HAVE THEM.

18       Q.   SO IT'S AN ASSOCIATION OF VOLUNTEERS THAT KIND

19  OF PROMOTE SAFETY AND INSTRUCTION, AND IF SOMEBODY WERE JUST

20  BUYING A BOAT FOR THE FIRST TIME, MIGHT THEY GO TO SOMEBODY

21  LIKE YOU AND SAY, TEACH ME HOW TO DO BOATING, I MEAN, I DON'T

22  KNOW HOW THAT APPLIES?

23       A.   THEY WOULD PROBABLY, RATHER THAN GO TO ME, SEEK

24  OUT THE POWER SQUADRON, OR I WOULD ADVISE THEM TO DO THAT,

25  IT'S MORE REGIMENTED IN TEACHING.

195

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1         Q.   DID YOU HAVE A CERTAIN NUMBER OF HOURS THAT YOU

2   HAD TO LOG IN ORDER TO GET THESE CERTIFICATIONS FOR

3   SEAMANSHIP, NAVIGATION, ET CETERA?

4         A.   THEY'RE TOTALLY CLASSROOM WORK.

5         Q.   IS THERE A CERTAIN NUMBER OF HOURS?

6         A.   I WOULD GATHER THAT EACH COURSE WAS PROBABLY

7   TEN, TWELVE HOURS OF CLASSROOM WORK, BUT I - IT'S BEEN A LONG

8   TIME, I TOOK NUMEROUS COURSES YEARS AGO.

9         Q.   COULD YOU ESTIMATE HOW MANY HOURS OF COURSE WORK

10  YOU HAD?

11        A.   100 HOURS, 60 TO 100 HOURS OVER THE YEARS.

12        Q.   WOULD YOU CONSIDER YOURSELF AN EXPERT IN

13  OPERATING POWER BOATS?

14        A.   I DON'T THINK I'M AN EXPERT.  I'M A LEARNED

15  POWER BOATER, BUT I DON'T REALLY THINK I'M AN EXPERT.

16        Q.   WHAT WOULD YOU HAVE TO DO TO BECOME AN EXPERT,

17  BY YOUR DEFINITION?

18        A.   I'M NOT SURE.  I DON'T KNOW WHAT I WOULD DO TO

19  MAKE ME FEEL MORE LEARNED, I REALLY DON'T.

20        Q.   SO YOU'VE BEEN OPERATING POWERBOATS SINCE 1988?

21        A.   YES, SIR.

22        Q.   YOU'VE OWNED POWERBOATS, BUT EVEN BEFORE THAT AS

23  A KID, YOU OPERATED POWERBOATS?

24        A.   YES, UNDER SUPERVISION.

25        Q.   HAVE YOU EVER BEEN IN A POSITION IN OPERATING A

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1  IF THEY TRULY CLOSED AT 6:00, I MUST HAVE STAYED AFTER HOURS,

2  BUT, WHAT WAS THE QUESTION, I'M SORRY?

3       Q.   HOW LONG YOU WERE THERE, HOW LONG YOU SPENT THE

4  FIRST DAY . . .

5       A.   I THINK I WAS THERE FOR AT LEAST AN HOUR, AT

6  LEAST AN HOUR.

7       Q.   HOW MANY BOATS DID YOU LOOK AT?

8       A.   I DID A CURSORY EXAMINATION OF ONE, AND I DID A

9  MUCH MORE THOROUGH EXAMINATION OF THIS BOAT.  THIS BOAT BEING

10  THE BOAT THAT I WAS INJURED ON.

11       Q.   SO I TAKE IT YOU - I MEAN, WE DID TALK A LITTLE

12  BIT ABOUT THE TWO BOATS, AND THE HIGH QUALITY

13  WAS - APPARENTLY THE TRITON WAS HIGHER QUALITY, AT LEAST

14  THAT'S WHAT YOU THOUGHT AT THAT TIME, CORRECT?

15       A.   YES, SIR.

16       Q.   SO THAT'S THE ONE THAT YOU WANTED TO SEA TRIAL?

17       A.   YES, SIR.

18       Q.   WHAT DID YOU TELL JOHN HYDE ABOUT TESTING OUT

19  THE BOAT?

20       A.   THAT MONDAY NIGHT?

21       Q.   YES?

22       A.   I TOLD HIM MY PURPOSE WAS I NEEDED A BOAT THAT

23  WOULDN'T BEAT MY WIFE UP AS THE SKIFF DID, THAT I NEEDED A

24  BOAT THAT WAS DRY IN RIDE, AND THAT BASICALLY WAS THE

25  PURPOSE, AND SINCE HE SAID THE TRITON WAS THE HEAVIER BOAT,

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1   IT WOULD BE DRIER, AND WOULDN'T POUND LIKE THE SKIFF WOULD

2   POUND, THAT SHE WOULD FIND IT A MORE COMFORTABLE RIDING BOAT.

3       Q.   SO YOU WANTED TO TEST IT OUT, YOU WANTED TO SEA

4   TRIAL IT, THE TRITON?

5       A.   YES, SIR.

6       Q.   YOU WANTED TO TAKE IT OUT AND TEST IT?

7       A.   YES, SIR, ABSOLUTELY.

8       Q.   THAT WAS YOUR IDEA, RIGHT?

9       A.   YES, I WOULDN'T BUY A BOAT WITHOUT SEA TRIALING

10  IT, YES.

11      Q.   RIGHT, I UNDERSTAND.  SO YOU TOLD HIM, LET'S

12  TAKE IT OUT, AND HOW DID THE DISCUSSION GO ABOUT WHEN YOU

13  WOULD TAKE IT OUT?

14      A.   I DROVE FROM WORK AND TOLD HIM I WAS HEADED TO

15  THE BEACH, AND I DON'T REMEMBER.  I WOULD HAVE SIMPLY SAID, I

16  NEEDED IT, IF I'M GOING TO DRIVE THE BOAT, IT NEEDS TO BE

17  TOMORROW.

18      Q.   WASN'T IT THE FACT THAT YOU SAID YOU WANTED TO

19  OPERATE IT IN HEAVY CONDITIONS?

20      A.   NO, MY DAYS OFF IS TUESDAY, WE DON'T HAVE A

21  CHOICE.  IF WE'RE GOING TO TEST DRIVE THE BOAT, IT'S ON

22  TUESDAY, PERIOD.

23      Q.   SO YOU DIDN'T SAY I WANT TO TEST IT IN HEAVY

24  CONDITIONS TO SEE IF IT STAYS DRY, YOU DIDN'T SAY THAT?

25      A.   NO, NO.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

Q.    YOU DON'T RECALL THAT?

A.    NO.

Q.    SO JUST TUESDAY IS YOUR DAY OFF, SO THAT'S THE DAY YOU HAD TO GO, IS THAT WHAT YOU'RE SAYING?

A.    CORRECT.

Q.    WAS THAT YOUR DECISION, YOUR CHOICE TO GO ON A TUESDAY?

A.    NO, I JUST SAID, IF YOU CAN DO IT TOMORROW, I'LL DO IT TOMORROW, THAT'S THE DAY I HAVE OFF, I'LL BE AT THE BEACH TOMORROW.

Q.    WERE YOU AT THE CONDO?

A.    YES, SIR, THAT'S WHERE I WAS HEADING.

Q.    DID YOU STAY THERE CERTAIN DAYS OF THE WEEK WHEN YOU WERE WORKING?

A.    NO, I ONLY WENT DOWN IF I COULD ON MONDAY NIGHT, AND SPENT TUESDAY, THEN CAME BACK TUESDAY NIGHT, BECAUSE I HAD TO WORK AGAIN WEDNESDAY.

Q.    HOW FAR AWAY ARE THE TWO RESIDENCES?

A.    ABOUT EIGHTY MILES.

Q.    SO YOU SET IT UP FOR A MEETING ON TUESDAY, TO TAKE THE BOAT OUT?

A.    YES, SIR.

Q.    THEN TELL ME WHAT HAPPENED, YOU MET JOHN HYDE AT THE DOCK?

A.    YES, SIR.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

Q. AT YOUR DOCK AT OLDE TOWNE?

A. YES, SIR.

Q. HE DOCKED IT SOMEWHERE ELSE AND OPERATED THE
BOAT AROUND TO WHERE YOU WERE LOCATED, RIGHT?

A. RIGHT, HE BROUGHT IT TO OLDE TOWNE.

Q. WHAT WERE THE WEATHER CONDITIONS?

A. IT WAS RAINING, AND IT WAS PROBABLY
BLOWING - THERE WAS A LITTLE SMALL CRAFT ADVISORY, AND
PROBABLY BLOWING 20, CONDITIONS WERE NICE AND A LITTLE SNOTTY
IN THE SOUND, PROBABLY WAVES 3 TO 4.

Q. 3 TO 4 FEET?

A. YES.

Q. YOU KNEW THAT BEFORE YOU WENT OUT?

A. YES, SIR.

Q. YOU DIDN'T THINK THAT WAS A PROBLEM IN ANY WAY,
DID YOU?

A. NO, SIR.

Q. CONDITIONS DIDN'T CHANGE FROM THE TIME YOU LEFT
UNTIL THE ACCIDENT, THEY WERE STILL 3 TO 4 FEET?

A. YES, SIR.

Q. DID THAT BOAT HAVE A G.P.S.?

A. I WOULD ALMOST THINK I LOOKED AT A SPEEDOMETER,
BUT NOT A G.P.S.

Q. DID YOU MAKE ANY NOTES AT ALL AS TO WHAT
HAPPENED THAT DAY, ANYTHING IN WRITING AT ANYTIME AFTER THE

206

1    ACCIDENT?

2         A.    NO, SIR.

3         Q.    WHETHER IT WAS MONTHS LATER, OR DAYS LATER?

4         A.    NO, SIR.

5         Q.    ARE YOU SURE IT HAD A SPEEDOMETER, OR DO YOU

6    JUST THINK IT DID?

7         A.    NO, IF THERE'S SOME OTHER DEVICE THAT GIVES YOU

8    SPEED - THERE WAS A DEVICE, IN MY MIND.

9         Q.    SO THERE WERE JUST THE THREE OF YOU ON THE BOAT,

10   JOHN HYDE, NEIL WAGONER, AND YOU, CORRECT?

11        A.    YES, SIR.

12        Q.    JOHN HYDE PICKED UP BOTH YOU AND NEIL AT YOUR

13   DOCK, CORRECT?

14        A.    YES.

15        Q.    HOW DID YOU GET DOWN TO THE DOCK FROM YOUR

16   APARTMENT, JUST WALK?

17        A.    YES, SIR.

18        Q.    YOU DIDN'T RIDE YOUR BIKE OR ANYTHING?

19        A.    NO, I DIDN'T RIDE A BIKE AROUND THE DOCK THEN.

20        Q.    DO YOU, AT THIS TIME, EVER WALK FROM YOUR

21   APARTMENT OR YOUR CONDO, TO THE DOCK?

22        A.    THAT'S ALL I DID.

23        Q.    WALK?

24        A.    YES, SIR.

25        Q.    NOT RIDE A BIKE?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1        A.    CORRECT.

2        Q.    WHEN DO YOU DECIDE WHEN YOU'RE GOING TO RIDE

3  YOUR BIKE OUTSIDE?

4        A.    NOW?

5        Q.    YES, I'M TALKING ABOUT AFTER THE ACCIDENT, DID

6  YOU WALK FROM YOUR CONDO . . .

7        A.    I ALMOST ALWAYS RIDE THE BIKE, EVERYWHERE I GO

8  AROUND THE CONDO, EVEN IF IT'S JUST DOWNSTAIRS TO SOCIALIZE.

9        Q.    DO YOU KNOW WHAT THE TEMPERATURE WAS THAT DAY AS

10  YOU WERE GOING OFF?

11       A.    I DON'T REMEMBER, I WOULDN'T GATHER AN ATTEMPT.

12       Q.    AS I UNDERSTAND WHAT HAPPENED, YOU TELL ME IF

13  I'M WRONG, YOU WERE GOING TO TEST DRIVE THE BOAT YOURSELF FOR

14  A WHILE, THEN YOU WERE GOING TO TURN IT OVER TO JOHN HYDE AND

15  HAVE HIM GO INTO THE INLET, AND SEE IF THE BOAT WOULD OPERATE

16  AND STAY DRY IN THOSE CONDITIONS IN THE INLET THAT DAY?

17           MR. HARDEE:  OBJECTION.  YOU MAY ANSWER, BEN.

18       Q.    IS THAT CORRECT?

19       A.    NO, SIR.

20       Q.    THAT'S NOT CORRECT?

21       A.    NO.

22       Q.    TELL ME WHAT HAPPENED THEN, WHAT THE PLAN WAS?

23       A.    I DROVE THE BOAT, AND WHEN I DIDN'T LIKE THE

24  HANDLING OF THE BOAT, ASKED JOHN, AS I HAS ASKED OTHER PEOPLE

25  TO DRIVE THE BOAT AND INSTRUCT ME, ASKED HIM TO SHOW ME COULD

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1 HE HANDLE THE BOAT BETTER, BUT THERE WAS NO MENTION OF THE

2 INLET, THERE WAS NO MENTION OF ROUGH WATER AT ALL.

3 Q. WELL, WASN'T PART OF YOUR PURPOSE TO SEE IF THAT

4 BOAT WOULD REMAIN DRY IN HEAVY CONDITIONS, I MEAN, YOU TOLD

5 HIM THE DAY BEFORE YOU WANTED A DRY BOAT, AND ONE THAT'S NOT

6 THAT ROUGH?

7 A. RIGHT, BUT HEAVY CONDITIONS IS NOT WHAT I WOULD

8 PUT MY WIFE IN AT ALL. I MEAN, HEAVY CONDITIONS, WE'RE

9 ALREADY IN IT, IT'S 3 TO 4 FEET. IF THAT'S ALL WE'RE GOING

10 TO DO - IF I TAKE MY WIFE OUT MORE THAN 3 TO 4, SHE'S MAD AS

11 HELL THAT I'M IN 3 OR 4, THAT'S SPRAYING HER ENOUGH, SO WHAT

12 I CHOSE THAT DAY WOULD BE ALL THAT WE'D EVER BE IN. THERE'S

13 NO REASON TO GO OUT TO THE INLET, I MEAN, I WOULDN'T WANT THE

14 BOAT FOR ANYTHING LIKE THAT.

15 Q. SO YOU DIDN'T TELL HIM TO GO OUT IN THE INLET

16 THEN?

17 A. NO, SIR. NO, I JUST WANTED TO SEE IF HE COULD

18 DRIVE THE BOAT AND SHOW ME HOW TO KEEP THE BOAT FROM

19 PORPOISING.

20 Q. WHY DID HE GO OUT IN THE INLET THEN?

21 A. YOU'D HAVE TO ASK HIM, I HAVE NO IDEA.

22 Q. YOU HEARD HIS TESTIMONY YESTERDAY, DIDN'T YOU?

23 A. I HEARD IT, BUT I DON'T REMEMBER WHAT HE SAID.

24 IF HE SAID I SAID IT, HE'S WRONG.

25 Q. CAN YOU THINK OF ANY REASON THAT HE WOULD GO OUT

209

Case 4:09-cv-00003-BR    Document 39-5    Filed 12/30/09    Page 13 of 32

INTO THE INLET AFTER YOU HAD DRIVEN IT FOR A HALF HOUR?

      A.   I WOULDN'T KNOW WHY HE DID WHAT HE DID, I REALLY WOULDN'T.

      Q.   DOES IT MAKE ANY SENSE?

      A.   THE WHOLE THING DID NOT MAKE SENSE.

      Q.   I MEAN, YOU KNOW HE'S A COAST GUARD CAPTAIN, RIGHT?

      A.   IT STILL WOULDN'T MAKE SENSE.  WHAT HAPPENED DID NOT MAKE SENSE.

      Q.   YOU UNDERSTAND THAT HE HAS . . .

      A.   IT WOULDN'T MATTER WHAT HE HAD.

      Q.   DO YOU UNDERSTAND THAT HE HAS THAT LICENSE?

      A.   I HEARD THAT HE HAD YESTERDAY, FOR THE FIRST TIME.

      Q.   WHEN YOU MET WITH HIM AND YOU TALKED TO HIM, DID HE SEEM LIKE HE WAS VERY CAPABLE?

      A.   I DIDN'T KNOW HE HAD A LICENSE AT THAT TIME, AND KNEW NOTHING ABOUT IT.

      Q.   DID YOU TELL JOHN HYDE, DON'T GO IN THE INLET?

      A.   NO, I DIDN'T SAY, DON'T GO IN THE INLET.

      Q.   SO YOU THOUGHT THAT WAS OKAY?

      A.   I WAS NOT AWARE HE WAS GOING IN THE INLET.

      Q.   YOU KEPT A PROPER LOOKOUT, DIDN'T YOU?

      A.   NO, I WASN'T WATCHING WHERE HE WAS DRIVING.

      Q.   YOU WERE STANDING TO HIS LEFT, YOU WERE FACING

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

FORWARD AS HE WAS OPERATING, ISN'T THAT RIGHT?

     A.    FACING OBLIQUELY.  I'M LOOKING AT HIM AND HOW HE'S DRIVING THE BOAT.  I AM TECHNICALLY FACING FORWARD, BUT I REALLY AM NOT LOOKING WHERE HE'S GOING, THAT'S TRUE.

     Q.    SO YOU DIDN'T EVEN KNOW WHERE HE WAS GOING, YOU WERE NOT LOOKING?

     A.    AS I SAID, I'M WATCHING HOW HE'S HANDLING THE BOAT, BECAUSE I'M TRYING TO SEE WHAT HE DOES DIFFERENTLY.

     Q.    WELL, WHAT WAS HE DOING?

     A.    DRIVING THE BOAT.

     Q.    I KNOW, BUT HOW WAS HE DOING IT, WHAT WAS HE DOING WITH HIS HANDS?

     A.    I'M NOT SURE WHAT YOU'RE ASKING?

     Q.    YOU SAID THAT YOU'RE LOOKING AT HIM, WATCHING HIM, HOW HE HANDLED THE BOAT, HOW DID HE HANDLE IT?

     A.    I WAS WATCHING HIM WITH HIS HAND ON THE WHEEL AND A HAND ON THE HELM.  I MEAN, HAND ON THE HELM AND HAND ON THE THROTTLE.

     Q.    WAS HE DOING ANYTHING, WAS HE MOVING HIS HANDS?

     A.    OH, YES, HE WAS MOVING BOTH.

     Q.    WAS IT SOMETHING DIFFERENT THAN WHAT YOU WERE DOING, WEREN'T YOU OPERATING IT THE SAME WAY HE DID, WITH YOUR HAND ON THE THROTTLE . . .

     A.    YOUR HANDS ARE ALWAYS IN THE SAME PLACE.  I WANTED TO SEE IF HE COULD MANAGE THE BOAT DIFFERENTLY.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1      Q.   SO YOU AGREE THAT YOU'RE HEADING OUT TO THESE

2 WAVES THAT ARE 3 TO 4 FEET HIGH, CORRECT, WHEN HE'S OPERATING

3 THE BOAT, ISN'T THAT RIGHT?

4      A.   YES.

5      Q.   AND YOU DIDN'T HAVE ANY OBJECTION TO THAT?

6      A.   NO.

7      Q.   OVER THE COURSE OF YOUR CAREER AND YOUR TEACHING

8 AND SO FORTH, I MEAN, YOU'VE BEEN IN THE SAME CONDITIONS

9 PROBABLY THOUSANDS OF TIMES, ISN'T THAT CORRECT?

10      A.   YES, I DIDN'T MIND BEING OUT IN 3 TO 4 FOOT

11 CHOP.

12      Q.   SO THAT WAS A COMMON THING FOR YOU TO

13 PARTICIPATE IN, SO TO SPEAK, OR TO BE IN THE PRESENCE OF

14 WAVES OF THAT SIZE?

15      A.   YES, SIR.

16      Q.   YOU DIDN'T HAVE ANY OBJECTION TO HIS GOING OUT

17 THERE?

18           MR. WEEKS:  WHEN YOU'RE TALKING ABOUT OUT THERE,

19 WHAT ARE YOU REFERRING TO?

20      Q.   I'LL WITHDRAW THE QUESTION.  YOU DIDN'T HAVE ANY

21 PROBLEM WITH THE DIRECTION IN WHICH HE WAS OPERATING THE

22 BOAT?

23           MR. WEEKS:  AT WHAT POINT IN TIME?

24      Q.   AFTER IT WAS TURNED OVER TO JOHN HYDE?

25      A.   I'M NOT SURE I AM UNDERSTANDING THE SPECIFICS OF

212

1  WHAT YOU'RE ASKING ME.

2      Q.    YOU'VE ALREADY AGREED THAT YOU DIDN'T TELL HIM,

3  DON'T GO OUT IN THE INLET?

4      A.    THAT'S CORRECT.

5      Q.    SO YOU DIDN'T HAVE A PROBLEM WITH THE FACT THAT

6  HE WAS GOING OUT IN THE INLET?

7      A.    I DIDN'T KNOW HE WAS GOING OUT IN THE INLET,

8  THAT'S CORRECT.

9      Q.    WHEN DID YOU FIND OUT THAT HE WAS GOING IN THE

10  INLET?

11      A.    I DIDN'T REALIZE UNTIL HE TURNED AT A CERTAIN

12  POINT IN FRONT OF FORT MACON WHERE WE WERE, BECAUSE I WASN'T

13  WATCHING WHERE WE WERE.

14      Q.    SO WHEN YOU SAW HIM TURNING LEFT TO GO OUT TO

15  THE INLET, YOU KNEW HE WAS GOING OUT TO THE INLET, ISN'T THAT

16  CORRECT?

17      A.    YES.

18      Q.    ISN'T THAT CORRECT?

19      A.    YES.

20      Q.    YOU HAD NO OBJECTION TO IT?

21      A.    NO, IT HAPPENED SUDDENLY.

22      Q.    WELL, HOW MUCH TIME PASSED FROM THE TIME THAT

23  JOHN HYDE TOOK OVER THE OPERATING OF THE BOAT AND THE

24  ACCIDENT?

25      A.    I WOULD SAY, IF HE TOOK OVER THE BOAT IN

213

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

FRONT - HE TOOK OVER THE BOAT IN FRONT OF SHACKLEFORD BANKS

AND PROBABLY DROVE THE BOAT FOR LESS THAN FIVE MINUTES.

     Q.    DID YOU EVER - YOU HAD SAID SOMETHING IN THE

COMPLAINT ABOUT WHILE HE WAS IN SHACKLEFORD HE WAS DOING A

CERTAIN SPEED, DO YOU REMEMBER THAT?

     A.    NO, I DON'T REMEMBER THAT.

     Q.    WELL, DID YOU EVER SEE THE COMPLAINT, I'LL SHOW

YOU A COPY HERE.  TAKE A LOOK AT THAT AND SEE IF YOU'VE EVER

SEEN IT BEFORE?

     A.    DO YOU HAVE A PAGE YOU WANT ME TO LOOK AT

SPECIFICALLY, BECAUSE IT'LL TAKE ME A WHILE TO READ

SOMETHING.

     Q.    WHY DON'T YOU LOOK AT THE WHOLE THING.

     A.    (PAUSE - PERUSES DOCUMENT.)

     Q.    HAVE YOU SEE IT BEFORE?

     A.    YES, SIR.

     Q.    DID YOU SUPPLY ANY OF THE INFORMATION THAT'S IN

THERE?

     A.    YES, SIR.

     Q.    YOU WERE HERE YESTERDAY WHEN JOHN HYDE TESTIFIED

ABOUT THE ROUTE THAT HE TOOK AND IT'S ON EXHIBIT NUMBER [9],

I DON'T KNOW IF YOU CAN PAN OVER HERE, DO YOU REMEMBER HE

TESTIFIED ABOUT THE ROUTE THAT HE TOOK AND HE MARKED IT OUT

ON EXHIBIT [9]?

     A.    YES, SIR.

1    Q.   AM I CORRECT THAT HE PICKED YOU UP AT OLDE

2    TOWNE, ACTUALLY, HE CAME THIS GREEN ROUTE, IF YOU WILL, AND I

3    WON'T DESCRIBE THE ROUTE, BUT YOU CAN SEE IT, PICKED YOU UP

4    AT OLDE TOWNE AT YOUR DOCK, AND THEN THE RED SIGNIFIES THE

5    ROUTE THAT YOU-ALL TOOK, DO YOU AGREE THAT THAT'S THE ROUTE

6    YOU TOOK?

7        A.   I CAN'T SAY WHERE HE WAS.  I JUST KNOW THAT I

8    STARTED OUT DRIVING AT OLDE TOWNE DOCK.  I DON'T WHERE ALL HE

9    GOT THERE, BUT . . .

10       Q.   I'M ONLY ASKING YOU ABOUT . . .

11       A.   ASK ME AGAIN THEN, I'M SORRY.

12       Q.   SO HE PICKED YOU UP AT OLDE TOWNE, AND IF YOU

13   FOLLOW THIS RED ROUTE, YOU ENDED UP GOING THROUGH THE CHANNEL

14   AND UP BEHIND SHACKLEFORD ISLAND, IS THAT CORRECT?

15       A.   YES, SIR, THAT'S WHERE I WAS DRIVING, FROM THE

16   OLDE TOWNE YACHT CLUB FUEL DOCK TO BEHIND SHACKLEFORD BANKS.

17       Q.   SO THE DOTTED LINE SHOWS THE PATH . . .

18       A.   THAT I TOOK.

19       Q.   . . . THAT YOU WERE DRIVING, OPERATING THE BOAT?

20       A.   YES, SIR.

21       Q.   THEN THERE'S A CIRCLE AND A SOLID LINE THAT'S

22   HEADING OUT TOWARD THE INLET, AND THAT'S THE PATH THAT JOHN

23   HYDE TOOK AS HE WAS OPERATING THE BOAT, IS THAT CORRECT?

24       A.   NO, SIR.

25       Q.   TELL ME WHY IT'S NOT CORRECT?

215

Case 4:09-cv-00003-BR    Document 39-5    Filed 12/30/09    Page 19 of 32

1      A.   HIS PATH WAS NORTH, AND WENT ACROSS NORTH OF

2 THAT SOLID RED LINE, AND HIS PATH WAS ACROSS THE SHIP'S

3 CHANNEL, RATHER THAN ENDING IN THE MID CHANNEL.

4      Q.   I'M GOING TO ASK YOU, WITH THE YELLOW MARKER, IF

5 YOU COULD . . .

6      MR. WEEKS:  I'M GOING TO ASK THAT YOU NOT WRITE

7 ON THAT EXHIBIT, THAT WAS MY EXHIBIT.  YOU CAN DEMONSTRATE,

8 BUT DO NOT WRITE ON THAT EXHIBIT.

9      MR. JOHNSTON:  DON'T WE HAVE A MINIATURE?

10     MR. PION:  HE CAN ZOOM IN TIGHT, IF YOU WANT,

11 AND IF DOCTOR HINES DOESN'T MIND SHOWING US ON THE VIDEO THE

12 PATH THAT HE BELIEVES . . .

13     A.   CAN YOU GIVE ME THIS ONE FOR A MINUTE AND LET ME

14 LOOK AT THIS ONE SO I WON'T HAVE TO STAND THERE, BECAUSE I'M

15 NOT FEELING GOOD, AND I CAN KIND OF STUDY THIS ONE FOR A

16 SECOND BEFORE I STAND UP, BECAUSE IT'S HARD TO CONCENTRATE.

17     Q.   SURE.

18     A.   (PAUSE - PERUSES CHART) - DO YOU WANT ME TO KIND

19 OF POINT WITH A POINTER OR SOMETHING?

20     Q.   IF YOU COULD DO IT HERE, IF YOU COULD STAND UP,

21 AND WE CAN HAVE THE CAMERA . . .

22     A.   CAN I TAKE THIS MIKE OFF?

23     Q.   CAN YOU CARRY IT?

24     A.   OKAY.

25     Q.   WHAT WE'RE TALKING ABOUT, BEFORE YOU DO THIS,

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

WE'RE TALKING ABOUT THE ROUTE THAT JOHN HYDE TOOK, AND,

AGAIN, HE HAS NOTED IN RED, A SOLID LINE - A CIRCLE AND A

SOLID LINE, THE PATH THAT HE SAID HE TOOK, AND YOU SAY HE

TOOK A DIFFERENT ROUTE, I THINK?

     A.   RIGHT.

     Q.   OKAY.  SO MAYBE YOU COULD POINT TO WHERE HE TOOK

OVER THE OPERATION OF THE BOAT?

     A.   (INDICATING ON EXHIBIT.)

     Q.   DID HE TAKE OVER WHERE THE CIRCLE IS, ROUGHLY?

     A.   I WOULD SAY WE WERE DOWN CLOSER TO THE NUN, AND

I DON'T KNOW - THERE'S A JETTY OVER HERE - (INDICATING) - AND

I THINK HE TOOK OVER MORE HERE, BECAUSE I DROVE QUITE A BIT

IN HERE - (INDICATING) - TRYING TO SEE IF THE BOAT WOULD

HANDLE BETTER, AND THEN HE DROVE HERE ON PLANE, ACROSS HERE

NORTH, AND CAME ACROSS HERE - (INDICATING) - AND THIS IS

WHERE HE MADE HIS TURN HERE, AND THAT'S WHERE WE ENCOUNTERED

THE WAVE, IN HERE - (INDICATING.)

     Q.   SO WAS THAT IN THE INLET?

     A.   I'M SORRY, I'M DRAWING WITH PENCIL, I'M SCREWING

UP . . .

     Q.   THAT WAS IN THE INLET?

     A.   YES, THIS IS THE INLET VICINITY, RIGHT

HERE - (INDICATING).

     Q.   SO WHEN YOU SAY HE WAS ON PLANE, HOW FAST WAS HE

GOING, AND THAT WOULD HAVE BEEN BEHIND SHACKLEFORD ISLAND?

217

Case 4:09-cv-00003-BR   Document 39-5   Filed 12/30/09   Page 21 of 32

1    A.   HE GOT ON PLANE THERE, AND HE MADE THE TURN ON

2 PLANE HERE - (INDICATING) - AND THAT WAS TWENTY, TWENTY-FIVE

3 MILES AN HOUR AT LEAST.

4    Q.   HOW MANY TIMES DID YOU LOOK AT THE SPEEDOMETER,

5 IF THAT'S WHAT WAS PRESENT ON THE BOAT?

6    A.   I HAD NOTICED IT WHEN I WAS DRIVING, BECAUSE I

7 WAS TRYING TO SEE WHEN THE BOAT WOULD GET ON PLANE.

8    Q.   DID YOU GET IT UP TO TWENTY-FIVE TO THIRTY MILES

9 AN HOUR?

10    A.   I GOT IT UP TO PLANE, AND IT TOOK OVER TWENTY TO

11 GET THE BOAT ON PLANE, AND THAT'S IMPORTANT TO ME TO KNOW HOW

12 FAST YOU HAVE TO GO TO GET ON PLANE.

13    Q.   THAT WAS IN THE CALM WATER AT SHACKLEFORD,

14 CORRECT?

15    A.   NO, I DROVE NUMEROUS PLACES ON PLANE, OUT AT THE

16 WAKE ZONE, COMING AWAY FROM OLDE TOWNE, OUT TO WHERE IT

17 STARTED GETTING CHOPPY, OUT IN THE MIDDLE OF THE SOUND, TO

18 THE SHIP'S CHANNEL, AND THEN I SLOWED DOWN AND CAME OFF

19 PLANE, CROSSED ENOUGH TO WHERE I'M OUT OF THE TURMOIL, AND

20 THEN RIGHT BEFORE YOU GET BACK TO SHACKLEFORD, I GOT BACK ON

21 PLANE, AND THEN STAYED ON PLANE ALL BACK IN HERE TO SEE HOW

22 FAST IT TAKES TO GET ON PLANE.

23    Q.   BACK IN HERE MEANING, BEHIND SHACKLEFORD ISLAND?

24    A.   COME FURTHER WEST, ALL IN THERE I'M ON PLANE

25 COMING ALL THE WAY BACK.

218

Q.   THAT WAS - THERE WEREN'T WAVES 3 TO 4 FEET
THERE, WERE THERE?

A.   I DON'T RECALL. I WOULD TELL YOU THAT IF YOU'VE
GOT AN OPENING HERE - (INDICATING) - ALL OF THIS IS 3 TO 4,
ALL OF THIS IN HERE.  ANYTHING OPEN TO THE WIND AND THE
CURRENT COMING THIS WAY IS ALL GOING TO BE 3 TO 4.  YOU'RE
NOT PROTECTED UNTIL YOU'RE BACK IN HERE - (INDICATING) - AND
IF THE WIND WERE BLOWING THAT WAY THAT DAY, THAT WOULD BE
CHOPPY TOO.

Q.   WHAT'S YOUR CLAIM THAT JOHN HYDE DID WRONG?

A.   JOHN DROVE TOO FAST FOR THE CONDITIONS OVER THE
SHOAL, AND DROVE RIGHT PERPENDICULAR INTO THAT WAVE, AND
DIDN'T TELL US WHAT WAS HAPPENING AS HE SAW IT HAPPENING.

Q.   SO YOU WEREN'T EVEN LOOKING AHEAD THEN?

A.   NO, SIR, I WAS WATCHING HIM.  I FELT THE BOW
COME UP, LOOKED UP, IT WAS TOO LATE THEN.

Q.   WHAT ABOUT NEIL WAGONER, WAS HE LOOKING FORWARD?

A.   I DON'T KNOW WHAT NEIL WAS DOING.

Q.   DIDN'T NEIL, IN HIS STATEMENT, SAY THAT HE HAD
BEEN OUT IN THOSE SAME CONDITIONS NUMEROUS TIMES AND FELT
THERE WAS NO PROBLEM WITH OPERATING THE BOAT UNDER THOSE
CONDITIONS THE WAY JOHN HYDE DID, ISN'T THAT WHAT HE SAID?

A.   I DON'T REMEMBER WHAT HE SAID, BUT IF YOU'RE
QUOTING HIM, I'M SURE THAT HE DID SAY THAT.  BUT, AGAIN, I
DON'T AGREE WITH THAT STATEMENT IF HE SAID THAT.

219

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

Q.   SO YOU LAST LOOKED AT THE SPEEDOMETER AT WHAT
POINT IN TIME?

A.   I NOTICED THE SPEEDOMETER AS I DROVE THE BOAT,
SIMPLY TO SEE HOW FAST I HAD TO DRIVE THE BOAT TO GET IT UP
ON PLANE.

Q.   DID YOU EVER SEE THE SPEEDOMETER WHILE JOHN HYDE
WAS OPERATING THE BOAT?

A.   I DON'T RECALL LOOKING AT IT, I JUST KNEW WHAT
IT TOOK TO GET ME UP ON PLANE, AND I KNEW THAT WHEN WE WERE
ON PLANE, WE HAD TO BE GOING OVER TWENTY, TWENTY-FIVE MILES
AN HOUR, BECAUSE I COULD FEEL ACCELERATION RIGHT AS WE
LAUNCHED INTO THAT WAVE.  SO I KNOW WE WERE GOING OVER TWENTY
MILES AN HOUR, AND I WOULD GUESS, IN MY ESTIMATE, WE WERE
GOING TWENTY-FIVE MILES AN HOUR.

Q.   BUT YOU REALLY DON'T KNOW THAT, DO YOU?

A.   I CAN'T TELL YOU THE EXACT SPEED, NO, SIR.

Q.   HE COULD HAVE BEEN DOING FIFTEEN MILES AN HOUR?

A.   YOU COULDN'T GET ON PLANE AT FIFTEEN MILES AN
HOUR, THAT, I DO KNOW.

Q.   YOU MEAN IN THE SHOAL OR . . .

A.   NO, PERIOD.  YOU COULDN'T GET THAT BOAT ON PLANE
AT FIFTEEN MILES AN HOUR.

Q.   JOHN HYDE TESTIFIED THERE WERE THREE WAVES IN
SUCCESSION THAT YOU HIT PERPENDICULAR RIGHT BEFORE THE
ACCIDENT, IS THAT CORRECT?

220

1        A.   I ONLY CAN RECOUNT THAT ONE WAVE WE WENT OVER.

2        Q.   SO YOU THINK IT WAS JUST ONE WAVE THEN?

3        A.   NO, I CAN ONLY RECOUNT THAT ONE WAVE.

4        Q.   COULD JOHN HYDE SEE THAT WAVE COMING?

5        A.   WHEN I FELT THE BOW LIFT, I COULD SEE IT.  COULD

6 HE SEE IT AT THAT MOMENT, ABSOLUTELY.

7        Q.   HOW MUCH BEFORE HE . . .

8        A.   I HAVE NO IDEA.

9        Q.   MY QUESTION IS, HOW MUCH BEFORE HE HIT THAT WAVE

10 PERPENDICULARLY DID HE SEE IT, OR COULD HE HAVE SEEN IT?

11        A.   I CAN'T TELL YOU.

12        Q.   I MEAN, LIKE, ONE SECOND, THREE SECONDS?

13        A.   I DON'T KNOW BECAUSE I WASN'T LOOKING WHEN HE

14 WAS LOOKING THE WHOLE TIME TO DRIVE THE BOAT, OBVIOUSLY, THE

15 DRIVER'S LOOKING ALL THE TIME.  I'M NOT WATCHING HIM LOOK

16 STRAIGHT AHEAD, I'M LOOKING AT HOW HE'S DRIVING THE BOAT.

17 BUT WHEN I FELT THE BOAT LIFT UP, I SAW THE - IF YOU SAID,

18 HINES, WHERE DO YOU THINK THE WAVE WAS, I'M SURE IT WAS

19 LIFTING UP IN FRONT OF HIM FOR BOAT LENGTHS AHEAD OF THE

20 BOAT.

21        Q.   YOU WEREN'T SMASHING INTO WAVES BEFORE THAT,

22 THAT WAS THE FIRST ONE THAT YOU REALLY SMASHED INTO?

23        A.   I RECOUNT THAT ONE WAVE.

24        Q.   JUST ONE?

25        A.   JUST THAT ONE WAVE IS THE ONE I RECOUNT LIFTING

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    UP OVER.

2         Q.   SO YOU WEREN'T ON PLANE WHEN YOU HIT THAT ONE

3    WAVE?

4         A.   I'M SORRY?

5         Q.   YOU WERE NOT ON PLANE . . .

6         A.   NO, WE WERE ON PLANE.

7         Q.   SO YOU'RE SAYING THAT THE BOAT WAS SITTING RIGHT

8    ON TOP OF THAT WAVE, THE CREST OF THAT WAVE?

9         A.   OH, YES, WE WENT OVER THAT WAVE, DEFINITELY OVER

10   THAT WAVE.

11        Q.   BUT THERE WAS NO INDICATION BEFORE THAT THAT YOU

12   WERE GOING TO HIT A WAVE LIKE THAT ON PLANE?

13             MR. HARDEE:   OBJECTION.   YOU CAN ANSWER, BEN.

14        A.   ASK ME AGAIN?

15        Q.   THERE WAS NO NOTICE BEFORE YOU HIT THAT WAVE

16   THAT YOU HAD PLANED OVER THAT WAVE?

17             MR. HARDEE:   NOTICE TO WHOM?

18        Q.   NOTICE TO WHOEVER'S ON THE BOAT?

19             MR. HARDEE:   OBJECTION TO THE QUESTION, BUT YOU

20   MAY ANSWER, BEN.

21        A.   I STILL DON'T UNDERSTAND THE QUESTION, I'M

22   SORRY.

23        Q.   THAT'S FINE.

24        A.   DO IT ONE MORE TIME, I'LL TRY TO PAY ATTENTION.

25        Q.   THERE WAS NO WAY FOR JOHN HYDE TO KNOW THAT HE

222

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

WAS GOING TO GO ON PLANE ON THAT WAVE, WAS THERE?

        MR. HARDEE:  OBJECTION.  GO AHEAD.

    A.  WE WERE ON PLANE WHEN WE WENT OVER THE WAVE, AND THAT'S NOT ANSWERING YOUR QUESTION, I DON'T UNDERSTAND THE QUESTION, I'M GETTING CONFUSED.  YOU CAN ASK ME AGAIN, BECAUSE I'M NOT ANSWERING, FOR SOME REASON I DON'T UNDERSTAND IT.

    Q.  IF I UNDERSTAND YOU CORRECTLY, WHAT YOU'RE SAYING THAT JOHN HYDE DID WRONG, AND YOU CORRECT ME IF I'M WRONG, IS THAT HE WAS GOING TOO FAST AT THE TIME THIS INCIDENT OCCURRED?

    A.  YES, SIR.

    Q.  IS THAT IT?

    A.  YES, SIR.

    Q.  ANYTHING ELSE?

    A.  AND THE FACT THAT WE WERE GOING TOO FAST IN THAT SHOAL AREA, AND IN COMBINATION, THAT WE'RE HITTING A WAVE HEAD ON, ON PLANE.

    Q.  SO HOW ARE YOU SUPPOSED TO HIT A WAVE IF NOT HEAD ON?

    A.  AT AN ANGLE.

    Q.  SO HITTING A WAVE PERPENDICULAR IS NOT THE WAY TO DO IT?

    A.  NO, SIR.

    Q.  IS THAT WHAT YOU'RE SAYING?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

```
1        A.    YES, SIR.

2        Q.    SO HOW DO YOU HIT A WAVE THEN?

3        A.    AT AN ANGLE.

4        Q.    ALWAYS?

5        A.    YES.  NOT ALWAYS, NOT A 1 FOOT WAVE.

6        Q.    HOW HIGH OF A WAVE?

7        A.    A WAVE THAT WOULD CAUSE DISCOMFORT TO MY WIFE,

8   HIT IT AT AN ANGLE.

9        Q.    HAD YOU EVER DONE THAT IN THE PAST, OVER THE

10  YEARS?

11       A.    ALWAYS HIT THEM AT AN ANGLE WITH HER, YES.

12       Q.    WHAT ABOUT IF SHE'S NOT IN THE BOAT, YOU

13  DON'T . . .

14       A.    I USUALLY GO AT AN ANGLE.  I BOAT AS IF SHE'S IN

15  THE BOAT, BECAUSE I'M ON COUMADIN, I HAVE TO BOAT CAREFULLY.

16       Q.    WHAT DO YOU MEAN, YOU BOAT CAREFULLY BECAUSE

17  YOU'RE ON COUMADIN?

18       A.    I'M ON COUMADIN.

19       Q.    WHAT DOES THAT MEAN?

20       A.    I BOAT JUST LIKE I'D BOAT WITH HER IN THE BOAT,

21  ALL THE TIME.

22       Q.    I DON'T UNDERSTAND WHAT YOU MEAN, THAT YOU

23  BOAT . . .

24       A.    I'M ON COUMADIN, I'M ON A BLOOD THINNER, I'M NOT

25  GOING TO JUMP WAVES AND BE AIRBORNE VOLUNTARILY.
```

224

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    Q.   WHAT KIND OF SHOES WERE YOU WEARING THAT DAY?

2    A.   I BELIEVE THEY WERE THE BRAND THAT BEGINS WITH A

3 "T," LIKE HIKING BOOTS.

4    Q.   WERE THEY DOCKSIDERS, OR . . .

5    A.   THEY WERE MORE THAN THAT.  IN THE BACK OF MY

6 MIND THERE'S A BOOT THAT BEGINS WITH A "T."

7    Q.   TIMBERLAND?

8    A.   YES, LIKE TIMBERLAND.

9    Q.   HOW WAS NEIL WAGONER HOLDING ON RIGHT BEFORE THE

10 ACCIDENT?

11    A.   NEIL HAD MOVED TO BEHIND THE HELM.

12    Q.   COULD YOU HAVE HELD ON INSTEAD OF - I UNDERSTAND

13 YOU HAD BOTH HANDS ABOVE YOUR HEAD?

14    A.   THIS ARM WAS LIKE THIS, AND THIS ARM WAS LIKE

15 THIS - (INDICATING.)

16    Q.   SO YOUR LEFT ARM WAS LIKE STRAIGHT OUT, PARALLEL

17 WITH . . .

18    A.   I DON'T KNOW THAT IT WAS PARALLEL, BUT IT WAS

19 OUT MORE HORIZONTAL THAN VERTICAL, AND THE RIGHT ARM WAS MORE

20 VERTICAL, WAS VERTICAL, BASICALLY.

21    Q.   SO YOU'RE SAYING THE LEFT ARM WAS OUT IN FRONT

22 OF YOU?

23    A.   YES, YES.

24    Q.   AND THE RIGHT ARM WAS STRAIGHT UP, LIKE IF YOU

25 WERE RAISING YOUR HAND IN CLASS?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

A.   YES, SIR.

Q.   WHAT HAPPENED WHEN YOU HIT THE WAVE?

A.   WHEN WE WENT OFF THE WAVE, THE BOAT, ON MY SIDE, THAT I COULD SEE, WAS COMING OUT OF THE WATER.  THE BOW WAS ALREADY OVER THE WAVE AND OVER THE WATER, AND I REMEMBER, ABOUT THE LAST THING I REMEMBER, WAS STRIKING THE T-TOP WITH MY HEAD, NOW, WHERE, I DON'T KNOW AT ALL.  I REMEMBER HOLDING ON AND THEN HEARING, WHICH IS PROBABLY MAYBE NOT A REAL SOUND BUT A FEELING, A CRACK, AS I IMPACTED THE DECK, AND THEN FALLING TO THE DECK.

Q.   DID YOU EVER TELL JOHN HYDE THAT YOU THOUGHT HE WAS GOING TOO FAST?

A.   NO, SIR.  NO, I DID NOT.

Q.   WHY NOT?

A.   IT WAS HAPPENING TOO FAST, IT HAPPENED BEFORE I KNEW EVEN WHAT WAS HAPPENING.  WHEN I LOOKED UP, THE WAVE WAS ON US, HE MADE THE TURN, ACCELERATED, AND IT JUST HAPPENED SO FAST.

Q.   HOW LONG WAS HE TRAVELING AT THE SPEED THAT YOU SAID HE WAS PLANING, EVEN . . .

A.   WE WERE ON PLANE COMING ACROSS THE SHIP'S CHANNEL, SO I WOULD SAY WE WERE GOING AT LEAST TWENTY MILES AN HOUR AT THAT POINT IN TIME.  MY ESTIMATION, TO BE ON PLANE, AT LEAST TWENTY.  HE TURNS, AND ACCELERATES, AND WE'RE GOING TWENTY-FIVE MILES AN HOUR WHEN WE HIT THE WAVE, AND

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

WHAT WAS YOUR QUESTION, I'M SORRY?

Q. WELL, YOU SAID THAT HE WAS GOING TWENTY OR TWENTY-FIVE AND HE WAS PLANING?

A. RIGHT.

Q. DID YOU EVER SAY, HEY, JOHN, SLOW DOWN?

A. NO, WHEN HE MADE THAT TURN AND ACCELERATED, IT HAPPENED SO FAST . . .

Q. WHAT ABOUT BEFORE YOU MADE THE TURN?

A. NO. WHEN HE WAS TRAVELING ON PLANE, IT TOOK TWENTY TO STAY ON PLANE ACROSS THE CHANNEL, AND I'D REALLY DONE THE SAME THING, I DIDN'T FEEL IN PERIL THEN. THE ONLY TIME I FELT IN PERIL WAS WHEN HE TURNED, ACCELERATED IN THAT SHOAL AREA, SUDDENLY I FELT THE BOW LIFT UP. I DON'T MIND GETTING ON PLANE, THAT WASN'T THE PROBLEM.

Q. YOU MEAN IN THE SHOAL AREA?

A. NO. I DON'T MIND GETTING ON PLANE AS HE CROSSED THE SHIP'S CHANNEL, I HAD DONE THE SAME THING.

Q. SO TWENTY WAS OKAY THERE?

A. TWENTY WAS OKAY TO PUT THE BOAT ON PLANE, BECAUSE THAT'S WHAT CAUSED THE BOAT TO PORPOISE, AND I WANTED TO SEE WHAT WOULD MAYBE - WHAT WOULD STOP THE BOAT FROM PORPOISING, YOU HAVE TO GET THE BOAT ON PLANE TO STOP THE BOAT FROM PORPOISING. SO THE TWENTY WAS FINE, IT WAS THE TWENTY-FIVE OVER A WAVE IN THE SHOAL, PERPENDICULAR INTO THE WAVE, THAT WAS THE PROBLEM, IN MY ESTIMATION, MY OPINION,

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1  THAT LED TO THE DAMAGE.

2      Q.  SO WHAT SPACE OF TIME WAS THERE BETWEEN THE TIME

3  HE WAS AT TWENTY AND THE TIME YOU SAY YOU THINK HE WAS AT

4  TWENTY-FIVE?

5      A.  GOSH, IT SEEMED LIKE AN HOUR WHEN I SAW THE WAVE

6  AND WE LAUNCHED, BUT IT WAS PROBABLY, FROM THE TIME HE TURNED

7  AND ACCELERATED, IT WAS TWO SECONDS, BUT IT'S HARD FOR ME TO

8  KNOW.

9      Q.  DID YOU EVER TALK TO JOHN HYDE AFTER THE

10  ACCIDENT?

11      A.  NO, SIR.

12      Q.  OR ANYBODY AT BOATS UNLIMITED?

13      A.  NO, SIR.  CAN WE TAKE A QUICK BREAK.

14      MR. JOHNSTON:  YES.

15      (A BRIEF RECESS WAS TAKEN.)

16      Q.  HOW LONG WOULD YOU SAY THAT JOHN HYDE AND YOU

17  WERE TOGETHER ON THE DAY OF THE ACCIDENT, FROM THE TIME HE

18  PICKED YOU UP UNTIL THE ACCIDENT?

19      A.  AN HOUR AND A HALF, MAX.  YOU SAID UNTIL THE

20  ACCIDENT, I'M SORRY, YOU DON'T MEAN UNTIL THE AMBULANCE?

21      Q.  CORRECT.  WELL, EVEN THEN, LET'S EVEN INCLUDE

22  THAT?

23      A.  I WOULD SAY, IF HE GOT THERE - FOR SOME REASON I

24  THINK HE WAS LATE, SO IF HE GOT THERE AT 2:30, AN HOUR AND

25  FIFTEEN MINUTES.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570