# EXHIBIT G



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CIVIL ACTION NO. 4:09-CV-3-BR

BENJAMIN G. HINES, JR.,          )
                                 )
                PLAINTIFF,       )        D-E-P-O-S-I-T-I-O-N
                                 )
VS.                              )               OF
                                 )
TRIAD MARINE CENTER, INC., ET    )        DONALD W. DAVIS
AL,                              )
                                 )
                DEFENDANTS.      )
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
NOVEMBER 12, 2009, AT THE LAW OFFICES OF WHEATLY, WHEATLY,
WEEKS & LUPTON, P.A., 710 CEDAR STREET, BEAUFORT, NORTH
CAROLINA

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF   -    STEVENSON L. WEEKS, ESQ.

                         WHEATLY, WHEATLY, WEEKS & LUPTON, P.A.
                         ATTORNEYS AT LAW
                         710 CEDAR STREET
                         NEW BERN, NC   28516



FOR THE DEFENDANTS  -    J. LAWSON JOHNSTON, ESQ.

                         DICKIE, MCCAMEY & CHILCOTE, P.C.
                         ATTORNEYS AT LAW
                         TWO PPG PLACE, SUITE 400
                         PITTSBURGH, PA   15222



COURT REPORTER      -    SHERRY HOPKINS

---

COASTAL COURT-REPORTING AGENCY, INC.
P.O. BOX 788
NEWPORT, NORTH CAROLINA  28570
TEL: (252) 223-4045
FAX: (252) 223-3663

1    Q.   WOULD THEY TELL YOU WHAT KIND OF EVIDENCE THAT

2    YOU WOULD NEED IN ORDER TO DETERMINE THE OPERATION OF A

3    VESSEL, WHETHER IT WAS IN ACCORDANCE WITH STANDARD OF CARE OR

4    REGULATIONS OR INDUSTRY ACCEPTED PRINCIPLES?

5         A.   THEY HAVE A - PART OF THE COURSE OF STUDY IS

6    TAUGHT BY AN ADMIRALTY ATTORNEY, AND I'M SURE THAT'S

7    MENTIONED IN THE COURSE OF STUDY, BUT THAT'S DONE, NOT IN THE

8    MANUAL, BUT AT THE TRAINING SEMINARS.

9         Q.   IS THERE A PARTICULAR ATTORNEY THAT YOU RECALL

10   THAT GAVE THE COURSE?

11        A.   I HAVE HIS NAME AT HOME.

12        Q.   WHEN YOU MADE THESE OPINIONS IN THESE OTHER

13   CASES THAT THE OPERATOR OF THE BOAT WAS GOING TO FAST, I

14   THINK YOU SAID, FOR CONDITIONS AND FAILED TO KEEP A PROPER

15   LOOKOUT, ARE THERE ANY HARD AND FAST STANDARDS THAT YOU

16   RELIED UPON IN MAKING THOSE OPINIONS IN THOSE CASES?

17        A.   I DON'T UNDERSTAND HARD AND FAST STANDARD.

18        Q.   FOR EXAMPLE, IT'S EASY WHEN YOU HAVE AN OPERATOR

19 - OF A MOTOR VEHICLE AND THERE'S A SPEED LIMIT THAT SAYS 35

20   MILES PER HOUR AND YOU'RE DOING 40, YOU KNOW YOU'RE OVER THE

21   LIMIT, SO YOU CAN SAY THAT PERSON IS SPEEDING OR IN VIOLATION

22   OF THE SPEEDING LAWS.

23             IS THERE ANY SUCH THING IN BOATING?

24        A.   THE BOATING STANDARDS ARE RELYING MORE AND MORE

25   ON THE JUDGEMENT OF THE OPERATOR AND NOT - THERE WAS NO SPEED

43

LIMITS IN ANY OF THE CASES THAT I'M SPEAKING OF, THEY WERE
NOT IN A NO WAKE ZONE.  SO THEREFORE, IT'S MORE THE DUE CARE
FROM AN EXPERIENCED SEAMAN AND HOW A COMPETENT SEAMAN SHOULD
ACT UNDER SIMILAR CIRCUMSTANCES.

    Q.   WHAT KINDS OF INFORMATION DO YOU NEED IN ORDER
TO MAKE AN OPINION THAT SOMEONE IS GOING TOO FAST FOR
CONDITIONS?

    A.   WHAT HAPPENED DURING THE ACCIDENT.

    Q.   YES, WHAT KINDS OF INFORMATION . . .

    A.   THAT'S MY ANSWER, WHAT HAPPENED DURING THE
ACCIDENT.  THE SEA CONDITIONS AT THE TIME OF THE ACCIDENT,
THE SPEED OF THE VESSEL AT THE TIME OF THE ACCIDENT, IF THAT
CAN BE ASCERTAINED.

    Q.   IF IT CAN BE ASCERTAINED, IS THAT WHAT YOU SAID?

    A.   YES, SIR.  OF COURSE, THE FINAL RESULTS, AS I
SAID, ARE PARAMOUNT.

    Q.   WHAT DO YOU MEAN BY THAT?

    A.   IF YOU RUN A VESSEL INTO HEAVY WEATHER AND
SOMEONE IS THROWN FROM THE DECK, THEN TO ME, THAT TELLS ME
THAT SOMEONE DIDN'T DO WHAT THEY SHOULD HAVE DONE.

    Q.   IS THERE ANY OTHER INFORMATION THAT YOU NEED IN
ORDER TO MAKE YOUR OPINION THAT SOMEONE WAS GOING TOO FAST
FOR CONDITIONS?

    A.   THE VESSEL ITSELF, OF COURSE, IS IMPORTANT TO
EXAMINE.  SOME VESSELS - OF COURSE, SIZE, DESIGN, HAVE A LOT

44

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1   TO DO WITH WHETHER A VESSEL - SOME VESSELS CAN OPERATE IN

2   CERTAIN SEA CONDITIONS WHERE OTHER ONES CANNOT, THAT'S THE

3   BASICS, YES, SIR.

4         Q.   WOULD YOU SAY THAT IF SOMEONE WENT OVER A WAVE,

5   LIKE IN THESE SEVERAL CASES THAT YOU'VE REFERENCED, AND SOME

6   OF THEM THEN CAME DOWN OFF THE WAVE AND WAS INJURED, THAT THE

7   OPERATOR WAS NOT USING DUE CARE?

8         A.   YES, SIR.

9         Q.   WOULD YOU NEED ANY OTHER INFORMATION OR WOULD

10   THAT BASICALLY BE SUFFICIENT FOR YOU TO SAY THAT THE OPERATOR

11   WAS GOING TO FAST FOR CONDITIONS?

12         MR. WEEKS:  ARE YOU REFERRING TO THE FACTORS HE

13   ENUMERATED OR JUST THE FACT THAT . . .

14         MR. JOHNSTON:  I'M GOING TO WITHDRAW THAT LAST

15   QUESTION.

16         Q.   WHEN YOU INVESTIGATE - LET'S TAKE THESE CASES

17   THAT YOU'VE TOLD US ABOUT, NOT DOCTOR HINES' CASE, BUT THE

18   ONES WHERE PEOPLE WERE INJURED GOING OVER WAVES, WHAT WAS THE

19   PURPOSE FOR WHICH YOU WERE HIRED?

20         A.   TO EXAMINE THE EVIDENCE, AND TO PROVIDE AN

21   OPINION AS TO WHAT WAS THE CAUSE OF THE INJURIES.

22         Q.   SO YOU WERE PRETTY MUCH THEN, AT LEAST IN THOSE

23   KIND OF CASES, HIRED TO DETERMINE THE CAUSE OF THE INJURY?

24         A.   IF POSSIBLE, THE MARITIME SIDE OF IT, NOT

25   THE - WHETHER THEY HAVE A BROKEN LIMB OR THAT TYPE OF THING,

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1  THAT'S NOT MY AREA OF EXPERTISE, IT'S THE OPERATION OF THE

2  VESSEL.

3          Q.    RIGHT, YOU'RE NOT A MEDICAL DOCTOR OR ANYTHING?

4          A.    THAT'S CORRECT.

5          Q.    THAT'S WHAT YOU'RE SAYING?

6          A.    YES, SIR.

7          Q.    YOU'RE LOOKING TO FIND THE CAUSE OF THE

8  ACCIDENT?

9          A.    THAT'S CORRECT.

10         Q.    WHETHER IT'S BOATER OR OPERATOR ERROR OR

11 WHATEVER?

12         A.    CORRECT.

13         Q.    WITH REGARD TO GATHERING EVIDENCE, YOU SAID THAT

14 YOU NEED - AS PART OF YOUR INVESTIGATION, YOU WOULD FIND OUT

15 WHAT THE SEA CONDITIONS WERE?

16         A.    YES.

17         Q.    AND YOU WOULD DO THAT BY GETTING DOCUMENTS?

18         A.    YES.

19         Q.    ANY OTHER METHOD?

20         A.    NO.

21         Q.    JUST GETTING THE DOCUMENTS?

22         A.    YES.

23         Q.    THAT WOULD BE WEATHER REPORTS, TIDE REPORTS,

24 THAT SORT OF THING?

25         A.    YES, SIR.

46

Q.    THEN YOU SAID YOU WOULD DETERMINE THE SPEED OF
THE VESSEL IF POSSIBLE, CORRECT?

A.    YES.

Q.    HOW DO YOU DETERMINE THAT?

A.    IF THERE'S ANY WITNESSES TO THE SPEED, IF ANYONE
WILL TELL US WHAT THE SPEED WAS.  IN A CASE OF IT'S
ELECTRONICALLY RECORDED, THEN YOU WOULD LOOK AT THAT.

Q.    I UNDERSTAND, AND YOU CORRECT ME IF I'M WRONG,
IN DOCTOR HINES' CASE, THAT WAS NOT ELECTRONICALLY PRESERVED?

A.    NOT TO MY KNOWLEDGE.

Q.    SO YOU HAD TO RELY ON WITNESSES FOR SPEED?

A.    YES.

Q.    THE FINAL RESULT, YOU SAID YOU LOOK AT THAT, IF
IT'S HEAVY WEATHER AND SOMEONE IS HURT, THEN SOMEONE DID WHAT
THEY SHOULDN'T HAVE DONE?

A.    A GOOD CHANCE OF IT, YES, SIR.

Q.    MEANING THE OPERATOR?

A.    DID NOT SHOW DUE CARE, YES.

Q.    I THINK YOU SAID IF THAT DID HAPPEN, THEN THERE
WAS NO DUE CARE?

MR. WEEKS:  I'M GOING TO OBJECT TO THE FORM OF
THE QUESTION.

A.    I APPRECIATE THAT.  I'M GETTING A LITTLE
CONFUSED ON WHERE YOU'RE GOING WITH THIS.

MR. JOHNSTON:  LET ME WITHDRAW THAT QUESTION.

47

1  Q.  IF SOMEONE GOES OVER A WAVE, AS IN THOSE CASES

2  THAT YOU HANDLED THAT WE TALKED ABOUT, THE FACT THAT SOMEONE

3  CAME DOWN IN THE BOAT AND WAS INJURED, DOES THAT MEAN THAT

4  THE OPERATOR DID NOT USE DUE CARE?

5  A.  NOT ALWAYS, NO.

6  Q.  HOW DO YOU DETERMINE WHETHER THE OPERATOR USED

7  DUE CARE?

8  A.  WHAT WERE THE CONDITIONS PRIOR TO, WHAT WAS HIS

9  KNOWLEDGE OF THE CONDITIONS OR WAS IT SOME KIND OF ROGUE WAVE

10  THAT NO ONE COULD HAVE FORESEEN, WOULD BE AN EXAMPLE.

11  Q.  HOW DO YOU DETERMINE WHETHER THE OPERATOR KNEW

12  ABOUT THE CONDITIONS?

13  A.  HE SHOULD BE SEEING THOSE CONDITIONS.  ON A

14  CLEAR DAY WITH GOOD VISIBILITY, THEN HE SHOULD BE AWARE OF

15  WHAT'S IN FRONT OF HIM THAT HE'S APPROACHING.

16  Q.  UNLESS THERE'S A ROGUE WAVE?

17  A.  IT COULD BE A ROGUE WAVE, IT COULD BE AT NIGHT.

18  Q.  HOW DO YOU TELL THAT, I MEAN, HOW DO YOU

19  DETERMINE WHETHER THE OPERATOR KNEW OF THE CONDITIONS, LET'S

20  SAY, LIKE, A ROGUE WAVE, YOU'RE SAYING NOBODY COULD FORESEE

21  THAT, I GUESS?

22  MR. WEEKS:  I'M GOING TO OBJECT TO THE FORM OF

23  THE QUESTION.

24  MR. JOHNSTON:  I'LL WITHDRAW THE QUESTION.

25  Q.  WHEN YOU SAY A ROGUE WAVE, WHAT DO YOU MEAN BY

48

1    THAT?

2                MR. WEEKS:  I'M GOING TO OBJECT TO THE FORM OF

3    THE QUESTION.

4           Q.   WHAT'S A ROGUE WAVE?

5           A.   A ROGUE WAVE IS AN UNUSUALLY MOUNTAINOUS WAVE

6    THAT OCCURS IN MID OCEAN.

7           Q.   AN UNUSUALLY WHAT?

8           A.   MOUNTAINOUS.

9           Q.   I'M NOT SURE OF THAT WORD?

10          A.   IT'S THE THINGS THAT ARE REAL HIGH.

11          Q.   MOUNTAINOUS?

12          A.   MOUNTAINOUS, YES, SIR.

13          Q.   DO THEY OCCUR IN THE INLET?

14          A.   NO, SIR, IT'S TOO SHALLOW.

15          Q.   HOW DEEP DOES IT HAVE TO BE TO BE A ROGUE WAVE?

16          A.   THE LATEST DATA THAT'S AVAILABLE SAYS OFF THE

17   CONTINENTAL SHELF.

18          Q.   YOU DO LOOK AT THE FINAL RESULT, AND THAT HELPS

19   YOU DETERMINE WHETHER DUE CARE WAS USED?

20          A.   YES.

21          Q.   MEANING, IF THERE WAS AN INJURY, RIGHT, THAT'S

22   THE FINAL RESULT?

23          A.   IF THAT'S THE FINAL RESULT, YES, SIR, IT COULD

24   BE DAMAGE TO A VESSEL.

25          Q.   I'M JUST TALKING ABOUT PERSONAL INJURY CASES FOR

49

1   NOW.

2        A.   OKAY.

3        Q.   INSPECTING THE VESSEL, YOU MENTIONED THAT AS

4   ANOTHER THING YOU LOOK AT, WHAT MIGHT THAT TELL YOU?

5        A.   I DON'T KNOW WHAT YOU'RE SAYING.

6        Q.   WHEN WE TALKED ABOUT THE THINGS THAT YOU LOOK AT

7   WHEN YOU INVESTIGATE CASES, YOU GAVE FIVE PARTICULAR ITEMS,

8   ONE WAS WHAT HAPPENED, TWO WAS SEA CONDITIONS, THREE WAS

9   SPEED OF THE VESSEL, IF POSSIBLE, FOUR WAS THE FINAL RESULT,

10   AND FIVE WAS INSPECTING THE VESSEL?

11        A.   YES, SIR.

12        Q.   MY QUESTION IS, WHAT MIGHT THAT TELL YOU

13   RELATIVE TO THE ACCIDENT?

14        A.   AN EXAMPLE WOULD BE HANDHOLDS, WERE THERE

15   SUFFICIENT HANDHOLDS FOR THE PERSONS, SAY, IF WE'RE TALKING

16   PERSONAL INJURY, WAS THERE ADEQUATE SEATING AVAILABLE IN SOME

17   INSTANCES, WERE THE PEOPLE ON BOARD GIVEN SAFETY

18   INSTRUCTIONS, WOULD BE AN EXAMPLE OF SOMETHING THAT I WOULD

19   LOOK AT.

20        Q.   THE FIRST ONE YOU MENTIONED IN WHAT YOU WOULD

21   INVESTIGATE IS WHAT HAPPENED, HOW DO YOU DETERMINE THAT

22   NUMBER ONE ITEM THAT YOU GAVE AS TO WHAT HAPPENED, HOW DO YOU

23   DETERMINE THAT WHEN YOU INVESTIGATE?

24        A.   FROM ALL AVAILABLE DATA.

25        Q.   WHAT DATA MIGHT THAT BE?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1      A.   IT MIGHT BE WITNESSES, IT MIGHT BE REPORTS FROM

2  THE COAST GUARD, IT MIGHT BE REPORTS FROM THE WILDLIFE

3  OFFICERS, IT MIGHT BE DAMAGE TO THE VESSEL THAT YOU CAN

4  EXAMINE.

5      Q.   IN DOCTOR HINES' CASE, DID YOU INVESTIGATE THE

6  ACCIDENT?

7      A.   I ASSUME YOU'RE REFERRING TO WHAT MY ACTIONS

8  WERE IN REGARD, AND THAT WOULD BE AN INVESTIGATION, YES.

9      Q.   I MEAN, DID YOU CONSIDER THAT WAS AN

10 INVESTIGATION?

11     A.   YES.

12     Q.   AND YOU TOOK THE STEPS THAT YOU NORMALLY WOULD

13 TAKE?

14     A.   WITH THE AVAILABLE INFORMATION, YES, SIR.

15     Q.   SO YOU WOULD TRY TO GET WITNESS STATEMENTS?

16     A.   NO, SIR, I DIDN'T DO THAT.

17     Q.   IS THAT PART OF YOUR NORMAL INVESTIGATION?

18     A.   IT IS, FROM TIME TO TIME.  YOU ASKED ME FOR A

19 GENERALIZATION, AND THAT'S A GENERALIZATION, NOT ALWAYS DO

20 YOU DO ALL THE STEPS, NO, SIR.

21     Q.   WHEN DO YOU DETERMINE IF - IN WHAT KIND OF

22 SITUATION WOULD YOU DETERMINE WHETHER YOU WANTED TO GET

23 WITNESS STATEMENTS?

24     A.   I SPOKE TO THE ONE WITNESS THAT I HAD AVAILABLE

25 AND THAT, OF COURSE, WAS DOCTOR HINES.

51

1       Q.   I'M JUST ASKING GENERALLY NOW, YOU SAY THAT ONE

2  OF THE THINGS YOU - I GUESS YOU'D LIKE TO DO, AND CORRECT ME

3  IF I'M WRONG, IS YOU'D LIKE TO GET WITNESS STATEMENTS, IS

4  THAT CORRECT OR NOT?

5       A.   YES, I'D LIKE TO SEE THEM, BUT I DON'T TAKE THE

6  WITNESS STATEMENTS AS FAR AS WRITTEN RECORDED STATEMENTS, I'M

7  NOT A P.I.

8       Q.   I MEAN, IF THERE ARE WITNESSES, YOU'D LIKE TO

9  GET THEIR VIEW OR THEIR ACCOUNT?

10      A.   YES, SIR.

11      Q.   WHY DO YOU DO THAT?

12      A.   TO TRY TO GATHER ALL OF THE INFORMATION TO

13  DETERMINE WHAT THE CAUSE WAS.

14      Q.   IN DOCTOR HINES' CASE, DO YOU KNOW IF THERE WERE

15  ANY WITNESSES TO THE ACCIDENT OTHER THAN DOCTOR HINES?

16      A.   I UNDERSTAND THERE WERE TWO OTHER INDIVIDUALS ON

17  BOARD THE VESSEL.

18      Q.   DID YOU TRY TO GET INFORMATION OR ACCOUNTS AS TO

19  WHAT THEIR ACCOUNTS WERE?

20      A.   NO.

21      Q.   WHY NOT?

22      A.   I WASN'T ASKED TO.

23      Q.   WHAT WERE YOU ASKED?

24      A.   I WAS ASKED TO SPEAK TO DOCTOR HINES.

25      Q.   DID YOU THINK THAT THE INVESTIGATION WAS

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1  COMPLETE BY HAVING ONLY THE ACCOUNT OF ONE PERSON OUT OF THE
2  THREE PEOPLE PRESENT?
3      A.   THE FACT THAT OTHER PEOPLE WERE GOING TO SPEAK
4  TO THOSE PEOPLE AND THERE INFORMATION WOULD BE AVAILABLE TO
5  ME, THEN THAT WAS FINE WITH ME.
6      Q.   SAY THAT AGAIN, I DIDN'T UNDERSTAND THAT.
7      A.   THE FACT THAT SOMEONE ELSE WAS GOING TO GET THE
8  INFORMATION FROM THE OTHER WITNESSES AND THEN THAT
9  INFORMATION, I WOULD BE MADE PRIVY TO IT, THEN THAT WAS OKAY.
10     Q.   DID YOU EVER GET THAT INFORMATION?
11     A.   I DON'T THINK SO.
12     Q.   WHO WAS GOING TO GET THE INFORMATION FROM THE
13 OTHER TWO WITNESSES AND GIVE IT TO YOU?
14     A.   I KNOW MISTER HARDEE WAS ATTEMPTING TO WHEN HE
15 ASKED ME TO SPEAK TO DOCTOR HINES.
16     Q.   SO THE FACT THAT YOU DIDN'T GET THE ACCOUNT OF
17 THE OTHER TWO PEOPLE ON BOARD, OTHER THAN DOCTOR HINES, WOULD
18 YOU SAY YOUR INVESTIGATION WAS NOT COMPLETE?
19     A.   NO.
20     Q.   WHAT MAKES IT COMPLETE?
21     A.   I BELIEVE DOCTOR HINES, HIS ACCOUNTS, THE
22 PHYSICAL EVIDENCE, THE WEATHER REPORTS, THE OTHER THINGS I
23 LOOKED AT, I FIND NO INCONSISTENCIES OR ANYTHING THAT WOULD
24 MAKE ME THINK ANYTHING OTHER THAN WHAT I HAVE BEEN TOLD.
25     Q.   I'D LIKE YOU TO, IF YOU WOULD, TELL ME

53

EVERYTHING THAT DOCTOR HINES TOLD YOU ABOUT THE ACCIDENT, I

KNOW YOU DON'T HAVE NOTES, SO WE CAN'T LOOK AT THAT, BUT I'D

LIKE TO KNOW EVERYTHING THAT HE TOLD YOU?

A.    TO THE BEST OF MY RECOLLECTION, DOCTOR HINES

TOLD ME THAT ON THE 21ST OF MARCH OF 2006, IN THE AFTERNOON,

SOMEWHERES AROUND 1600, THAT HE WAS ON BOARD A TRITON CENTER

CONSOLE VESSEL THAT HE WAS THINKING ABOUT PURCHASING, THAT ON

BOARD THAT VESSEL WAS A GENTLEMAN FROM THE DEALERSHIP WHO WAS

DEMONSTRATING THE VESSEL FOR HIM, AND THERE WAS ANOTHER

GENTLEMAN ON BOARD WHO WAS AN ACQUAINTANCE OF HIS THAT LIVED

IN THE SAME CONDOS.  THAT THEY LEFT THE PIER AT OLDE TOWNE,

PROCEEDING OUT OF THE BULKHEAD CHANNEL INTO THE AREA OF THE

MOREHEAD CITY SHIP CHANNEL.

Q.    CAN I STOP YOU FOR A SECOND, THEY CAME OUT OF

THE BULKHEAD CHANNEL?

A.    YES, SIR.

Q.    AND THEN WHERE?

A.    PROCEEDED INTO THE MOREHEAD CITY SHIP CHANNEL.

Q.    DO YOU HAVE ANY - I THINK WE CAN LOOK AT THE

DOCUMENTS YOU BROUGHT, CAN'T WE?

A.    SURE.

MR. WEEKS:  WHY DON'T YOU JUST LET HIM ANSWER

THE QUESTION?

Q.    GO AHEAD, I INTERRUPTED YOU, I'M SORRY?

A.    THEY TURNED IN A GENERALLY EASTERLY DIRECTION

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1  AND PROCEEDED BEHIND SHACKLEFORD BANKS. SOMEWHERE IN THAT

2  PROCESS DOCTOR HINES WAS GIVEN THE CONTROLS OF THE VESSEL

3  BEHIND SHACKLEFORD BANKS, NEAR THE WEST END OF SHACKLEFORD

4  BANKS, HE MANEUVERED THE VESSEL, STEERED THE VESSEL, OPERATED

5  THE THROTTLE AND TRIM ON THE VESSEL, HAD SOME QUESTIONS ABOUT

6  THE WAY THE VESSEL WAS HANDLING. HE HAD TOLD ME, HIS WORDS

7  WERE PORPOISING, THE VESSEL WANTED TO PORPOISE AND HE DIDN'T

8  KNOW WHY.

9         THE INDIVIDUAL FROM THE DEALERSHIP TOOK THE

10 CONTROLS OF THE VESSEL, HEADED IN A GENERALLY WESTERLY

11 DIRECTION BACK INTO THE SHIP'S CHANNEL AT THE CUTOFF, TURNED

12 THE VESSEL TO THE SOUTH, PROCEEDING INTO THE AREA OF BEAUFORT

13 INLET ON THE WESTERN SIDE, ENCOUNTERED WAVES AT LEAST 4 FEET

14 HIGH AT A SPEED OF 20 KNOTS OR GREATER. THE VESSEL WAS

15 THROWN INTO THE AIR, HE WAS THROWN OFF OF HIS FEET, AND WHEN

16 HE MET THE VESSEL COMING BACK UP ON THE NEXT WAVE, IT CRUSHED

17 HIS ANKLE AND HE FELL TO THE FLOOR OF THE VESSEL, AND FROM

18 THERE HE WAS TAKEN BACK TO THE CONDO AND TAKEN TO THE

19 HOSPITAL.

20         Q.   IS THAT IT OR IS THERE MORE?

21         A.   THAT'S IT.

22         Q.   CAN YOU REPEAT THE PART WHERE YOU SAID ABOUT THE

23 4 FOOT WAVE, I DON'T KNOW IF YOU SAID WAVE OR WAVES?

24         A.   THEY RAN INTO WAVES WHICH WERE 4 FEET HIGH OR

25 GREATER.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    Q.   IS THAT WHAT HE TOLD YOU?

2    A.   YES.

3    Q.   HE DIDN'T TELL YOU 3 TO 4 FEET?

4    A.   NOT TO MY RECOLLECTION.

5    Q.   WHAT DID THE DOCUMENTS SHOW THAT YOU REVIEWED IN

6    TERMS OF THE SIZE OF THE WAVES?

7    A.   THEY WERE RUNNING AT LEAST 4 FEET.

8    Q.   SO THAT'S ALL HE TOLD YOU AND NOTHING MORE?

9    A.   YES.

10   Q.   HE DIDN'T TELL YOU - HOW FAST WOULD 20 KNOTS BE,

11   HOW MANY MILES PER HOUR?

12   A.   I'D HAVE TO CALCULATE IT FOR YOU, SIR.

13   Q.   WHAT DID YOU SAY WAS 20 KNOTS, WHAT WERE YOU

14   REFERRING TO WHEN YOU SAID 20 KNOTS?

15   A.   THAT'S HOW FAST THE VESSEL WAS TRAVELING.

16   Q.   DO YOU HAVE AN APPROXIMATION OF HOW FAST THAT

17   WOULD BE IN MILES PER HOUR?

18   A.   I'D HAVE TO CALCULATE IT.

19   Q.   HOW LONG WOULD IT TAKE YOU?

20        MR. WEEKS:  GIVE ME A SECOND, 23.

21   A.   23 MILES PER HOUR.

22   Q.   OBVIOUSLY, I MEAN, I TAKE IT THAT YOU BELIEVED

23   EVERYTHING THAT DOCTOR HINES TOLD YOU?

24   A.   YES.

25   Q.   WAS THERE ANYTHING THAT SUPPORTED - STRIKE THAT.

56

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1  WHEN YOU WROTE YOUR REPORT, WHAT INFORMATION DID YOU HAVE, IF

2  ANYTHING, OTHER THAN DOCTOR HINES' STATEMENT?

3       A.   I REVIEWED THE NOAA CHARTS OF THE AREA OF THE

4  ACCIDENT, THAT WOULD BE 11547 AND 11545.  I HAD REVIEWED THE

5  NAVIGATION RULES, WHICH WAS COMMANDANT'S INSTRUCTION

6  M16672.2D, I HAD THE VERBAL INTERVIEW WITH DOCTOR HINES,

7  WHICH WE JUST SPOKE ABOUT.  I LOOKED AT THE NOAA TIDE AND

8  CURRENT INFORMATION FOR BEAUFORT INLET NEAR FORT MACON FOR

9  THAT DATE, I LOOKED AT THE NOAA WEATHER DATA FOR THE

10 RECORDING STATION AT CAPE LOOKOUT FOR THAT DATE, I LOOKED AT

11 THE NOAA WEATHER DATA FOR THE STATION BUOY CLOSEST TO THE

12 AREA OF THE ACCIDENT FOR THAT DATE, AND I INSPECTED THE

13 VESSEL INVOLVED.

14      Q.   ALL OF THOSE THINGS ARE WHAT YOU HAD WHEN YOU

15 WROTE YOUR REPORT?

16      A.   YES.

17      Q.   YOU SUBMITTED THIS TO MISTER HARDEE OR DOCTOR

18 HINES' COUNSEL ON OR ABOUT NOVEMBER 24, 2008, CORRECT?

19      A.   YES.

20      Q.   IN THE TEACHING THAT YOU DID FOR INVESTIGATIONS,

21 WOULD YOU HAVE INSTRUCTED YOUR PUPILS OR WHOEVER WAS

22 ATTENDING THE COURSE, THAT I THINK YOU SAID YOU DID TWO TIMES

23 FOR THE BOAT AND YACHT COUNCIL, WOULD YOU INSTRUCT THEM TO

24 GATHER THE ACCOUNTS OF WITNESSES TO AN ACCIDENT?

25      A.   NO.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

```
1    Q.   YOU WOULD NOT?

2    A.   NOT IN THAT COURSE, NO.

3    Q.   WHY NOT, IT JUST WASN'T APPROPRIATE FOR THE

4  COURSE?

5    A.   IT WASN'T APPROPRIATE FOR THAT COURSE, WE WERE

6  BASICALLY LOOKING AT THE STRUCTURE.

7    Q.   IF YOU WERE TEACHING A COURSE - WOULD YOU BE

8  QUALIFIED TO TEACH SUCH A COURSE OF ACCIDENT INVESTIGATION

9  THEN OR NO?

10   A.   PROBABLY.

11   Q.   PROBABLY?

12   A.   YES.

13   Q.   WOULD YOU INSTRUCT THAT INDIVIDUALS SHOULD

14  OBTAIN ALL STATEMENTS, ALL ACCOUNTS OF WITNESSES?

15   A.   THAT THEY COULD AT THE TIME, YES, SIR.

16   Q.   WHAT DO YOU MEAN, THAT THEY COULD AT THE TIME?

17   A.   SOME THINGS AREN'T AVAILABLE.  I REMEMBER MISTER

18  HARDEE WAS TRYING TO FIND THE OPERATOR OF THE VESSEL AND NO

19  ONE COULD FIND HIM.  IT'S KIND OF HARD TO GET A STATEMENT

20  FROM HIM WHEN HE'S NOT AVAILABLE.

21   Q.   IF HE HAD GIVEN A STATEMENT, WOULD YOU HAVE

22  ENTERTAINED THAT STATEMENT?

23   A.   SURE.

24   Q.   LET'S ASSUME, JUST HYPOTHETICALLY, LET'S SAY

25  THAT YOU DID NOT HAVE A STATEMENT FROM DOCTOR HINES BUT YOU
```

58

HAD ONE FROM HIS FRIEND NEIL WAGONER, HE WAS THE NEIGHBOR AND
FRIEND OF DOCTOR HINES, ASSUME HE GAVE A STATEMENT AND HE
SAID THAT THE OPERATOR OF THE BOAT WAS OPERATING THE BOAT
PROPERLY AND DID NOTHING WRONG, AND WAS NOT AT FAULT, THAT'S
THE STATEMENT THAT YOU HAD, WHAT WOULD YOUR OPINION BE IN
THAT SITUATION?

A.   I WOULD TAKE THAT UNDER - SURE, I WOULD LISTEN
TO HIM AND I WOULD TAKE WHAT HE SAID AT FACE VALUE, AND THEN
AS MY INVESTIGATION INTO THE PHYSICAL EVIDENCE, I.E., THE
WEATHER, THE CONDITIONS, WHAT WAS GOING ON, I WOULD THEN
JUDGE THAT AGAINST WHAT HE HAD SAID.

Q.   LET'S SAY THAT EVERYTHING'S THE SAME IN YOUR
INVESTIGATION EXCEPT YOU DON'T HAVE DOCTOR HINES' STATEMENT,
BUT YOU HAVE NEIL WAGONER'S STATEMENT?

A.   I DON'T HAVE HIS STATEMENT.

Q.   I KNOW YOU DON'T, BUT I'M ASKING YOU TO ASSUME.

A.   THAT'S HARD.

Q.   WELL, I'M ASKING YOU TO DO IT AS AN EXPERT,
BECAUSE I'M SURE THAT YOU EVALUATE STATEMENTS?

A.   NOT THAT I HAVEN'T SEEN.  I CAN'T EVALUATE
SOMETHING THAT I HAVEN'T SEEN.

Q.   I UNDERSTAND THAT, BUT I'M ASKING YOU THE
QUESTION THAT IF YOU HAD - THE ONLY THING THAT WAS DIFFERENT
IN YOUR INVESTIGATION IS YOU DON'T HAVE DOCTOR HINES'
STATEMENT, BUT YOU HAVE A STATEMENT FROM NEIL WAGONER, AND

59

1    HIS STATEMENT IS AS I JUST SAID . . .

2                MR. WEEKS:  IS THAT HIS STATEMENTS OR HIS

3    CONCLUSIONS?

4                MR. JOHNSTON:  HIS STATEMENT, THAT'S WHAT HE

5    SAID.

6         A.   WHAT DID HE SAY.  I DON'T MEAN TO ASK YOU A

7    QUESTION, BUT . . .

8         Q.   THAT'S FINE.  I'M ASKING YOU TO ASSUME THAT NEIL

9    WAGONER SAID THAT THE CONDITIONS THAT DAY WERE NOT UNUSUAL

10   AND THAT THE OPERATOR OF THE BOAT DIDN'T DO ANYTHING WRONG,

11   IT WAS JUST A FREAK ACCIDENT, AND THAT'S THE STATEMENT YOU

12   HAD, EVERYTHING ELSE IS THE SAME, WHAT WOULD YOUR OPINION BE?

13        A.   THE SAME AS IT IS NOW.

14        Q.   THE SAME?

15        A.   YES.

16        Q.   WITHOUT DOCTOR HINES' STATEMENT?

17        A.   CORRECT.

18        Q.   WHY IS THAT?

19        A.   BECAUSE THE PHYSICAL EVIDENCE, I.E., THE WEATHER

20   CONDITIONS, THE SEA CONDITIONS, THE ACCIDENT AS IT OCCURRED,

21   WHETHER DOCTOR HINES TOLD ME OR NOT, IT'S A FACT OF HIS

22   INJURY, THEN SOMEONE DID NOT SHOW DUE CARE.  SO MISTER

23   WAGONER'S STATEMENT, THEREFORE, IN MY OPINION, WOULD NOT BE

24   CREDIBLE.

25        Q.   YOU'RE BASING IT ON THE WEATHER, LET'S GO

                              60

1 THROUGH THOSE FACTORS, THE WEATHER?

2       A.   YES, SIR.

3       Q.   WHAT WAS IT ABOUT THE WEATHER THAT WOULD STILL

4 MAKE . . .

5       A.   THEY HAD SMALL CRAFT WARNINGS.

6       Q.   IS THAT SHOWN IN THE DOCUMENTS YOU HAVE, THE

7 SMALL CRAFT WARNING?

8       A.   THE SEA CONDITIONS ARE THERE, YES, SIR.

9       Q.   DOES IT SAY SMALL CRAFT WARNING?

10       A.   I DON'T THINK THEY SAY SMALL CRAFT WARNINGS, NO,

11 SIR.

12       Q.   WHAT DID THE SMALL CRAFT WARNING MEAN TO YOU?

13       A.   IT MEANT THAT YOU'RE GOING TO HAVE WINDS FROM AT

14 LEAST 21 TO UP INTO 38 MILES PER HOUR.

15       Q.   DIDN'T THE REPORT SHOW THAT THEY WERE 14 TO 16

16 MILES PER HOUR?

17       A.   NO.

18       Q.   WHAT WERE THEY?

19       A.   THEY WERE OVER 20.

20       Q.   IS THAT SOMETHING THAT THE PEOPLE ON THE BOAT

21 WOULD SEE AS THEY WERE GOING ON THE BOAT?

22       A.   YES.

23       Q.   DID DOCTOR HINES SEE THAT?

24       A.   I DON'T KNOW THAT.

25       Q.   DID HE SEE THE SEA CONDITIONS?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1      A.   I'M SURE HE DID.

2      Q.   WHAT SHOULD HE HAVE DONE IF HE SAW THOSE SEA

3    CONDITIONS?

4      A.   HOLD ON.

5      Q.   OR SHOULD HE SAY, LET'S GET OUT OF HERE, TURN

6    AROUND?

7      A.   HE COULD HAVE SAID THAT, BUT HE'S NOT RUNNING

8    THE BOAT.  HE'S IN THE CONTROL OF THE MASTER OF THE VESSEL.

9      Q.   IS HE NOT AN EXPERIENCED BOATER?

10     A.   HE'S AN AMATEUR, HE'S A RECREATIONAL BOATER.

11   THIS GUY HAD A LICENSE, HE SHOULD HAVE KNOWN BETTER.

12     Q.   SO YOU'RE SAYING THAT THE WEATHER REPORT WAS

13   BAD, THAT THEY SHOULDN'T HAVE GONE OUT IN THAT?

14     A.   I WOULDN'T HAVE PROCEEDED IN THE INLET AT THE

15   SPEED APPARENTLY THEY WERE TRAVELING.  FROM THE WAY THE

16   ACCIDENT OCCURRED, THE INJURIES THAT I'VE SEEN, KNOWING WHAT

17   THE SEAS WERE COMING IN THE INLET, THE CURRENT, ALL OF THOSE

18   FACTORS IN MY MIND, THAT MAN SHOULD HAVE NEVER HEADED THROUGH

19   THAT INLET AT THAT SPEED.

20     Q.   THE SPEED, ASSUMING THAT THIS NEIL WAGONER SAID

21   THE OPERATOR OF THE BOAT DID NOTHING WRONG, SPEED INCLUDED,

22   AND YOU DIDN'T HAVE DOCTOR HINES' STATEMENT, WOULDN'T YOU

23   CONCLUDE THAT HE WASN'T DOING AN INADEQUATE SPEED OR AN

24   INAPPROPRIATE SPEED?

25     A.   NO, SIR.  I JUST SAID A FEW MINUTES AGO THAT I

62

1   WOULD HAVE CONSIDERED MISTER WAGONER'S STATEMENT.  I WOULD

2   HAVE TAKEN THAT AS NOT VERY CORRECT.

3          Q.   THAT WOULD BE BASED ON THE FACT - JUST THE

4   WEATHER REPORT?

5          A.   THE WEATHER REPORTS, THE CURRENTS, MY KNOWLEDGE

6   OF THAT INLET IN THOSE CONDITIONS.

7          Q.   WASN'T THE CURRENT GOING OUT?

8          A.   YES, SIR.

9          Q.   THE TIDE WAS GOING OUT?

10         A.   YES, SIR.

11         Q.   AND THE WIND WAS GOING IN THE SAME DIRECTION?

12         A.   IT HAD ONLY SHIFTED AN HOUR BEFORE, THAT'S

13  CORRECT.

14         Q.   SO THAT WOULD BE LESS CHOPPY CONDITIONS THAN IF

15  THEY WERE OPPOSING EACH OTHER?

16         A.   NO, IT WOULDN'T.

17         Q.   NO?

18         A.   NO.

19         Q.   WOULD IT BE MORE CHOPPY?

20         A.   IT WOULD MAKE MORE CHOP, BECAUSE THE SEA WAS

21  RUNNING AGAINST THE WIND AND AGAINST THE CURRENT.

22         Q.   SO WHEN YOU'RE SAYING HE WENT TOO FAST FOR

23  CONDITIONS OR WAS GOING TO FAST, YOU'RE BASING THAT ON THE

24  SEA CONDITIONS?

25         A.    YES, SIR, AND MY KNOWLEDGE OF THAT INLET IN

63

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

THOSE CONDITIONS.

Q.   IF THE OPERATOR SAID HE WAS GOING 15 MILES PER HOUR, YOU WOULD DISREGARD THAT?

A.   IT MAY HAVE BEEN TOO MUCH FOR THOSE CONDITIONS.

Q.   BUT WOULD YOU CONSIDER THAT IF HE SAID HE WAS ONLY GOING 15 MILES PER HOUR, WOULD YOU TAKE THAT INTO ACCOUNT?

A.   I WOULD LISTEN TO HIM, SURE.

Q.   WOULD YOU BELIEVE IT?

A.   POSSIBLY, BUT IT WOULD BE HARD TO.

Q.   WHY IS THAT?

A.   BECAUSE OF THE WAY THE ACCIDENT OCCURRED.

Q.   WHAT DO YOU MEAN BY THAT?

A.   TO DRIVE THIS VESSEL INTO THAT SEA, TO THROW THE VESSEL IN THE AIR THE WAY IT APPARENTLY DID TO INJURE DOCTOR HINES THE WAY HE WAS INJURED, I WOULD THINK THAT WE'D HAVE A GREATER SPEED.

Q.   HOW FAR INTO THE AIR WAS IT?

A.   HIGH ENOUGH TO EJECT HIM FROM THE DECK TO WHERE HE CAME DOWN AND CRUSHED HIS ANKLE.

Q.   SO ARE YOU SAYING THAT IF THE GUY - IF HE'S INJURED, THAT THERE'S SOME INAPPROPRIATE CONDUCT ON BEHALF OF THE OPERATOR?

MR. WEEKS:   OBJECTION TO THE FORM OF THE QUESTION, THAT IS NOT WHAT HE SAID.  HE SAID THERE WAS

64

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1     NUMEROUS FACTORS INVOLVED.

2            MR. JOHNSTON:  I DON'T WANT YOU TO GIVE . . .

3            MR. WEEKS:  YOU KEEP PLAYING THIS GAME, YOU WANT

4     TO COME BACK AND SAY THIS ONE THING.

5            MR. JOHNSTON:  YOU CAN OBJECT.

6            MR. WEEKS:  I'VE OBJECTED, YOU'VE ASKED THE SAME

7     THING OVER AND OVER.  HE'S TOLD YOU THERE WERE NUMEROUS

8     FACTORS.

9            MR. JOHNSTON:  YOU'RE ANSWERING FOR HIM.

10           MR. WEEKS:  I DON'T HAVE TO ANSWER FOR HIM.

11        Q.  I'M ASKING HIM THE QUESTION, THE FACT THAT THIS

12     MAN WAS INJURED AND THAT HE CAME DOWN OVER A WAVE, IS THAT

13     SUFFICIENT FOR YOU TO SAY THAT THE BOAT OPERATOR WAS GOING

14     TOO FAST FOR CONDITIONS?

15        A.  IT'S A FACTOR.

16        Q.  IS THAT SUFFICIENT IN AND OF ITSELF?

17        A.  IT'S A FACTOR.  I ANSWERED YOU EARLIER THAT IT

18     COULD BE A ROGUE WAVE AT SEA AND IT WOULDN'T NECESSARILY MEAN

19     THE OPERATOR DIDN'T SHOW DUE CARE.  IN THIS CASE, IT'S MY

20     OPINION HE DID NOT SHOW DUE CARE IN THE CONDITIONS THAT WERE

21     IN THE INLET AT THE TIME OF THIS ACCIDENT, AND THIS INJURY IS

22     THE RESULT OF THAT, THAT IS MY OPINION.

23        Q.  HOW FAST DO YOU THINK HE WAS GOING?

24        A.  I DON'T KNOW.

25        Q.  WHAT WOULD BE . . .

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

```
 1          A.   CAN I GO BACK TO DOCTOR HINES AGAIN, HE SAYS THE
 2    BOAT WAS GOING OVER 20.   HE SAID THE BOAT WOULD NOT PLANE
 3    UNTIL IT WENT 20 AND HE SAID HE SAW THE SPEEDOMETER, AND THE
 4    VESSEL WAS GOING GREATER THAN 20.
 5          Q.   WASN'T THAT BACK AT SHACKLEFORD WHERE HE SAID HE
 6    WAS GOING 20?
 7          A.   THE LAST TIME HE SAW IT, YES, SIR.   HE DIDN'T
 8    TELL ME THE MAN SLOWED DOWN, SO THAT'S THE ONLY INFORMATION I
 9    HAVE.
10          Q.   DID YOU ASSUME HE DIDN'T SLOW DOWN?
11          A.   I MADE NO ASSUMPTION.
12          Q.   IF HE WERE DOING 15 MILES PER HOUR . . .
13          A.   THAT STILL COULD BE TOO GREAT.
14          Q.   IT COULD BE?
15          A.   YES, SIR.
16          Q.   IT MIGHT OR MIGHT NOT BE?
17          A.   YES, SIR.
18          Q.   IN REACHING YOUR OPINION THAT HE WAS GOING TOO
19    FAST, YOU RELIED UPON DOCTOR HINES' STATEMENT THAT HE WAS
20    DOING 20, GREATER THAN 20 KNOTS?
21          A.   AND WHAT YOU JUST SAID, IT COULD HAVE BEEN LESS
22    THAN THAT, BUT THE SEA CONDITIONS WERE SUCH THAT HE SHOULD
23    NOT HAVE PROCEEDED, WHICHEVER OR WHATEVER SPEED HE ENTERED
24    THAT INLET WAS TOO GREAT.
25          Q.   SO YOU'RE SAYING THAT WITH THE CONDITIONS OF THE
```

66

1 INLET, HE SHOULDN'T HAVE BEEN THERE PERIOD, NO MATTER WHAT

2 SPEED HE WAS TRAVELING?

3     A.   I DID NOT.

4     Q.   I'M ASKING YOU?

5     A.   NO, HE COULD HAVE GONE THROUGH THAT INLET AT A

6 SLOWER SPEED, YES, SIR.

7     Q.   WHAT SPEED?

8     A.   IDLE.

9     Q.   HOW FAST WOULD THAT BE?

10     A.   I DON'T KNOW WHAT THAT BOAT IDLES.  AT A SLOW

11 SPEED, AT A PRUDENT SPEED FOR THE EXISTING CONDITIONS.

12     Q.   LET ME ASK YOU TO ASSUME YOU HAVE TWO PIECES OF

13 EVIDENCE THAT ARE DIFFERENT, LET'S SAY YOU DON'T HAVE DOCTOR

14 HINES' STATEMENT BUT EVERYTHING ELSE IS THE SAME.  ONE PIECE

15 OF EVIDENCE IS ABOUT NEIL WAGONER'S STATEMENT THAT I

16 MENTIONED TO YOU BEFORE, IN ADDITION TO THAT IS THE TESTIMONY

17 OR STATEMENT OF THE OPERATOR THAT HE WAS DOING 10 TO 15 MILES

18 PER HOUR GOING OVER THE WAVES IN THE INLET AT THE TIME OF

19 THIS ACCIDENT, ASSUMING THAT'S THE EVIDENCE THAT YOU HAD,

20 WOULD THAT CHANGE YOUR OPINION THAT HE WAS NOT KEEPING A

21 PROPER LOOKOUT?

22          MR. WEEKS:   I'M GOING TO OBJECT TO THE FORM OF

23 THE QUESTION, BECAUSE THAT IS NOT THE EVIDENCE BEFORE THIS

24 EXPERT.

25     Q.   I DON'T KNOW THAT IT IS, BUT YOU CAN ANSWER THE

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

```
 1    QUESTION?

 2            A.   IT WILL NOT CHANGE MY OPINION.

 3            Q.   SO YOU WOULD DISBELIEVE THE STATEMENTS OF

 4    WAGONER AND THE OPERATOR OF THE BOAT?

 5            A.   YES.

 6            Q.   AND PART OF THE REASON WOULD BE BASED ON DOCTOR

 7    HINES' STATEMENT?

 8            A.   YOU JUST TOLD ME I WAS SUPPOSED TO DISREGARD

 9    THAT.

10            Q.   I DID.

11            A.   I ANSWERED YOU THAT IT WOULD NOT CHANGE MY

12    OPINION, AND WITH HIS STATEMENT, IT JUST REINFORCES MY

13    OPINION.

14            Q.   YOU'RE NOT AN ENGINEER, AM I CORRECT?

15            A.   CORRECT.

16            Q.   NOT A NAVAL ARCHITECT?

17            A.   I AM NOT.

18            Q.   OR A SMALL BOAT NAVAL ARCHITECT?

19            A.   NO, SIR.

20            Q.   HAVE YOU ANY EXPERIENCE IN DESIGNING SMALL

21    BOATS?

22            A.   NO.

23            Q.   DO YOU HAVE ANY EXPERIENCE IN OPERATING OUTBOARD

24    POWERED BOATS, FISHING BOATS OF 22, 23 FEET?

25            A.   I DO.
```

68

1    Q.   WHAT'S YOUR EXPERIENCE?

2    A.   A LIFETIME.  I OWN A 21 FOOT CENTER CONSOLE

3    OUTBOARD.

4    Q.   YOU'VE BEEN A YACHT CAPTAIN?

5    A.   I HAVE.

6    Q.   FOR BOATS OVER 23 FEET?

7    A.   YES.

8    Q.   ANY UNDER 23 FEET?

9    A.   NOT AS A CAPTAIN OF A YACHT UNDER 23 FEET, NO,

10   SIR.

11   Q.   HAVE YOU BEEN THROUGH THE BEAUFORT INLET MANY

12   TIMES?

13   A.   THE HOME I WAS RAISED IN IS IN BEAUFORT, IT'S ON

14   FRONT STREET IN BEAUFORT, IN THE 900 BLOCK.  MY BEDROOM IS ON

15   THE SECOND FLOOR, EVERY MORNING OF MY LIFE WHEN I GOT UP IN

16   THE MORNING AND LOOKED OUT MY FRONT WINDOW, I LOOKED AT THE

17   AREA WHERE THIS ACCIDENT OCCURRED, EVERY MORNING.  I HAVE

18   OPERATED VESSELS THERE, AS IN RECREATIONAL ASPECTS, ALL OF MY

19   CHILDHOOD AND MOST OF MY ADULT LIFE.  I HAVE RECORDED OVER

20   700 TRIPS THROUGH THAT AREA ON VESSELS, OCEAN GOING SHIPS OF

21   OVER ANY GROSS TONS, I'VE OPERATED THE PILOT VESSEL PAST THE

22   AREA WHERE THIS HAPPENED MANY HUNDREDS OF TIMES.  I PROBABLY

23   CONSERVATIVELY TRANSITED THAT AREA OVER 2,000 TIMES.

24   Q.   AND IN SMALL BOATS?

25   A.   IN SMALL BOATS AND LARGE BOATS, IN ALL KINDS OF

69

1  WEATHER.

2      Q.   WERE THE WAVES, ON THAT PARTICULAR DAY OF THE

3  ACCIDENT, PERPENDICULAR TO THE INLET?

4      A.   YES, SIR.

5      Q.   CAN YOU SHOW ME ON THE CHARTS THE WIND AND TIDE

6  DETAILS?

7      A.   ON THE CHART?

8      Q.   IN YOUR FILE?

9      A.   ON THE CHARTS?

10     Q.   DIDN'T YOU HAVE DOCUMENTATION . . .

11     A.   I HAVE DOCUMENTATION AND I HAVE CHARTS, THEY'RE

12  NOT ONE IN THE SAME.

13     Q.   I DIDN'T MEAN CHARTS, BUT THE DOCUMENTATION, CAN

14  YOU SHOW ME THAT?

15     A.   I CAN.

16     Q.   THE WIND AND TIDE DETAILS?

17     A.   WHICH WOULD YOU PREFER FIRST?

18     Q.   LET'S TAKE THE WIND, THAT'S APPLICABLE?

19     A.   OKAY.

20     Q.   IS IT 10 TO 15 MILES PER HOUR FROM THE NORTHEAST

21  AND OUTGOING?

22         MR. WEEKS:  THE WIND?

23     A.   ARE WE TALKING NOW ABOUT THE TIDE OR WIND?

24     Q.   I'M SORRY, I'M TALKING ABOUT TIDE NOW?

25     A.   THE TIDE DOESN'T GO OUT, SO I CAN'T DO THAT,

70

Case 4:09-cv-00003-BR    Document 39-10    Filed 12/30/09    Page 30 of 49

THE TIDE RISES AND FALLS.

      Q.    LET'S SAY FALL?

      A.    AT WHAT TIME WOULD YOU LIKE, SIR?

      Q.    LET'S TAKE THE TIME OF THE ACCIDENT?

      A.    AND THAT TIME WAS?

      Q.    IT WAS AROUND 3:30?

      A.    I'M GOING TO ASK FOR YOUR INDULGENCE FOR JUST A
SECOND.  I'VE GOT THE - LET ME GO GET YOU - I DON'T HAVE
THAT, IT'S THE WRONG ONE IN MY FILE.  LET ME GO GET YOU THE
ONE FOR THE DATE OF THE ACCIDENT, I NEED A GLASS OF WATER
ANYWAY.

      MR. JOHNSTON:  LET'S TAKE A SHORT BREAK.

      (A BRIEF RECESS WAS TAKEN.)

      Q.    HAVE YOU GOT THE CORRECT TIDE REPORT?

      A.    YES, I DO.

      Q.    WHERE DID YOU GET IT?

      A.    I GOT IT FROM MISTER WEEKS' OFFICE, THE ONE I
HAD BROUGHT TO HIM.

      Q.    SO YOU HAD THE ONE WITH THE WRONG DATE OR
SOMETHING?

      A.    I DID, I JUST HAD ONE FOR SOMETHING ELSE, IT WAS
THE WRONG DATE.

      Q.    GO AHEAD?

      A.    YOU SAID AT 3:30?

      Q.    IT WAS ROUGHLY AROUND THERE?

71

Case 4:09-cv-00003-BR   Document 39-10   Filed 12/30/09   Page 31 of 49

A.    THIS TIDE REPORT SHOWS THAT WE HAD 1 FOOT OF
TIDE REMAINING AND THE TIDE WOULD HAVE BEEN EBBING, FALLING.

Q.    DO LAYMEN SAY THE TIDE'S GOING OUT?

A.    THAT WOULD BE CORRECT.

Q.    WHAT ABOUT THE WIND?

A.    I HAVE ONE FOR TWO DIFFERENT STATIONS THAT I
LOOKED AT, I LISTED THEM ON MY REPORT.  THE FIRST STATION
THAT I LOOKED AT IS THE CLOSEST NOAA STATION RECORDING TO THE
SITE, WHICH IS CAPE LOOKOUT AT STATION CLKN7, THAT'S ITS
DESIGNATOR, AND THIS IS FOR MARCH 21ST, 2006.

Q.    IS THAT AT 3:30?

A.    DO I HAVE A 3:30 TIME, NO, SIR, I HAVE A 3:00
O'CLOCK AND A 4:00 O'CLOCK, THEY DID NOT . . .

Q.    WHAT'S THE 3:00 AND THE 4:00?

A.    THE ONE AT 3:00 WAS READING 10.5 WITH GUSTS TO
12.4 AND AT 4:00 O'CLOCK WERE READING 10.8 WITH GUSTS TO
12.7.

Q.    IS THAT THE ONE THAT YOU RELIED UPON?

A.    IT IS.

Q.    WHAT DID YOU TAKE THAT TO MEAN IN TERMS OF YOUR
OPINION IN THIS CASE?

A.    THAT WE HAD WINDS THAT WERE SMALL CRAFT
VELOCITY.

Q.    WERE THEY COMING OUT OF THE NORTHEAST?

A.    THEY HAD SHIFTED TO THE NORTH AT 2:00 O'CLOCK.

72

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1   Q.   WHAT ABOUT THE OTHER - I GUESS YOU DIDN'T RELY

2   UPON THE OTHER WIND REPORT, WHERE WAS THAT TAKEN, YOU SAID

3   YOU TOOK IT AT TWO LOCATIONS?

4        A.   YES.   THE OTHER LOCATION IS STATION ONSLOW BAY,

5   ITS STATION DESIGNATOR IS 41035, DO YOU WANT IT FOR THE SAME

6   TIME?

7        Q.   YES, PLEASE?

8        A.   IT'S 8.6 TO 10.2, WOULD BE THE 3:00 O'CLOCK

9   READING AND THEN 6.6 TO 7.9 WOULD HAVE BEEN THE 4:00 O'CLOCK

10  READING.

11       Q.   WHEN DO THE SMALL CRAFT WARNINGS COME INTO PLAY,

12  AT WHAT LEVELS?

13       A.   21.

14       Q.   21?

15       A.   YES.

16       Q.   I THOUGHT YOU SAID 10.5 TO GUSTS OF 12.4?

17       A.   I DID.

18       Q.   WHAT'S THE 21?

19       A.   21 MILES PER HOUR.

20       Q.   WHAT IS THE 10.5?

21       A.   METERS PER SECOND.

22       Q.   IS THAT GIVEN IN MILES PER HOUR?

23       A.   IT IS NOT.

24       Q.   HOW DID YOU FIGURE THAT?

25       A.   IT'S A MULTIPLE.

73

1    Q.    WHAT DID YOU MULTIPLY?

2    A.    2.23.

3    Q.    TIMES WHAT?

4    A.    TIMES THE NUMBER I GAVE YOU, 10.5, 10.8,

5    WHATEVER I GAVE YOU.  10.5, 12.4, IF YOU MULTIPLY THAT TIMES

6    2.23, IT WILL CONVERT TO MILES PER HOUR.

7    Q.    WERE THERE ANY OTHER BOATS OUT WHERE DOCTOR

8    HINES WAS THAT DAY?

9    A.    I DON'T KNOW THAT.

10   Q.    WOULD THAT BE SOMETHING YOU'D WANT TO KNOW?

11   A.    NO.

12   Q.    DID YOU SAY NO?

13   A.    NO, THERE COULD HAVE BEEN OTHER BOATS OUT THERE,

14   LOTS OF DIFFERENT KINDS OF BOATS.

15   Q.    BOATS OF THE SAME SIZE, WOULD THAT MEAN ANYTHING

16   TO YOU?

17   A.    YES, THAT PEOPLE WERE OPERATING THE BOAT THE WAY

18   THEY SHOULD, YES.  IF THEY DIDN'T GET INJURED, THEN THEY MUST

19   HAVE DONE WHAT THEY SHOULD HAVE.

20   Q.    WHAT ARE YOU SAYING ABOUT THE FACT THAT DOCTOR

21   HINES WAS INJURED THEN?

22   A.    THEN THE OPERATOR WAS NOT SHOWING DUE CARE, MOST

23   ESPECIALLY IF THERE WERE OTHER BOATS OUT THERE THE SAME SIZE

24   THAT DIDN'T HAVE A PROBLEM.

25   Q.    I KNOW YOU WROTE YOUR REPORT BACK IN NOVEMBER OF

74

| | |
|---|---|
| 1 | '08, BUT IF YOU HAD THE STATEMENTS OF NEIL WAGONER AND THE |
| 2 | OPERATOR OF THE BOAT AT THIS TIME, KNOWING THAT THEY'RE |
| 3 | THERE, WOULD YOU THINK THAT IT WOULD BE NECESSARY TO REVIEW |
| 4 | THOSE STATEMENTS IN ORDER TO HAVE A COMPLETE INVESTIGATION? |
| 5 | A.    I WOULD BE GLAD TO READ THEM. |
| 6 | Q.    THAT'S NOT MY QUESTION? |
| 7 | A.    YOU'VE HAD ME ASSUME SOME THINGS THAT THEY SAID |
| 8 | AND I ASSUME THAT'S WHAT'S IN THE REPORT, AND THAT DIDN'T |
| 9 | CHANGE MY OPINION, SO, NO. |
| 10 | Q.    I'M JUST SAYING, IF YOU HAD THOSE REPORTS, WOULD |
| 11 | YOU WANT TO REVIEW THEM IN ORDER TO COMPLETE THE |
| 12 | INVESTIGATION? |
| 13 | A.    I WOULD REVIEW THEM, BUT YOU'VE ALREADY TOLD |
| 14 | ME - YOU'VE HAD ME ASSUME SOME THINGS AND I ASSUME THAT |
| 15 | YOU'RE - WHAT'S FAVORABLE TO YOU, SO, NO.  I'LL READ THEM, |
| 16 | AND IF THEY CHANGE MY OPINION, SURE. |
| 17 | Q.    WOULDN'T YOU WANT TO READ THEM, THOUGH? |
| 18 | A.    SURE. |
| 19 | Q.    I MEAN, WOULDN'T THAT MAKE YOUR INVESTIGATION |
| 20 | COMPLETE, THAT YOU GATHERED ALL THE EVIDENCE YOU COULD AND |
| 21 | YOU'VE EVALUATED IT ALL? |
| 22 | A.    SURE. |
| 23 | Q.    ISN'T THAT PART OF A PROPER INVESTIGATION? |
| 24 | A.    YES. |
| 25 | Q.    WOULD YOU EXPECT THE SEAS CLOSE TO THE SHORE TO |

75

1    BE 4 FEET IN THE AREA WHERE - THE BEAUFORT INLET ON IN TOWARD

2    THE SHORE?

3                 MR. WEEKS:  WHICH SHORE ARE YOU REFERRING TO?

4         A.    YES, I'M CONFUSED.

5         Q.    WHERE OLDE TOWNE YACHT CLUB IS, WHY DON'T YOU

6    TAKE THAT ONE?

7         A.    OKAY.  YOUR QUESTION IS?

8         Q.    WOULD YOU EXPECT THE SEAS THAT ARE CLOSE TO THE

9    SHORE AT THAT POINT TO BE 3 TO 4 FEET?

10        A.    NO.

11        Q.    WHY NOT?

12        A.    BECAUSE THEY WOULD HAVE RUN THROUGH SHOAL WATER

13   AND THEY WOULD HAVE DISSIPATED.

14        Q.    IN ORDER TO HAVE WAVES 3 TO 4 FEET, WHAT

15   CONDITIONS WOULD BE NECESSARY?

16        A.    A PARTICULAR VELOCITY OF WIND.  A WAVE TRAIN IS

17   CREATED BY A VELOCITY OF WIND FOR A PERIOD OF TIME OVER A

18   DISTANCE.

19        Q.    ANYTHING ELSE?

20        A.    THE WAVES WILL REACT WITH THE SEA FLOOR, THEY

21   REACT WITH SHOALS, THEY WILL REACT WITH CURRENTS, THEY WILL

22   REACT WITH OTHER WAVE TRAINS.

23        Q.    WHAT ABOUT THE DEPTH OF THE WATER, DOES THAT

24   HAVE ANY EFFECT AS TO HOW HIGH THE WAVES MIGHT BE?

25        A.    IT HAS AN EFFECT ON HOW HIGH THEY CAN BE.

76

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1     Q.   WHAT IS THAT EFFECT, WHAT IS THAT PHENOMENON?

2     A.   AFTER A CERTAIN DEPTH - WAVES CAN ONLY REACH A

3  CERTAIN HEIGHT IN A DEPTH, BECAUSE THEY DRAG ON THE BOTTOM,

4  SIMPLY.

5     Q.   SO IF YOU HAD WATER 2 FEET, YOU COULDN'T HAVE

6  WAVES 3 FEET?

7     A.   CORRECT.

8     Q.   IS BEAUFORT INLET CONSIDERED A NARROW INLET?

9     A.   NO.

10    Q.   WHAT WOULD YOU CONSIDER A NARROW INLET?

11    A.   I DON'T KNOW HOW TO ANSWER THAT.

12    Q.   ARE THERE ANY STANDARDS OR ANY IN YOUR

13  EXPERIENCE THAT YOU WOULD CONSIDER A NARROW INLET?

14    A.   NO, NOT THAT I'M AWARE OF.

15    Q.   IN THAT INLET, SHOULD BOATS IN THE INLET STAY TO

16  THE RIGHT TO ALLOW BOATS TO PASS PORT TO PORT?

17    A.   IN THE SHIP'S CHANNEL, THAT'S STANDARD.  THAT'S

18  A REQUIREMENT OF THE RULES OF THE ROAD, FOR VESSELS TO STAY

19  TO THAT SIDE OF THE CHANNEL, IF THEY CAN NAVIGATE WITHIN THE

20  CONFINES OF THAT CHANNEL.  IN THIS CASE, NO, BECAUSE THEY

21  COULD OPERATE OUTSIDE THE CONFINES OF THE CHANNEL.

22    Q.   IF YOU WERE TRAVELING OVER THESE WAVES AT 3 TO 4

23  FEET, WHAT COULD HAPPEN IF YOU GO TOO SLOW?

24    A.   IF WHAT?

25    Q.   IF YOU'RE TRAVELING TOO SLOW OVER WAVES 3 TO 4

77

```
 1   FEET?

 2           A.   IN WHAT?

 3           Q.   WHAT DO YOU MEAN, IN WHAT, IN WAVES 3 TO 4 FEET,

 4   LET'S TAKE . . .

 5           A.   AM I IN A CANOE, IN A STEAMSHIP, WHAT KIND OF

 6   VESSEL?

 7           Q.   WE'RE NOT TALKING ABOUT A 100 FOOT BOAT, WE'RE

 8   TALKING ABOUT THE 22 FOOT TRITON?

 9           A.   SO WE'RE TALKING ABOUT THE VESSEL INVOLVED IN

10   THIS?

11           Q.   CORRECT, CAN YOU ANSWER?

12           A.   IF YOU GO ACROSS THOSE TOO SLOW?

13           Q.   RIGHT?

14           A.   I DON'T KNOW OF ANYTHING.

15           Q.   DO YOU KNOW WHAT A BROACH IS?

16           A.   YES, SIR.

17           Q.   WHAT IS A BROACH?

18           A.   A BROACH OF VESSEL IS LAYING SIDE TO A WAVE AND

19   YOU CAN ROLL THE VESSEL OVER, IT'S CALLED A BROACH.

20           Q.   CAN THAT HAPPEN IF YOU'RE GOING TOO SLOW OVER

21   THE WAVES?

22           A.   IN THAT SIZE WAVE IN A 22 FOOT BOAT, NOT

23   LIKELY.

24           Q.   IT COULD HAPPEN?

25           A.   NOT THAT I'VE EVER SEEN.
```

78

1       Q.   DID DOCTOR HINES TELL YOU WHY THEY WERE GOING

2  OUT INTO THE INLET?

3       A.   NO.

4       Q.   DID YOU ASK?

5       A.   NO.   THE BOAT WAS BEING DEMONSTRATED, THAT'S ALL

6  HE SAID.

7       Q.   SO YOU DON'T KNOW WHETHER DOCTOR HINES ACTUALLY

8  WANTED TO GO OUT IN THE INLET?

9       A.   I DO NOT.

10      Q.   TO TEST THE BOAT TO SEE IF IT WOULD REMAIN DRY?

11      A.   I DON'T KNOW THAT.

12      Q.   WOULD THAT BE A GOOD TEST TO SEE IF THE BOAT

13  WOULD REMAIN DRY, TO GO OUT IN THE INLET IN THOSE CONDITIONS?

14      A.   SURE.

15      Q.   I'D LIKE TO TURN TO YOUR REPORT, ON PAGE 2, AND

16  IT HAS A HEADING OF "OPINIONS."

17      A.   OKAY.

18      Q.   PARAGRAPH 1 SAYS "THE ACCIDENT OCCURRED"?

19      A.   YES.

20      Q.   AND "THE FACTUAL BASIS OF MY OPINION IS AS

21  FOLLOWS, VERBAL INTERVIEW WITH DOCTOR HINES"?

22      A.   YES, SIR.

23      Q.   IF WE GO TO 2, "THE ACCIDENT OCCURRED ON

24  NAVIGABLE WATERS OF THE UNITED STATES"?

25      A.   CORRECT.

79

1      Q.    THAT WAS BASED ON DOCTOR HINES' INTERVIEW?

2      A.    WHERE HE TOLD ME THE ACCIDENT OCCURRED, YES,

3  SIR.

4      Q.    THAT AT THE TIME OF THE ACCIDENT, DOCTOR HINES

5  WAS A PASSENGER ON BOARD WITH THIS HULL IDENTIFICATION NUMBER

6  THAT YOU'VE LISTED?

7      A.    THAT'S MY UNDERSTANDING, YES, SIR.

8      Q.    THAT WAS BASED ON DOCTOR HINES' INTERVIEW?

9      A.    THAT'S CORRECT.

10     Q.    THE ONE THAT YOU HAD IN THE LIVING ROOM OR WHEN

11  YOU WERE OUT AT SEA?

12     A.    I DON'T RECALL AT WHICH TIME.

13     Q.    BECAUSE WHEN YOU SAY VERBAL INTERVIEW, IT

14  DOESN'T - IT JUST MEANS, I TAKE IT THEN, EITHER ONE OR THE

15  OTHER INTERVIEWS THAT YOU HAD WITH HIM?

16     A.    THAT WOULD BE CORRECT, YES, SIR.

17     Q.    NUMBER 4, THAT JOHN HYDE WAS THE OPERATOR AT THE

18  TIME OF THE ACCIDENT, THE BASIS WAS DOCTOR HINES' INTERVIEW?

19     A.    WHAT HE TOLD ME, THAT'S CORRECT.

20     Q.    THEN NUMBER 5, I'M NOT GOING TO READ IT ALL, BUT

21  YOU TALK ABOUT EXCESSIVE SPEED, ET CETERA, AND YOU'RE SAYING

22  THE EXCESSIVE SPEED - THE FACTUAL BASIS FOR THAT OPINION WAS

23  THE INTERVIEW WITH DOCTOR HINES?

24     A.    YES, SIR.

25     Q.    LET'S GO TO NUMBER 6, YOU HAVE CITED THIS RULE,

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

| | |
|---|---|
| 1 | ARE THESE ALSO CALLED THE COREGS? |
| 2 | A. NO, THEY ARE NOT. |
| 3 | Q. ANYWAY, THE NAVIGATION RULES YOU CITE, COMDTINST |
| 4 | M16672.2D, RULE NUMBER 6, "SAFE SPEED," AND THIS RULE 6 THAT |
| 5 | YOU QUOTE, I'LL READ IT, "EVERY VESSEL SHALL AT ALL TIMES |
| 6 | PROCEED AT A SAFE SPEED SO THAT SHE CAN TAKE PROPER AND |
| 7 | EFFECTIVE ACTION TO AVOID COLLISION AND BE STOPPED WITHIN A |
| 8 | DISTANCE APPROPRIATE TO THE PREVAILING CIRCUMSTANCES AND |
| 9 | CONDITIONS. IN DETERMINING A SAFE SPEED, THE FOLLOWING |
| 10 | FACTORS SHALL BE AMONG THOSE TAKEN INTO ACCOUNT," AND THEN IT |
| 11 | SAYS "(A) BY ALL VESSELS," AND THEN "(V)," FOR FIVE, "THE |
| 12 | STATE OF WIND, SEA AND CURRENT, AND THE PROXIMITY OF |
| 13 | NAVIGATIONAL HAZARDS." |
| 14 | A. CORRECT. |
| 15 | Q. MY QUESTION IS, THIS RULE 6, IS THAT - WHEN THEY |
| 16 | TALK ABOUT AVOIDING A COLLISION, IS THAT AVOIDING A COLLISION |
| 17 | WITH ANOTHER BOAT, ANOTHER OBJECT, SOMETHING ELSE? |
| 18 | A. FOR THE COLLISION PART, YES, SIR, I WOULD SAY |
| 19 | THAT THAT IS WHAT IT SAYS, TO AVOID A COLLISION. |
| 20 | Q. WHAT'S YOUR UNDERSTANDING OF WHAT THAT MEANS? |
| 21 | A. COLLISION WITH ANOTHER VESSEL, OR AN OBJECT, OR |
| 22 | IN THIS CASE, WITH A WAVE. |
| 23 | Q. IS THAT THE WAY YOU INTERPRET IT? |
| 24 | A. IT IS. |
| 25 | Q. WHAT'S YOUR BASIS FOR SAYING THAT? |

81

Case 4:09-cv-00003-BR    Document 39-10    Filed 12/30/09    Page 41 of 49

1        A.   MY STUDIES, MY TRAINING.

2        Q.   HAS ANYBODY EVER SAID THAT THAT'S WHAT THAT

3  MEANS, IT MEANS AVOID COLLISION WITH A WAVE?

4        A.   IT GOES ON TO SAY "AND BE STOPPED WITHIN A

5  DISTANCE APPROPRIATE TO THE PREVAILING CIRCUMSTANCES AND

6  CONDITIONS."

7        Q.   WOULDN'T YOU TAKE THAT TO BE AN OBJECT RATHER

8  THAN A WAVE?

9        A.   NO, SIR, IT CAN BE A SEA.

10       Q.   HAVE YOU EVER SEEN THAT QUOTED IN THAT CONTEXT

11  ANYWHERE?

12       A.   I HAVE SEEN IT INTERPRETED AS SUCH, YES.

13       Q.   IN WHERE?

14       A.   I DON'T RECALL AS I SIT HERE, BUT I HAVE.

15       Q.   YOU DON'T REMEMBER THE . . .

16       A.   I TOLD YOU I DID NOT, NO, SIR.  I DON'T RECALL

17  AS I SIT HERE, NO, SIR.

18       Q.   HOW MANY TIMES HAVE YOU SEEN IT USED IN THAT

19  CONTEXT "TO AVOID A COLLISION WITH A WAVE"?

20       A.   I DON'T RECALL.

21       Q.   HAVE YOU SEEN IT IN CONTEXT WITH COLLISION WITH

22  OTHER OBJECTS?

23       A.   YES.

24       Q.   WHAT KINDS OF OBJECTS, OTHER SHIPS, OTHER

25  VESSELS?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1      A.    BUOYS, LAND, BOTTOM, PILINGS, DOCKS, PIERS,

2   BARGES, SHALL I GO ON?

3      Q.    IF YOU HAVE OTHERS, YES, SURE?

4      A.    THE LAND, ROCKS.

5      Q.    IN NUMBER 6, YOU GAVE AN OPINION ABOUT THE

6   PROPER LOOKOUT, AND THE FACTUAL BASIS OF THAT OPINION WAS

7   YOUR VERBAL INTERVIEW WITH DOCTOR HINES?

8      A.    YES.

9      Q.    IN NUMBER 7, YOU TALKED ABOUT DOCTOR HINES NOT

10  BEING NEGLIGENT, NOT CONTRIBUTING, BUT LET ME JUST ASK YOU,

11  WOULD HE HAVE ANY RESPONSIBILITY TO ASCERTAIN THE WEATHER

12  CONDITIONS AND THE SEA CONDITIONS THAT DAY?

13     A.    AS A PASSENGER?

14     Q.    YES?

15     A.    NO.

16     Q.    NONE WHATSOEVER?

17     A.    NO.

18     Q.    WHAT ABOUT THE WAY HE WAS HOLDING ON, DID HE

19  TELL YOU HOW HE WAS HOLDING ON TO THE . . .

20     A.    NOT SPECIFICALLY.

21     Q.    DO YOU KNOW IF HE COULD HAVE DONE ANYTHING

22  DIFFERENTLY TO PROTECT HIMSELF?

23     A.    NOT TO MY KNOWLEDGE.

24     Q.    YOU DON'T KNOW ONE WAY OR THE OTHER?

25     A.    I DO NOT.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1      Q.   IF I'VE ASKED THIS, PLEASE EXCUSE ME.   WHEN YOU

2   WENT TO INSPECT THE BOAT, WHAT, IF ANY, FINDINGS DID YOU MAKE

3   ABOUT THE BOAT?

4         A.   BESIDES ITS PHYSICAL FEATURES, ITS SIZE, LENGTH,

5   IT WAS A CENTER CONSOLE VESSEL, IT HAD A T-TOP, THAT IT HAD

6   HANDRAILS OR RAILINGS AROUND THE T-TOP THAT PEOPLE COULD HOLD

7   ONTO, THERE WAS A HANDRAIL BEHIND THE LEANING POST.   THAT IT

8   HAD A 250 HORSEPOWER YAMAHA FOUR-STROKE OUTBOARD MOTOR, EXTRA

9   LONG SHAFT, THAT'S ABOUT IT.

10        Q.   WERE THE HANDHOLDS APPROPRIATE, DID YOU THINK?

11        A.   I THOUGHT SO.

12        Q.   WAS THERE ANYTHING INAPPROPRIATE ABOUT THE BOAT?

13        A.   NOT THAT I SAW, EXCEPT THAT I DIDN'T LIKE WHAT

14  THEY HAD DONE MOUNTING THE ENGINE, BUT THAT'S A - PUTTING AN

15  EXTRA LONG SHAFT ENGINE ON A LONG SHAFT TRANSOM, IT WAS JUST

16  A COBBLED UP LOOKING THING TO ME.

17        Q.   WHERE WAS DOCTOR HINES STANDING WHEN HE WAS

18  INJURED?

19        A.   TO MY KNOWLEDGE, HE WAS STANDING TO THE LEFT OF

20  THE OPERATOR.

21        Q.   IN WHAT PART OF THE BOAT, FRONT, BACK?

22        A.   TO THE LEFT OF THE OPERATOR.

23        Q.   FRONT, BACK, MIDDLE?

24        A.   WHERE THE OPERATOR STATION IS, HE WAS TO THE

25  LEFT OF, WHICH IS APPROXIMATELY THE CENTER OF THE VESSEL.

84

1    Q.    NEAR THE CENTER?

2    A.    ON THE PORT SIDE.

3    Q.    AS THE BOAT WAS GOING OUT TOWARD THE INLET, DO

4    YOU KNOW WHICH DIRECTION THE OPERATOR WAS FACING?

5    A.    DO NOT.

6    Q.    DO YOU KNOW IF HE SAW THE CONDITIONS AHEAD?

7    A.    DON'T KNOW.

8    Q.    WOULD THAT BE IMPORTANT FOR YOU TO KNOW IN

9    MAKING YOUR OPINION?

10    A.    SURE.

11    Q.    WHEN YOU WENT TO THE - I THINK YOU WERE ON THE

12    PREMISES OF BOATS UNLIMITED WHEN YOU SAW THE BOAT, WHEN YOU

13    INSPECTED IT?

14    A.    CORRECT.

15    Q.    DID YOU HAVE PERMISSION TO GO THERE?

16    A.    YES.

17    Q.    BY WHOM?

18    A.    MISTER HARDEE CONTACTED THE PEOPLE AND GOT OUR

19    PERMISSION TO GO THERE.  WE TOLD THE PEOPLE WE WERE THERE AND

20    WE WERE ALLOWED TO LOOK AT THE VESSEL.

21    Q.    DID YOU PHOTOGRAPH IT?

22    A.    I DID.

23    Q.    WHERE ARE THE PHOTOGRAPHS?

24    A.    I DON'T HAVE THEM.

25    Q.    DO YOU KNOW WHERE THEY ARE?

85

1       A.    I THINK MISTER WEEKS HAD THEM, OR MISTER HARDEE.

2       Q.    WHEN YOU WRITE YOUR REPORTS, DO YOU USE THE TERM

3   NEGLIGENCE?

4       A.    NOT NORMALLY.

5       Q.    YOU DID IN THIS CASE THOUGH, CORRECT?

6       A.    I DID, I THINK.   I THINK I SAID THAT IT

7   WAS - LET ME READ EXACTLY WHAT I DID SAY - (PAUSE - PERUSES

8   REPORT.)

9           MR. WEEKS:  HE SAID, "DID NOT EXERCISE DUE

10  CARE."

11          MR. JOHNSTON:  HE USED IT AT THE END IN TALKING

12  ABOUT DOCTOR HINES IN PARAGRAPH 7.

13      A.    I FELT THAT HE WAS NOT NEGLIGENT.

14      Q.    WHY DID YOU SAY HE WASN'T NEGLIGENT INSTEAD OF

15  USING DUE CARE?

16      A.    HE WAS NOT REQUIRED TO BE THE PERSON THAT WOULD

17  HAVE GIVEN DUE CARE, AND HE DID NOT, BY HIS ACTIONS, THAT I

18  KNOW OF, DO ANYTHING THAT WOULD HAVE CAUSED HIM TO SUSTAIN

19  THE INJURIES THAT HE DID.

20      Q.    YOU'RE NOT AN ACCIDENT RECONSTRUCTIONIST, ARE

21  YOU?

22      A.    I AM NOT.

23      Q.    IF YOU DID NOT HAVE DOCTOR HINES' STATEMENT AT

24  ALL, YOU HAD NO WITNESS STATEMENTS, BUT KNEW HE WAS INJURED,

25  WOULD YOU BE ABLE TO GIVE AN OPINION AS TO THE FAULT OF THE

86

1  OPERATOR OF THE BOAT, BASED ON THE OTHER INFORMATION YOU

2  REVIEWED, THE DOCUMENTS?

3            MR. WEEKS:  I'M GOING TO OBJECT TO THE FORM OF

4  THE QUESTION.

5        A.    I DID NOT UNDERSTAND WHAT YOU JUST ASKED ME AT

6  ALL.

7        Q.    LET'S ASSUME YOU DIDN'T HAVE DOCTOR HINES'

8  STATEMENT, BUT YOU KNEW HE WAS IN A BOAT, WENT OVER A WAVE,

9  CAME DOWN AND WAS INJURED, THEN YOU HAD THE OTHER INFORMATION

10 THAT YOU HAD IN YOUR FILE, THE CHARTS, THE WIND REPORT, THE

11 TIDE REPORT, WOULD THAT BE ENOUGH FOR YOU TO MAKE AN OPINION

12 THAT THE OPERATOR OF THE BOAT DID NOT USE DUE CARE?

13       A.    NO.

14       Q.    IT WOULD NOT BE?

15       A.    NO.

16       Q.    SO YOU NEED DOCTOR HINES' STATEMENT?

17       A.    YES, SIR, I NEED TO KNOW WHERE IT WAS.

18       Q.    WHERE IT WAS?

19       A.    YES, WITHOUT HIM, HOW WOULD I KNOW?

20       Q.    SUPPOSE YOU DID KNOW WHERE IT WAS, LET'S ADD

21 THAT IN, BUT YOU DIDN'T HAVE THE OTHER . . .

22       A.    NOW I WOULD HAVE ENOUGH INFORMATION, YES.

23       Q.    JUST THE PLACE WHERE IT HAPPENED, THE DOCUMENTS,

24 THE . . .

25       A.    CONDITIONS, YES, SIR.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    Q.    AND THE FACT THAT HE WAS INJURED?

2    A.    YES.

3    Q.    THAT WOULD GIVE YOU ENOUGH INFORMATION . . .

4    A.    IF I KNEW HOW HE WAS INJURED, WHETHER HE WAS

5    DROPPED ON THE DECK, IN OTHER WORDS, HE DIDN'T CUT HIS HAND

6    WITH A KNIFE.  SO THERE'S A LOT OF THINGS THAT YOU'RE

7    ASSUMING HERE THAT I DON'T KNOW AND I CAN'T ANSWER THAT.

8    Q.    WE'RE ASSUMING IN THE CONTEXT OF . . .

9    A.    I CAN'T ASSUME.  I MEAN, WE'VE PLAYED THAT GAME

10   AND IT DOESN'T SEEM TO COME OUT CORRECTLY, SO I WOULD PREFER

11   NOT TO ASSUME.

12   Q.    YOU'VE SAID THAT IF HE FELL THE WAY - YOU KNOW,

13   HE CAME DOWN OVER A WAVE . . .

14   A.    I WOULD GET THAT INFORMATION FROM SOMEWHERE, AND

15   I DON'T KNOW WHERE I WOULD GET THAT UNLESS I WAS . . .

16   Q.    IS IT POSSIBLE TO HAVE AN INJURY LIKE THIS

17   WITHOUT SOMEBODY BEING AT FAULT IN THE OPERATION OF THE BOAT?

18   A.    SURE.

19   Q.    HOW, HOW SO?

20   A.    YOU COULD SLIP DOWN A SET OF STEPS ON A SHIP AND

21   YOU CAN GET HURT THAT WAY.

22   Q.    I'M TALKING ABOUT THE WAY DOCTOR HINES WAS

23   INJURED?

24   A.    NO.

25   Q.    IT'S NOT POSSIBLE?

88

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

```
1          A.    NOT IN MY OPINION.

2                MR. JOHNSTON:    THAT'S ALL THE QUESTIONS I HAVE.

3    THANK YOU.

4                MR. WEEKS:    I HAVE NO QUESTIONS.

5    * * * * * * * * * * * * * * * * * * * * * * * * * *

6                        END OF DEPOSITION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

89