THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:09-CV-00003-BR

BENJAMIN G. HINES, JR., )
)
   Plaintiff, )
) MEMORANDUM OF LAW IN
) SUPPORT OF MOTION FOR
v. ) SUMMARY JUDGMENT
) Fed. R. Civ. P. 56
TRIAD MARINE CENTER, INC. )
d/b/a BOATS UNLIMITED NC and )
JOHN BANISTER HYDE, )
)
   Defendants. )

AND NOW, come Defendants, Triad Marine Center, Inc., d/b/a Boats Unlimited NC and John Banister Hyde, by and through their attorneys, Dickie, McCamey & Chilcote, P.C. and file the within Memorandum of Law in Support of Motion for Summary Judgment, stating as follows:

## I. Nature of the Case

Plaintiff, Benjamin G. Hines, Jr., initiated this Admiralty action for injuries and damages allegedly sustained on March 21, 2006 while onboard a 22-foot recreational boat in the Beaufort Inlet. Plaintiff alleges that John Banister Hyde, an agent and employee of Triad Marine Center, Inc., was negligent in the operation of the boat.

## II. Statement of the Facts

At the time of the accident, John Hyde was employed as a sales representative for Boats Unlimited in New Bern, NC and held a Captain's Operator Uninspected Passenger Vessel License. (John Banister Hyde Depos. Tr., p. 7, L. 16-17; p. 9, L. 5-13, a true and correct copy of which is attached hereto as Exhibit "A"). Part of Mr. Hyde's job duties included meeting customers that came to Boats Unlimited and conducting demonstration rides. (Hyde Tr., p. 15,

L. 17-21).  On March 20, 2006, Plaintiff came to Boats Unlimited and met with Mr. Hyde. (Hyde Tr., p. 21, L. 10-18).  According to Mr. Hyde, Plaintiff was looking to purchase a center console power boat that he could take fishing and could handle heavy weather conditions.  (Hyde Tr., p. 21, L. 21-23).  Plaintiff testified that he needed a boat that was dry in ride and would not pound the water and "beat my wife up."  (Benjamin G. Hines, Jr. Depos Tr., p. 203, L. 18-25; p. 204, L. 1-2, a true and correct copy of which is attached hereto as Exhibit "B").  Plaintiff was interested in a Triton, model 2286, center console boat.  (Hyde Tr., p. 23, L. 2-7).  Plaintiff and Mr. Hyde made arrangements to sea trial the boat the following day, March 21, 2006, when Mr. Hyde would pick up Plaintiff at his residence at Old Towne Yacht Club and begin the sea trial from Plaintiff's dock.  (Hyde Tr., p. 29, L. 3-23).

On March 21, 2006, Mr. Hyde trailered the vessel to Radio Island Marina where he launched the boat.  (Hyde Tr., p. 30, L. 9-10; p. 32, L. 4).  After launching the vessel, Mr. Hyde motored the boat to Plaintiff's dock at Olde Towne Yacht Club where he arrived at approximately 3:00 p.m.  (Hyde Tr., p. 32, L. 4-20; p. 34, L. 18-20).  There, Mr. Hyde was met by Plaintiff and his friend, Neil Wagoner, who accompanied them on the sea trial.  (Hyde Tr., p. 34, L. 23-25; p. 35, L. 1-3).  Plaintiff spent approximately 20 minutes looking around the boat while it was at the dock, and then Mr. Hyde operated the boat from the dock.  (Hyde Tr., p. 38, L 2-7).

Although Plaintiff testified that he was the one that drove the boat from the dock, and not Mr. Hyde, at some point Plaintiff was operating the boat behind Shackleford Banks.  (Hines Tr., p. 215, L. 7-16); (Hyde Tr., p. 39, L. 6-25; p. 39, L. 1-2).  Plaintiff drove the boat for approximately 10 to 15 minutes to get a feel for how it would handle.  (Hyde Tr., p. 40, L. 12-22).  Plaintiff then asked Mr. Hyde to take over operation of the boat.  (Hyde Tr., p. 41, L. 9-13).

2

When Mr. Hyde took over operation of the boat, he was behind the helm and Plaintiff was standing to his left, on the port side of the boat, holding on to the pipes of the T-top of the boat. (Hyde Tr., p. 42, L. 15-25; p. 43, L. 1-3). At this time, Mr. Wagoner was behind the lean post to the rear of Mr. Hyde. (Hyde Tr., p. 43, L. 10-11). Mr. Hyde motored the boat off plane, toward the inlet at a speed in between 10 and 15 m.p.h. (Hyde Tr., p. 43, L. 14-19). Mr. Hyde observed waves of 3 to 4 feet in the inlet, consistent with the forecasted weather conditions for that day. (Hyde Tr., p. 52, L. 20-25).

After making the turn to port in a southerly direction, Mr. Hyde operated the boat forward and there was a set of waves that he had to negotiate. (Hyde Tr., p. 44, L. 3-10). The boat went up and down the first wave, and then up and down the second wave. (Hyde Tr., p. 44, L. 11-12). The period of the third wave was shorter and the V-hull of the boat penetrated the third wave and there was a jolt, at which time Mr. Hyde saw that Plaintiff was on the floor of the boat. (Hyde Tr., p. 44, L. 13-16). These three waves were perpendicular to the vessel, and the same size as those seen in the inlet (3 to 4 feet) and very typical. (Hyde Tr., p. 54, L. 12; p. 56, L. 12-15). According to Mr. Hyde, the tide was outgoing, and wind speed was 10 to 15 knots out of the northeast. (Hyde Tr., p. 33, L. 18-22; p. 53, L. 15-18; p. 54, L. 23-25).

Plaintiff described the weather conditions on March 21, 2006 as "nice and a little snotty in the sound, probably waves three to four [feet]." (Hines Tr., p. 206, L. 7-12). Plaintiff testified that the weather conditions did not change from the time they left the dock until the time of the accident. (Hines Tr., p. 206, L. 13-20). Moreover, Plaintiff did not believe that these weather conditions posed any problem. (Hines Tr., p. 206, L. 15-17). According to Mr. Wagoner, the weather conditions on March 21, 2006 were gray, overcast, with waves 2 to 3 feet, nothing unusual for the inlet, and he had no objection to being out that day. (Michael Neil Wagoner

3

Depos. Tr., p. 7, L. 17-24; p. 8, L. 7-10; p. 9, L. 2-4, a true and correct copy of which is attached hereto as Exhibit "C").

According to the Plaintiff, he turned the helm over to Mr. Hyde because he did not like the handling of the boat when he was operating it, and he wanted to see if Mr. Hyde could show him how to keep the boat from porpoising. (Hines Tr., p. 208, L. 23-25; p. 209, L. 17-19). Plaintiff was standing to Mr. Hyde's left, watching him operate the boat and was not aware that Mr. Hyde was going in the inlet. (Hines Tr., p. 210, L. 22-25; p. 211, L. 1-4). The waves were 3 to 4 feet high. (Hines Tr., p. 212, L. 1-4). Plaintiff testified that he did not have any objection to Mr. Hyde traveling in such waves, as it was common, and he had been in similar conditions thousands of times. (Hines Tr., p. 212, L. 7-15).

Plaintiff testified that Mr. Hyde was driving the boat on plane, made the turn, and that is when the boat encountered the wave. (Hines Tr., p. 217, L. 14-17). Plaintiff testified that he recalled only one wave, as opposed to the three waves described by Mr. Hyde. (Hines Tr., p. 221, L. 1). Nonetheless, Plaintiff did not know how much time elapsed when Mr. Hyde first saw or could have seen the wave and when the boat hit the wave. (Hines Tr. p. 221, L. 9-11). With respect to the speed of the boat, the Plaintiff testified that as the boat was coming across the channel, they were traveling at least 20 m.p.h. with the boat on plane. (Hines Tr., p. 226, L. 21-24). When the boat was traveling at 20 m.p.h., Plaintiff did not feel he was in peril and, in fact, he had been traveling at the same speed when he had been operating the boat. (Hines Tr., p. 227, L. 9-11). According to the Plaintiff, Mr. Hyde then turned the boat, accelerated, and the boat was traveling at 25 m.p.h. when the boat hit the wave. (Hines Tr., p. 226, L. 24-25). However, Plaintiff did not recall ever looking at the speedometer while Mr. Hyde was operating the boat. (Hines Tr., p. 220, L. 6-8). Thus, Plaintiff did not know the exact speed of the boat at the time of

the accident. (Hines Tr., p. 220, L. 16). Plaintiff further testified that he did not tell Mr. Hyde that he thought the boat was traveling too fast because the events happened too fast, and when he looked up, the wave was upon them, Mr. Hyde made the turn, and then accelerated. (Hines Tr., P. 226, L. 11-18).

Plaintiff testified that they hit the wave, he was holding on to the supports with his left hand out in front of him and his right hand straight up in the air, and then recalls striking the T-top of the boat with his head and then falling to the deck. (Hines Tr., p. 225, L. 12-25; p. 226, L. 1-10). When asked what Mr. Hyde did wrong, Plaintiff testified that Mr. Hyde drove too fast for conditions over the shoal, drove perpendicular into the wave, and did not tell anyone what was happening. (Hines Tr., p. 219, L. 10-14).

Mr. Wagoner, who accompanied Plaintiff on the boat, is a friend of Plaintiff and a Coast Guard Captain with a lifetime of boating experience. (Wagoner Tr., p. 4, L. 3-5). Mr. Wagoner had been in the area where the accident occurred on hundreds of occasions prior to March 21, 2006. (Wagoner Tr., p. 5, L. 5-20). Mr. Wagoner was standing behind the leaning post, holding on to the handrails in the back of the boat. (Wagoner Tr., p. 11, L. 17-21). Mr. Wagoner testified that the boat encountered previous waves, but on the one wave, Plaintiff fell. (Wagoner Tr., p. 12, L. 6-12). To Mr. Wagoner, it was simply an accident. (Wagoner Tr., p. 12, L. 20). Mr. Wagoner did not feel unsafe at any time on the boat that day and did not believe that Mr. Hyde improperly operated the boat. (Wagoner Tr., p. 11, L. 3-9). According to Mr. Wagoner, Mr. Hyde was operating the boat slowly (under 20 m.p.h., and probably 15 m.p.h.) at the time of the accident and the boat was not on plane. (Wagoner Tr., p. 35, L. 1-15).

In his Complaint, Plaintiff alleges that the Defendant, John Banister Hyde, and by respondent superior, the Defendant, Triad Marine Center, Inc., were negligent in the following

5

particulars: by failing to operate the vessel at a safe speed; by failing to keep the vessel under proper control; by failing to keep a proper lookout; and by operating the vessel without exercising reasonable care under the circumstances. (*See* Paragraph 15 of Plaintiff's Complaint).

### III. Argument

### 1. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. Id at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. Anderson, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." *See* Celotex Corp., 477 U.S. at 324; Anderson, 477 U.S. at 252; Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). The facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See* Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475

U.S. 574, 587-88 (1986). The Court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See* Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

**2. Plaintiff has failed to establish a *prima facie* case of negligence against Defendants**

To prevail in a negligence action in admiralty, a plaintiff must demonstrate that the boat owner breached the duty of "exercising reasonable care under the circumstances" that he owes to boat passengers. Holesapple v. Barrett, 5 Fed. Appx. 177, *180; 2001 U.S. App. LEXIS 3128, **8 (4th Cir. 2001) (citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959)). (A copy of the Holesapple opinion is attached hereto as Exhibit "D"). In this case, Plaintiff has failed to demonstrate sufficient evidence that the Defendants breached any duty.

First, Plaintiff alleges that Mr. Hyde failed to operate the vessel at a safe speed. (*See* Paragraph 15 of Plaintiff's Complaint). According to the Plaintiff's own testimony, Mr. Hyde drove the boat too fast for the conditions over the shoal, which he estimated at 25 m.p.h. after the boat accelerated and hit the wave that caused Plaintiff to fall. Just prior to that time, Plaintiff testified that Mr. Hyde had been operating the boat at 20 m.p.h., a speed at which Plaintiff was comfortable. Thus, the only evidence supporting the Plaintiff's allegation that Mr. Hyde failed to operate the boat at a safe speed is the Plaintiff's own testimony that Mr. Hyde accelerated from 20 m.p.h. to 25 m.p.h. Plaintiff offers no other support for this contention. He has no testimony, expert or otherwise, that traveling at an estimated speed of 25 m.p.h., as opposed to 20 m.p.h. or less, under the conditions in the inlet violated any standard of care. He offers no evidence of what the proper boat speed should be under the conditions then and there existing on March 21, 2006. Thus, armed only with his unsupported assertion that Mr. Hyde was operating the boat too fast for conditions, Plaintiff has failed to present any evidence that Mr. Hyde

7

operated the boat at an unreasonable speed.  *See* Felton v. Felton, 1999 U.S. App. LEXIS 12081 (4th Cir. 1999) (holding that a plaintiff's own conclusory deposition testimony that a boat operator was traveling at an excessive speed is insufficient to avoid summary judgment).  (A copy of the Felton opinion is attached hereto as Exhibit "E").

Second, Plaintiff alleges that Mr. Hyde failed to keep the boat under proper control.  (*See* Paragraph 15 of Plaintiff's Complaint).  The record is devoid of any facts to support this allegation.  During his deposition, Plaintiff testified, in his opinion, that Mr. Hyde did two things wrong that potentially could be construed as failing to keep the boat under proper control:  (1) he was traveling too fast for conditions over the shoal, as addressed above; and (2) that Mr. Hyde drove the boat perpendicular into the wave at the time of the accident, as opposed to at an angle.  (Hines Tr., p. 219, L. 11-12; p. 223, L. 8-18).  Again, however, Plaintiff has not offered any evidence, expert or otherwise, on the issue of the proper manner in which to hit a wave, whether perpendicular or at an angle.  By his own testimony, when the Plaintiff operates a boat, he gauges when to hit a wave at an angle based upon whether the wave would potentially cause discomfort to his wife.  (Hines Tr., p. 224, L. 2-15).  Aside from this testimony, Plaintiff offers no evidence or explanation of the difference between hitting a wave perpendicular or at an angle, the reasons for doing so, or under what circumstances.  Such testimony by the Plaintiff amounts to nothing more that an unsupported assertion that is insufficient to establish that Mr. Hyde failed to properly control the boat.

Third, Plaintiff alleges that Mr. Hyde failed to keep a proper lookout.  (*See* Paragraph 15 of Plaintiff's Complaint).  Plaintiff's testimony, however, demonstrates that he possesses no facts to support this allegation.  Plaintiff testified that he was not watching where Mr. Hyde was driving the boat.  (Hines Tr. p. 210, L. 23-24).  He testified that he did not know how much time

elapsed when Mr. Hyde first saw or could have seen the wave and when the boat hit it. (Hines Tr., p. 221, L. 9-11). When pressed to attempt to quantify the time that had elapsed, Dr. Hines testified as follows: "I don't know because I wasn't looking when he was looking the whole time to drive the boat, obviously, the driver's looking all the time. I'm not watching him look straight ahead, I'm looking at how he's driving the boat." (Hines Tr., p. 221, L. 12-16). Further, Plaintiff testified that he was not watching the direction the boat was heading, and in fact, he had no idea what direction the boat was heading because he was looking only at Mr. Hyde with his hands on the helm and throttle. (Hines Tr., p. 210, L. 19-25; p. 211, L. 1-18). It is clear from this testimony that Plaintiff does not know whether Mr. Hyde kept a proper lookout because he was looking at Mr. Hyde and not what Mr. Hyde saw or could have seen out in front of the boat. Specifically, Plaintiff was unable to state when Mr. Hyde could have seen the wave. Therefore, not only is Plaintiff unable to state when Mr. Hyde did see the wave, he is unable to testify as to when Mr. Hyde should have seen the wave. If Plaintiff is unable to state when Mr. Hyde should have seen the wave that caused the accident, then it follows that he cannot establish that Mr. Hyde failed to keep a proper lookout.

Lastly, Plaintiff generally alleges that Mr. Hyde did not operate the boat with reasonable care. (*See* Paragraph 15 of Plaintiff's Complaint). The only remaining allegation of Mr. Hyde's negligence, by Plaintiff's own testimony, is his opinion that Mr. Hyde failed to warn him of this one particular wave. Plaintiff testified that was not aware of the conditions surrounding the boat just before the accident, as he had his attention focused solely on Mr. Hyde's hands upon the helm and throttle. However, Plaintiff knew that the boat was in waters with 3 to 4 foot waves, which by the testimony of both Plaintiff and Mr. Wagoner, was not unusual for that inlet, and neither had any objection to taking the boat out in the weather conditions present on March 21,

2006. Plaintiff offers no evidence as to why a warning was necessary. Even if the presence of this particular wave required a warning to the passengers, there is no evidence to support when Mr. Hyde first saw the wave, whether he could have or should have seen the wave, and if so, when and what type of warning should have been given to Plaintiff.

In sum, Plaintiff makes assertions in his deposition of the lack of due care by Mr. Hyde in the operation of the boat. Plaintiff is an experienced boater, but by his own admission, he is not an expert. (Hines Tr., pp. 193-196; p. 196, L. 14-16). However, these assertions amount to nothing more than the Plaintiff's own opinions. He has made no showing of the appropriate standard of care and thus that Mr. Hyde negligently operated the boat on March 21, 2006. Plaintiff is unable to set forth any facts to support the allegations of negligence in his Complaint. Accordingly, summary judgment is appropriate.

### 3. Plaintiff does not have reliable expert testimony to support his negligence claim

Not only does Plaintiff's own testimony fail to make a prima facie showing of negligence, but the opinions of Plaintiff's expert, Donald W. Davis, should be excluded for being unreliable, as the methodologies and principles he employed in reaching his opinions are flawed.

Mr. Davis' opinions are contained in his report of November 28, 2008. (A true and correct copy of Mr. Davis' November 28, 2008 report is attached hereto as Exhibit "F"). In his report, Mr. Davis arrived at two basic conclusions regarding Mr. Hyde's operation of the vessel. First, he opined that Mr. Hyde operated the boat at an "excessive speed for the existing conditions." (Davis report, p. 3, ¶5). Mr. Davis concluded that Mr. Hyde did not reduce his speed upon encountering "large seas." He went on to opine that due to the high speed impact into the oncoming waves, the forward area of the vessel was driven violently upward and then

dropped sharply into the trough behind the wave as the vessel passed over it. (Davis report, p. 3, ¶5).

Next, Mr. Davis opined that Mr. Hyde failed to maintain a proper lookout. He stated that Mr. Hyde should have observed the oncoming waves and sea conditions in sufficient time to have warned his passengers of the approaching dangers. (Davis report, p. 4, ¶6). Mr. Davis also opined that Mr. Hyde should have reduced his speed and taken an alternate course. (Davis report, p. 4, ¶ 6).

When investigating accidents, Mr. Davis attempts to obtain "all available data." (Donald W. Davis Depos. Tr., p. 50, L. 20-24, a true and correct copy of which is attached hereto as Exhibit "G"). Nonetheless, in preparing his report, Mr. Davis relied almost exclusively upon an interview he conducted of Dr. Hines.[1] He testified that he did not speak with the other occupants of the boat, Neil Wagoner and John Banister Hyde. In fact, at the time of his deposition on December 12, 2009, he had not been provided any additional information, including the depositions and statements of Mr. Wagoner and Mr. Hyde. Notwithstanding, Mr. Davis believed that his investigation of the accident was complete. (Davis Tr., p. 53, L. 16-19). With respect to the account of the accident that he received from interviewing Plaintiff, Mr. Davis testified that he learned the following:

> The individual from the dealership took the controls of the vessel, headed in a generally westerly direction back into the ship's channel at the cutoff, turned the vessel to the south, proceeding into the area of Beaufort Inlet on the western side, encountered waves at least 4 feet high at a speed of 20 knots or greater. The vessel was thrown into the air, he was thrown off of his feet, and when he met the vessel coming back up on the next wave, it crushed his ankle and he fell to the

---

[1] In addition to speaking with Dr. Hines, Mr. Davis reviewed two NOAA charts of the area of the accident. He reviewed the navigation rules, including Commandment Instruction M11672.2D. He reviewed the NOAA tide and current information for the Beaufort Inlet near Fort Macon for the date of the accident. He reviewed the NOAA weather data for the recording station at Cape Lookout on March 21, 2006, as well as the NOAA weather data for the station buoy closest to the area of the accident on March 21, 2006. He also inspected the involved vessel. (See, Davis Tr., p. 57, L. 3-13).

> floor of the vessel, and from there he was taken back to the condo and taken to the hospital.

(Davis Tr., p. 55, L. 9-19).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualifying as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

A district court's gatekeeping obligation under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), applies not only to scientific testimony but to all expert testimony, and the inquiry must be tied to the facts of a particular case. *See* Kumho Tire Company v. Carmichael, 526 U.S. 137 (1999). Under Rule 702, expert testimony must be both relevant and reliable. Daubert, 509 U.S. at 589. To satisfy these requirements, the testimony must be based on "more than subjective belief or unsupported speculation." Id. at 590. Reliability is to be determined by the "principles and methodology" employed by the expert. *See* Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (quoting Daubert, 509 U.S. at 594-95). Although experts with specialized knowledge often extrapolate from existing data, as the Supreme Court observed, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Kumho Tire, 526 U.S. at 157 (finding no abuse of discretion in rejecting opinion of expert with specialized knowledge) (quoting General Electric Company v. Joiner, 522 U.S. 136, 146 (1997)).

In this case, the opinions proffered by Mr. Davis are unreliable as the principles and methodologies he employed are flawed. First, it is apparent that Mr. Davis conducted a very limited investigation into the accident. Mr. Davis testified that he typically obtains "all available data" when investigating personal injury cases. (Davis Tr., p. 50, L. 20-24). When asked to describe the data he is generally interested in procuring, Mr. Davis replied: "It might be witnesses, it might be reports from the Coast Guard, it might be reports from Wildlife officers, it might be damage to the vessel that you can examine." (Davis Tr., p. 50, L. 25; p. 51, L. 1-4). However, he went on to testify that the only data he reviewed in this case were reports regarding the sea and weather conditions, an inspection of the vessel and his interview of Plaintiff. He made no attempt to obtain the statements of Mr. Wagoner and Mr. Hyde but acknowledged that it would be important to do so to determine the cause of the accident. (Davis Tr., p. 52, L. 8-22). He was aware that Plaintiff's counsel was going to speak with Mr. Hyde and Mr. Wagoner, but he never obtained these accounts. (Davis Tr., p. 53, L. 3-15). Mr. Davis could have requested the statements and depositions of Mr. Hyde and Mr. Wagoner from Plaintiff's counsel, however he never did so. Further, there was no damage to the subject vessel for him to inspect. Accordingly, in this case Mr. Davis failed to follow his own established methodologies before rendering his opinions.

It is clear from his report and deposition testimony that Mr. Davis relied almost exclusively upon information provided to him by the Plaintiff during a verbal interview. First, with respect to his mechanism of determining speed, Mr. Davis testified that he typically relies on witness interviews and electronically recorded speed information. (Davis Tr., p. 47, L. 1-7). In this case, he was only able to rely upon information provided to him by witnesses, as the speed in the subject vessel was not electronically preserved. (Davis Tr., p. 47, L. 8-12).

However, despite the fact that there were three (3) occupants of the boat at the time of the accident, Mr. Davis only interviewed and took into account the Plaintiff's estimate of speed during his verbal interview, which was 20 knots, or 23 m.p.h. (Davis Tr., p. 56, L. 13-21). At this particular time, however, Plaintiff had told Mr. Davis that the boat was going over 20 knots when it was in a different location than the accident, and Mr. Davis therefore assumed that Mr. Hyde never slowed down. (Davis Tr., p. 66, L. 1-9). Mr. Davis had no other information as to the speed of the boat and he never spoke with Mr. Hyde or Wagoner, nor did he ever review their statements or deposition testimony. (Davis Tr., p. 52, L. 14-25; p. 53, L. 1-11).

Although Plaintiff estimated in his deposition that the speed of the boat at the time of the accident was 25 m.p.h., he could not state the exact speed of the boat. (Hines Tr., p. 220, L. 8-16). Notwithstanding, Mr. Davis does not rely on Plaintiff's deposition testimony to support his opinions. On the other hand, Mr. Hyde testified that the boat was doing between 10 and 15 m.p.h. at the time of the accident, consistent with Mr. Wagoner's testimony that Mr. Hyde was doing under 20 m.p.h., and probably 15 m.p.h., at the time of the accident. Again, Mr. Davis never took this testimony into account when formulating his opinions. Mr. Davis' report and deposition testimony indicate simply that Mr. Hyde should have been operating the boat at a slower speed in the inlet, but Mr. Davis fails to state what that speed should be. There was no speed limit applicable at the time of the accident and, as Mr. Davis testified, the boating standards are relying more and more on the judgment of the operator. (Davis Tr., p. 43, L. 18-25; p. 44, L. 1-4). Thus, Mr. Davis concludes that Mr. Hyde was operating the boat at an excessive speed for the existing conditions, but he fails to say why or how traveling at 20 knots, or 25 m.p.h. as testified to by the Plaintiff, is improper as compared to some other slower speed. Mr. Davis' opinion as to the reasonableness of the speed of the boat is, therefore, unreliable.

Next, Mr. Davis opined that Mr. Hyde did not maintain a proper lookout. Specifically, he stated: "Mr. Hyde should have observed the oncoming waves and sea conditions in sufficient time to have warned his passengers of the approaching dangers and taken appropriate actions to lessen the exposure of his vessel and passengers to that danger." (Davis report, p. 4, ¶ 6). Again, Mr. Davis did not review any information provided by Mr. Hyde or Mr. Wagoner in reaching this conclusion. He did not consider the Plaintiff's deposition testimony. He does not know what Mr. Hyde saw or when he saw it. He simply states that Mr. Hyde should have observed the oncoming waves and sea conditions in sufficient time to warn the passengers. Mr. Davis makes an assertion of "approaching dangers" but he does not state what the danger is in traveling in 3 to 4 foot waves, which all of the witnesses characterized as being typical or not unusual in this inlet. Further, he does not state what "appropriate actions" Mr. Hyde should have taken to "lessen the exposure of his vessel and passengers to that danger." Mr. Davis testified as follows:

> Q. As the boat was going out toward the inlet, do you know which direction the operator was facing?
>
> A. Don't know.
>
> Q. Do you know if he saw the conditions ahead?
>
> A. Don't know.
>
> Q. Would that be important for you to know in making your opinion?
>
> A. Sure.

(Davis Tr., p. 85, L. 3-10).

Therefore, Mr. Davis testified that he did not know if Mr. Hyde saw the conditions ahead. As such, he clearly cannot provide an opinion as to whether Mr. Hyde failed to maintain a proper lookout. Moreover, as Plaintiff is unable to provide any facts as to when Mr. Hyde did see the

15

waves, or when he should have seen them, any opinion by Mr. Davis based upon the information provided by Plaintiff is unreliable.

Finally, the opinions of Mr. Davis are unsound as he basically concluded that Mr. Hyde was at fault for the March 21, 2006 accident simply because Plaintiff was injured. "[A] defendant's negligence will not be presumed from the mere happening of an accident… ." Griffis v. Lazarovich, 588 S.E.2d 918, 924 (N.C. Ct. App. 2003), *quoting* Ethridge v. Ethridge, 24 S.E.2d 477, 479 (N.C. 1943). Tellingly, Mr. Davis testified as follows:

> Q. Were there any other boats out where Dr. Hines was that day?
>
> A. I don't know that.
>
> Q. Would that be something that you would want to know?
>
> A. No.
>
> Q. Did you say no?
>
> A. No, there could have been other boats out there, lots of different kinds of boats.
>
> Q. Boats of the same size, would that mean anything to you?
>
> A. Yes that people were operating the boat the way that they should, yes. If they didn't get injured, then they must have done what they should have.
>
> Q. What are you saying about the fact that Dr. Hines was injured then?
>
> A. Then the operator was not showing due care, most especially if there were other boats out there the same size that didn't have a problem.

(Davis Tr., p. 74, L. 7-24).

Similarly, he provided the following testimony:

> Q. The final result, you said you would look at that, if it's heavy weather and someone is hurt, then someone did what they shouldn't have done?

|  | A. | A good chance of it, yes, sir. |
|---|---|---|
|  | Q. | You mean the operator? |
|  | A. | Did not show due care, yes. |

(Davis Tr., p. 47, L. 13-18).

Mr. Davis also testified:

|  | Q. | Is it possible to have an injury like this without somebody being at fault in the operation of the boat? |
|---|---|---|
|  | A. | Sure. |
|  | Q. | How, how so? |
|  | A. | You could slip down a set of steps on a ship and you could get hurt that way. |
|  | Q. | I am talking about the way that Dr. Hines was injured? |
|  | A. | No. |
|  | Q. | It's not possible? |
|  | A. | Not in my opinion. |

(Davis Tr., p. 88, L. 16-25; p. 89, L. 1).

In addition, Mr. Davis agreed that he would conclude that an operator of a vessel failed to use due care if one of his passengers was injured when the vessel came down off a wave. (Davis Tr., p. 44, L. 5-25; p. 45, L. 1-8). He also stated: "If you run a vessel into heavy weather and someone is thrown from the deck, then to me, that tells me that someone didn't do what they should have done." (Davis Tr., p. 44, L. 18-20). Moreover, he confirmed that he considers the final result when determining whether due care was used. (Davis Tr., p. 49, L. 1-24). He testified that if he only possessed the weather and sea conditions his opinion would not change because "it's a fact of his injury, then someone did not show due care." (Davis Tr., p. 60, L. 8-24). He also testified that he would not have changed his conclusions, even if he had been told

by Mr. Wagoner that the weather conditions were not unusual and Mr. Hyde did not do anything wrong. (Davis Tr., p. 60, L. 8-24).

In sum, Mr. Davis' opinions are based on flawed principles and methodologies. He testified that it was important for him to obtain "all available data" including witness accounts and that it would be important to have those to determine the cause of an accident. By his own admission, however, Mr. Davis did not review all available data and came to his opinions without considering what witnesses other than the Plaintiff had to say. Instead, he relied only on a verbal interview of the Plaintiff along with sea and weather conditions. He opines that Mr. Hyde did not exercise due care by operating the boat at an excessive speed for the existing conditions and that he failed to keep a proper lookout, but his opinions are based on his subjective beliefs and unsupported speculation. Mr. Davis made it quite clear during his deposition that he believes an accident of this nature can only be equated with operator negligence. Such principles are unreliable and contrary to law. Accordingly, the testimony and opinions of Donald W. Davis should not be considered and summary judgment is appropriate because Mr. Davis' opinions are unreliable.

## IV. Conclusion

For all of the foregoing reasons, Defendants, Triad Marine Center, Inc., d/b/a Boats Unlimited NC and John Banister Hyde, respectfully submit that Plaintiff cannot make out a *prima facie* claim in negligence against Defendants. Accordingly, and as a matter of law, this action should be dismissed in its entirety, with prejudice, as to Triad Marine Center, Inc., d/b/a Boats Unlimited NC and John Banister Hyde.

18
Case 4:09-cv-00003-BR    Document 40    Filed 01/01/10    Page 18 of 20

This 30th day of December, 2009.

          Respectfully submitted,

          DICKIE, McCAMEY & CHILCOTE, P.C.

      By:    /s/ J. Lawson Johnston
              J. Lawson Johnston, Esquire
              Attorneys for Defendants
              Dickie, McCamey & Chilcote, P.C.
              Two PPG Place, Suite 400
              Pittsburgh, PA 15222
              (412) 392-5322
              Fax (412) 392-5367
              ljohnston@dmclaw.com

      By:    /s/ John T. Pion
              John T. Pion, Esquire
              Attorneys for Defendants
              Dickie, McCamey & Chilcote, P.C.
              Two PPG Place, Suite 400
              Pittsburgh, PA 15222
              (412) 392-5452
              Fax (412) 392-5367
              jpion@dmclaw.com

      By:    /s/ Susan H. Briggs
              Susan H. Briggs
              Attorneys for Defendants
              Dickie, McCamey & Chilcote, P.C.
              2115 Rexford Road, Suite 210
              Charlotte, NC 28211
              sbriggs@dmclaw.com
              (704) 998-5184
              Fax (888) 811-7144
              N.C. State Bar No. 21132
              LR 83.1 Counsel

# CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Stevenson L. Weeks, Esq.
Attorney for Plaintiff
Wheatly, Wheatly, Weeks & Lupton, P.A.
710 Cedar Street
Post Office Box 360
Beaufort, NC 28516
slw@wwnwpa.com

Charles R. Hardee, Esq.
Attorney for Plaintiff
Hardee & Hardee, LLP
202 E. Arlington Blvd., Suite W
Greenville, NC 27835
crh@hardeeandhardee.com

|     |     |
| --- | --- |
|     | Dickie, McCamey & Chilcote, P.C. |
| By: | /s/ J. Lawson Johnston |
|     | J. Lawson Johnston, Esquire |
|     | Attorneys for Defendants |
|     | Dickie, McCamey & Chilcote, P.C. |
|     | Two PPG Place, Suite 400 |
|     | Pittsburgh, PA 15222 |
|     | (412) 392-5322 |
|     | Fax (412) 392-5367 |
|     | ljohnston@dmclaw.com |