# EXHIBIT B



# COPY

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
### CIVIL ACTION NO. 4:09-CV-3-BR

BENJAMIN G. HINES, JR.,    )        VIDEOTAPED
                    )
        PLAINTIFF,    )    D-E-P-O-S-I-T-I-O-N
                    )
VS.                    )           OF
                    )
TRIAD MARINE CENTER, INC., ET )   BENJAMIN G. HINES, JR.
AL,                  )
        DEFENDANTS.   )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SEPTEMBER 29, 2009, AT THE LAW OFFICES OF WHEATLY, WHEATLY, WEEKS & LUPTON, P.A., 710 CEDAR STREET, BEAUFORT, NORTH CAROLINA

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF   -    STEVENSON L. WEEKS, ESQ.

                          WHEATLY, WHEATLY, WEEKS & LUPTON, P.A.
                          ATTORNEYS AT LAW
                          710 CEDAR STREET
                          BEAUFORT, NC  28516

                          CHARLES R. HARDEE, ESQ.

                          HARDEE & HARDEE
                          ATTORNEYS AT LAW
                          202 EAST ARLINGTON BLVD.
                          GREENVILLE, NC

FOR THE DEFENDANTS  -    JOHN T. PION, ESQ.
                          J. LAWSON JOHNSTON, ESQ.

                          DICKIE, MCCAMEY & CHILCOTE, P.C.
                          ATTORNEYS AT LAW
                          TWO PPG PLACE, SUITE 400
                          PITTSBURGH, PA  15222

COURT REPORTER     -    SHERRY HOPKINS

**COASTAL COURT-REPORTING AGENCY, INC.**
P.O. BOX 788
NEWPORT, NORTH CAROLINA 28570
TEL: (252) 223-4045
FAX: (252) 223-3663

MARINA AND STUFF, IT'S NOT MUCH DIFFERENT THAN HERE. THERE'S

A LITTLE LESS TO DO THAN THERE IS HERE, BUT IT'S JUST A

CHANGE OF SCENERY.

    Q.   HOW FAR CAN YOU RIDE YOUR BIKE?

    A.   PROBABLY - I HAVEN'T RIDDEN IT, MORE THAN BEING

AROUND THE DOCK AND AROUND THE MARINA, MORE THAN A MILE.

    Q.   WHY DO YOU NEED A GIRL'S BIKE?

    A.   IT'S HARD TO GET ON AND OFF OF THE BIKE.

    Q.   WHY IS THAT?

    A.   THAT HORIZONTAL BAR, IT'S DIFFICULT TO PRESS

DOWN ON THE ANKLE TO GET UP IF YOU USE YOUR LEFT ANKLE, AND

IF YOU DON'T AND YOU'RE GETTING OFF THE BIKE, IT'S UNSTABLE

TO RELY ON ONE ANKLE ALL OF A SUDDEN. IT'S JUST EASIER

WITHOUT THAT BAR IN THE WAY. YOU HAVE LESS OF A SPACE FOR

YOUR ANKLE TO HAVE TO HIT BEFORE BOTH FEET ARE ON THE GROUND,

DOES THAT MAKE SENSE?

    Q.   UH-HUH.

    A.   OKAY.

    Q.   WHEN DID YOU START LEARNING ABOUT BOATS, WHAT

AGE WERE YOU?

    A.   A KID.

    Q.   DID YOUR FATHER BOAT AS WELL?

    A.   HE DIDN'T, BUT MY UNCLE DID.

    Q.   YOU WERE HOW OLD, ABOUT?

    A.   TEN.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

```
 1          Q.   WHEN DID YOU FIRST OWN YOUR OWN BOAT?

 2          A.   AS SOON AS I GOT OUT OF SCHOOL, RESIDENCY, SO

 3    SINCE '88.

 4          Q.   HOW MANY BOATS HAVE YOU OWNED?

 5          A.   AT LEAST HALF A DOZEN TO TEN.

 6          Q.   BEFORE THESE LAST FOUR THAT WE DISCUSSED?

 7          A.   PROBABLY FOUR MORE.

 8          Q.   WHAT KIND OF BOATS?

 9          A.   PROBABLY THE LARGEST WAS ABOUT A 38, 40 FOOT

10    BOAT.

11          Q.   ALL MOTORIZED?

12          A.   YES, ALL MOTOR BOATS.  I KNOW NOTHING ABOUT

13    SAILING, DIDN'T GROW UP WITH SAILBOATS.

14          Q.   DID YOU EVER TAKE ANY KIND OF COURSES, OR

15    INSTRUCTION . . .

16          A.   YES, SIR.

17          Q.   WHAT DID YOU TAKE?

18          A.   POWER SQUADRON COURSES.

19          Q.   SAY IT AGAIN?

20          A.   POWER SQUADRON COURSES.

21          Q.   WHAT IS THAT?

22          A.   IT'S AN ASSOCIATION, VOLUNTEERS, SORT OF LIKE A

23    PSEUDO AUXILIARY COAST GUARD, FOR TEACHING.

24          Q.   FOR TEACHING?

25          A.   TEACHING, AND RECREATION, SOCIALIZATION, AND YOU
```

194

1   TAKE COURSES, AND YOU TAKE COURSES FOR NAVIGATION, AND

2   MECHANICS, AND I'VE TAKEN ALL OF THOSE, SEAMANSHIP.

3            Q.   HAVE YOU TAUGHT?

4            A.   NO, I HAVE NOT TAUGHT.

5            Q.   DO YOU HAVE ANY SORT OF CERTIFICATE OF ANY KIND?

6            A.   YES, UH-HUH.

7            Q.   WHAT DO YOU HAVE?

8            A.   DON'T KNOW THE NAMES ANYMORE, BUT SEAMANSHIP,

9   AND PROBABLY NAVIGATION, AND ADVANCED NAVIGATION, AND

10  MECHANICS, AND I'M NOT SURE WHAT ELSE, BUT THERE'S QUITE A

11  FEW OF THEM.

12           Q.   WHO GRANTS THOSE TO YOU, WHAT ORGANIZATION?

13           A.   THE COURSE INSTRUCTOR THAT IS TEACHING UNDER THE

14  AUSPICES OF THE POWER SQUADRON.

15           Q.   THIS POWER SQUADRON IS A . . .

16           A.   THAT WAS A GREENVILLE BASED POWER SQUADRON, MOST

17  COUNTIES, I THINK, HAVE THEM.

18           Q.   SO IT'S AN ASSOCIATION OF VOLUNTEERS THAT KIND

19  OF PROMOTE SAFETY AND INSTRUCTION, AND IF SOMEBODY WERE JUST

20  BUYING A BOAT FOR THE FIRST TIME, MIGHT THEY GO TO SOMEBODY

21  LIKE YOU AND SAY, TEACH ME HOW TO DO BOATING, I MEAN, I DON'T

22  KNOW HOW THAT APPLIES?

23           A.   THEY WOULD PROBABLY, RATHER THAN GO TO ME, SEEK

24  OUT THE POWER SQUADRON, OR I WOULD ADVISE THEM TO DO THAT,

25  IT'S MORE REGIMENTED IN TEACHING.

195

1    Q.   DID YOU HAVE A CERTAIN NUMBER OF HOURS THAT YOU

2 HAD TO LOG IN ORDER TO GET THESE CERTIFICATIONS FOR

3 SEAMANSHIP, NAVIGATION, ET CETERA?

4    A.   THEY'RE TOTALLY CLASSROOM WORK.

5    Q.   IS THERE A CERTAIN NUMBER OF HOURS?

6    A.   I WOULD GATHER THAT EACH COURSE WAS PROBABLY

7 TEN, TWELVE HOURS OF CLASSROOM WORK, BUT I - IT'S BEEN A LONG

8 TIME, I TOOK NUMEROUS COURSES YEARS AGO.

9    Q.   COULD YOU ESTIMATE HOW MANY HOURS OF COURSE WORK

10 YOU HAD?

11   A.   100 HOURS, 60 TO 100 HOURS OVER THE YEARS.

12   Q.   WOULD YOU CONSIDER YOURSELF AN EXPERT IN

13 OPERATING POWER BOATS?

14   A.   I DON'T THINK I'M AN EXPERT.  I'M A LEARNED

15 POWER BOATER, BUT I DON'T REALLY THINK I'M AN EXPERT.

16   Q.   WHAT WOULD YOU HAVE TO DO TO BECOME AN EXPERT,

17 BY YOUR DEFINITION?

18   A.   I'M NOT SURE.  I DON'T KNOW WHAT I WOULD DO TO

19 MAKE ME FEEL MORE LEARNED, I REALLY DON'T.

20   Q.   SO YOU'VE BEEN OPERATING POWERBOATS SINCE 1988?

21   A.   YES, SIR.

22   Q.   YOU'VE OWNED POWERBOATS, BUT EVEN BEFORE THAT AS

23 A KID, YOU OPERATED POWERBOATS?

24   A.   YES, UNDER SUPERVISION.

25   Q.   HAVE YOU EVER BEEN IN A POSITION IN OPERATING A

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1  IF THEY TRULY CLOSED AT 6:00, I MUST HAVE STAYED AFTER HOURS,

2  BUT, WHAT WAS THE QUESTION, I'M SORRY?

3      Q.   HOW LONG YOU WERE THERE, HOW LONG YOU SPENT THE

4  FIRST DAY . . .

5      A.   I THINK I WAS THERE FOR AT LEAST AN HOUR, AT

6  LEAST AN HOUR.

7      Q.   HOW MANY BOATS DID YOU LOOK AT?

8      A.   I DID A CURSORY EXAMINATION OF ONE, AND I DID A

9  MUCH MORE THOROUGH EXAMINATION OF THIS BOAT.  THIS BOAT BEING

10  THE BOAT THAT I WAS INJURED ON.

11      Q.   SO I TAKE IT YOU - I MEAN, WE DID TALK A LITTLE

12  BIT ABOUT THE TWO BOATS, AND THE HIGH QUALITY

13  WAS - APPARENTLY THE TRITON WAS HIGHER QUALITY, AT LEAST

14  THAT'S WHAT YOU THOUGHT AT THAT TIME, CORRECT?

15      A.   YES, SIR.

16      Q.   SO THAT'S THE ONE THAT YOU WANTED TO SEA TRIAL?

17      A.   YES, SIR.

18      Q.   WHAT DID YOU TELL JOHN HYDE ABOUT TESTING OUT

19  THE BOAT?

20      A.   THAT MONDAY NIGHT?

21      Q.   YES?

22      A.   I TOLD HIM MY PURPOSE WAS I NEEDED A BOAT THAT

23  WOULDN'T BEAT MY WIFE UP AS THE SKIFF DID, THAT I NEEDED A

24  BOAT THAT WAS DRY IN RIDE, AND THAT BASICALLY WAS THE

25  PURPOSE, AND SINCE HE SAID THE TRITON WAS THE HEAVIER BOAT,

203

Case 4:09-cv-00003-BR    Document 40-3    Filed 01/01/10    Page 7 of 32

1    IT WOULD BE DRIER, AND WOULDN'T POUND LIKE THE SKIFF WOULD

2    POUND, THAT SHE WOULD FIND IT A MORE COMFORTABLE RIDING BOAT.

3           Q.    SO YOU WANTED TO TEST IT OUT, YOU WANTED TO SEA

4    TRIAL IT, THE TRITON?

5           A.    YES, SIR.

6           Q.    YOU WANTED TO TAKE IT OUT AND TEST IT?

7           A.    YES, SIR, ABSOLUTELY.

8           Q.    THAT WAS YOUR IDEA, RIGHT?

9           A.    YES, I WOULDN'T BUY A BOAT WITHOUT SEA TRIALING

10   IT, YES.

11          Q.    RIGHT, I UNDERSTAND.  SO YOU TOLD HIM, LET'S

12   TAKE IT OUT, AND HOW DID THE DISCUSSION GO ABOUT WHEN YOU

13   WOULD TAKE IT OUT?

14          A.    I DROVE FROM WORK AND TOLD HIM I WAS HEADED TO

15   THE BEACH, AND I DON'T REMEMBER.  I WOULD HAVE SIMPLY SAID, I

16   NEEDED IT, IF I'M GOING TO DRIVE THE BOAT, IT NEEDS TO BE

17   TOMORROW.

18          Q.    WASN'T IT THE FACT THAT YOU SAID YOU WANTED TO

19   OPERATE IT IN HEAVY CONDITIONS?

20          A.    NO, MY DAYS OFF IS TUESDAY, WE DON'T HAVE A

21   CHOICE.  IF WE'RE GOING TO TEST DRIVE THE BOAT, IT'S ON

22   TUESDAY, PERIOD.

23          Q.    SO YOU DIDN'T SAY I WANT TO TEST IT IN HEAVY

24   CONDITIONS TO SEE IF IT STAYS DRY, YOU DIDN'T SAY THAT?

25          A.    NO, NO.

204

Case 4:09-cv-00003-BR    Document 40-3    Filed 01/01/10    Page 8 of 32

```
 1          Q.   YOU DON'T RECALL THAT?

 2          A.   NO.

 3          Q.   SO JUST TUESDAY IS YOUR DAY OFF, SO THAT'S THE

 4   DAY YOU HAD TO GO, IS THAT WHAT YOU'RE SAYING?

 5          A.   CORRECT.

 6          Q.   WAS THAT YOUR DECISION, YOUR CHOICE TO GO ON A

 7   TUESDAY?

 8          A.   NO, I JUST SAID, IF YOU CAN DO IT TOMORROW, I'LL

 9   DO IT TOMORROW, THAT'S THE DAY I HAVE OFF, I'LL BE AT THE

10   BEACH TOMORROW.

11          Q.   WERE YOU AT THE CONDO?

12          A.   YES, SIR, THAT'S WHERE I WAS HEADING.

13          Q.   DID YOU STAY THERE CERTAIN DAYS OF THE WEEK WHEN

14   YOU WERE WORKING?

15          A.   NO, I ONLY WENT DOWN IF I COULD ON MONDAY NIGHT,

16   AND SPENT TUESDAY, THEN CAME BACK TUESDAY NIGHT, BECAUSE I

17   HAD TO WORK AGAIN WEDNESDAY.

18          Q.   HOW FAR AWAY ARE THE TWO RESIDENCES?

19          A.   ABOUT EIGHTY MILES.

20          Q.   SO YOU SET IT UP FOR A MEETING ON TUESDAY, TO

21   TAKE THE BOAT OUT?

22          A.   YES, SIR.

23          Q.   THEN TELL ME WHAT HAPPENED, YOU MET JOHN HYDE AT

24   THE DOCK?

25          A.   YES, SIR.
```

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

Q.   AT YOUR DOCK AT OLDE TOWNE?

A.   YES, SIR.

Q.   HE DOCKED IT SOMEWHERE ELSE AND OPERATED THE BOAT AROUND TO WHERE YOU WERE LOCATED, RIGHT?

A.   RIGHT, HE BROUGHT IT TO OLDE TOWNE.

Q.   WHAT WERE THE WEATHER CONDITIONS?

A.   IT WAS RAINING, AND IT WAS PROBABLY BLOWING - THERE WAS A LITTLE SMALL CRAFT ADVISORY, AND PROBABLY BLOWING 20, CONDITIONS WERE NICE AND A LITTLE SNOTTY IN THE SOUND, PROBABLY WAVES 3 TO 4.

Q.   3 TO 4 FEET?

A.   YES.

Q.   YOU KNEW THAT BEFORE YOU WENT OUT?

A.   YES, SIR.

Q.   YOU DIDN'T THINK THAT WAS A PROBLEM IN ANY WAY, DID YOU?

A.   NO, SIR.

Q.   CONDITIONS DIDN'T CHANGE FROM THE TIME YOU LEFT UNTIL THE ACCIDENT, THEY WERE STILL 3 TO 4 FEET?

A.   YES, SIR.

Q.   DID THAT BOAT HAVE A G.P.S.?

A.   I WOULD ALMOST THINK I LOOKED AT A SPEEDOMETER, BUT NOT A G.P.S.

Q.   DID YOU MAKE ANY NOTES AT ALL AS TO WHAT HAPPENED THAT DAY, ANYTHING IN WRITING AT ANYTIME AFTER THE

206

ACCIDENT?

      A.    NO, SIR.

      Q.    WHETHER IT WAS MONTHS LATER, OR DAYS LATER?

      A.    NO, SIR.

      Q.    ARE YOU SURE IT HAD A SPEEDOMETER, OR DO YOU JUST THINK IT DID?

      A.    NO, IF THERE'S SOME OTHER DEVICE THAT GIVES YOU SPEED - THERE WAS A DEVICE, IN MY MIND.

      Q.    SO THERE WERE JUST THE THREE OF YOU ON THE BOAT, JOHN HYDE, NEIL WAGONER, AND YOU, CORRECT?

      A.    YES, SIR.

      Q.    JOHN HYDE PICKED UP BOTH YOU AND NEIL AT YOUR DOCK, CORRECT?

      A.    YES.

      Q.    HOW DID YOU GET DOWN TO THE DOCK FROM YOUR APARTMENT, JUST WALK?

      A.    YES, SIR.

      Q.    YOU DIDN'T RIDE YOUR BIKE OR ANYTHING?

      A.    NO, I DIDN'T RIDE A BIKE AROUND THE DOCK THEN.

      Q.    DO YOU, AT THIS TIME, EVER WALK FROM YOUR APARTMENT OR YOUR CONDO, TO THE DOCK?

      A.    THAT'S ALL I DID.

      Q.    WALK?

      A.    YES, SIR.

      Q.    NOT RIDE A BIKE?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1    A.    CORRECT.

2    Q.    WHEN DO YOU DECIDE WHEN YOU'RE GOING TO RIDE

3    YOUR BIKE OUTSIDE?

4    A.    NOW?

5    Q.    YES, I'M TALKING ABOUT AFTER THE ACCIDENT, DID

6    YOU WALK FROM YOUR CONDO . . .

7    A.    I ALMOST ALWAYS RIDE THE BIKE, EVERYWHERE I GO

8    AROUND THE CONDO, EVEN IF IT'S JUST DOWNSTAIRS TO SOCIALIZE.

9    Q.    DO YOU KNOW WHAT THE TEMPERATURE WAS THAT DAY AS

10   YOU WERE GOING OFF?

11   A.    I DON'T REMEMBER, I WOULDN'T GATHER AN ATTEMPT.

12   Q.    AS I UNDERSTAND WHAT HAPPENED, YOU TELL ME IF

13   I'M WRONG, YOU WERE GOING TO TEST DRIVE THE BOAT YOURSELF FOR

14   A WHILE, THEN YOU WERE GOING TO TURN IT OVER TO JOHN HYDE AND

15   HAVE HIM GO INTO THE INLET, AND SEE IF THE BOAT WOULD OPERATE

16   AND STAY DRY IN THOSE CONDITIONS IN THE INLET THAT DAY?

17            MR. HARDEE:  OBJECTION.  YOU MAY ANSWER, BEN.

18   Q.    IS THAT CORRECT?

19   A.    NO, SIR.

20   Q.    THAT'S NOT CORRECT?

21   A.    NO.

22   Q.    TELL ME WHAT HAPPENED THEN, WHAT THE PLAN WAS?

23   A.    I DROVE THE BOAT, AND WHEN I DIDN'T LIKE THE

24   HANDLING OF THE BOAT, ASKED JOHN, AS I HAS ASKED OTHER PEOPLE

25   TO DRIVE THE BOAT AND INSTRUCT ME, ASKED HIM TO SHOW ME COULD

208

HE HANDLE THE BOAT BETTER, BUT THERE WAS NO MENTION OF THE

INLET, THERE WAS NO MENTION OF ROUGH WATER AT ALL.

Q.   WELL, WASN'T PART OF YOUR PURPOSE TO SEE IF THAT

BOAT WOULD REMAIN DRY IN HEAVY CONDITIONS, I MEAN, YOU TOLD

HIM THE DAY BEFORE YOU WANTED A DRY BOAT, AND ONE THAT'S NOT

THAT ROUGH?

A.   RIGHT, BUT HEAVY CONDITIONS IS NOT WHAT I WOULD

PUT MY WIFE IN AT ALL.  I MEAN, HEAVY CONDITIONS, WE'RE

ALREADY IN IT, IT'S 3 TO 4 FEET.  IF THAT'S ALL WE'RE GOING

TO DO - IF I TAKE MY WIFE OUT MORE THAN 3 TO 4, SHE'S MAD AS

HELL THAT I'M IN 3 OR 4, THAT'S SPRAYING HER ENOUGH, SO WHAT

I CHOSE THAT DAY WOULD BE ALL THAT WE'D EVER BE IN.  THERE'S

NO REASON TO GO OUT TO THE INLET, I MEAN, I WOULDN'T WANT THE

BOAT FOR ANYTHING LIKE THAT.

Q.   SO YOU DIDN'T TELL HIM TO GO OUT IN THE INLET

THEN?

A.   NO, SIR.  NO, I JUST WANTED TO SEE IF HE COULD

DRIVE THE BOAT AND SHOW ME HOW TO KEEP THE BOAT FROM

PORPOISING.

Q.   WHY DID HE GO OUT IN THE INLET THEN?

A.   YOU'D HAVE TO ASK HIM, I HAVE NO IDEA.

Q.   YOU HEARD HIS TESTIMONY YESTERDAY, DIDN'T YOU?

A.   I HEARD IT, BUT I DON'T REMEMBER WHAT HE SAID.

IF HE SAID I SAID IT, HE'S WRONG.

Q.   CAN YOU THINK OF ANY REASON THAT HE WOULD GO OUT

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

INTO THE INLET AFTER YOU HAD DRIVEN IT FOR A HALF HOUR?

    A.   I WOULDN'T KNOW WHY HE DID WHAT HE DID, I REALLY WOULDN'T.

    Q.   DOES IT MAKE ANY SENSE?

    A.   THE WHOLE THING DID NOT MAKE SENSE.

    Q.   I MEAN, YOU KNOW HE'S A COAST GUARD CAPTAIN, RIGHT?

    A.   IT STILL WOULDN'T MAKE SENSE.  WHAT HAPPENED DID NOT MAKE SENSE.

    Q.   YOU UNDERSTAND THAT HE HAS . . .

    A.   IT WOULDN'T MATTER WHAT HE HAD.

    Q.   DO YOU UNDERSTAND THAT HE HAS THAT LICENSE?

    A.   I HEARD THAT HE HAD YESTERDAY, FOR THE FIRST TIME.

    Q.   WHEN YOU MET WITH HIM AND YOU TALKED TO HIM, DID HE SEEM LIKE HE WAS VERY CAPABLE?

    A.   I DIDN'T KNOW HE HAD A LICENSE AT THAT TIME, AND KNEW NOTHING ABOUT IT.

    Q.   DID YOU TELL JOHN HYDE, DON'T GO IN THE INLET?

    A.   NO, I DIDN'T SAY, DON'T GO IN THE INLET.

    Q.   SO YOU THOUGHT THAT WAS OKAY?

    A.   I WAS NOT AWARE HE WAS GOING IN THE INLET.

    Q.   YOU KEPT A PROPER LOOKOUT, DIDN'T YOU?

    A.   NO, I WASN'T WATCHING WHERE HE WAS DRIVING.

    Q.   YOU WERE STANDING TO HIS LEFT, YOU WERE FACING

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

FORWARD AS HE WAS OPERATING, ISN'T THAT RIGHT?

     A.     FACING OBLIQUELY.  I'M LOOKING AT HIM AND HOW
HE'S DRIVING THE BOAT.  I AM TECHNICALLY FACING FORWARD, BUT
I REALLY AM NOT LOOKING WHERE HE'S GOING, THAT'S TRUE.

     Q.     SO YOU DIDN'T EVEN KNOW WHERE HE WAS GOING, YOU
WERE NOT LOOKING?

     A.     AS I SAID, I'M WATCHING HOW HE'S HANDLING THE
BOAT, BECAUSE I'M TRYING TO SEE WHAT HE DOES DIFFERENTLY.

     Q.     WELL, WHAT WAS HE DOING?

     A.     DRIVING THE BOAT.

     Q.     I KNOW, BUT HOW WAS HE DOING IT, WHAT WAS HE
DOING WITH HIS HANDS?

     A.     I'M NOT SURE WHAT YOU'RE ASKING?

     Q.     YOU SAID THAT YOU'RE LOOKING AT HIM, WATCHING
HIM, HOW HE HANDLED THE BOAT, HOW DID HE HANDLE IT?

     A.     I WAS WATCHING HIM WITH HIS HAND ON THE WHEEL
AND A HAND ON THE HELM.  I MEAN, HAND ON THE HELM AND HAND ON
THE THROTTLE.

     Q.     WAS HE DOING ANYTHING, WAS HE MOVING HIS HANDS?

     A.     OH, YES, HE WAS MOVING BOTH.

     Q.     WAS IT SOMETHING DIFFERENT THAN WHAT YOU WERE
DOING, WEREN'T YOU OPERATING IT THE SAME WAY HE DID, WITH
YOUR HAND ON THE THROTTLE . . .

     A.     YOUR HANDS ARE ALWAYS IN THE SAME PLACE.  I
WANTED TO SEE IF HE COULD MANAGE THE BOAT DIFFERENTLY.

211

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    Q.   SO YOU AGREE THAT YOU'RE HEADING OUT TO THESE

2   WAVES THAT ARE 3 TO 4 FEET HIGH, CORRECT, WHEN HE'S OPERATING

3   THE BOAT, ISN'T THAT RIGHT?

4        A.   YES.

5        Q.   AND YOU DIDN'T HAVE ANY OBJECTION TO THAT?

6        A.   NO.

7        Q.   OVER THE COURSE OF YOUR CAREER AND YOUR TEACHING

8   AND SO FORTH, I MEAN, YOU'VE BEEN IN THE SAME CONDITIONS

9   PROBABLY THOUSANDS OF TIMES, ISN'T THAT CORRECT?

10        A.   YES, I DIDN'T MIND BEING OUT IN 3 TO 4 FOOT

11   CHOP.

12        Q.   SO THAT WAS A COMMON THING FOR YOU TO

13   PARTICIPATE IN, SO TO SPEAK, OR TO BE IN THE PRESENCE OF

14   WAVES OF THAT SIZE?

15        A.   YES, SIR.

16        Q.   YOU DIDN'T HAVE ANY OBJECTION TO HIS GOING OUT

17   THERE?

18             MR. WEEKS:  WHEN YOU'RE TALKING ABOUT OUT THERE,

19   WHAT ARE YOU REFERRING TO?

20        Q.   I'LL WITHDRAW THE QUESTION.  YOU DIDN'T HAVE ANY

21   PROBLEM WITH THE DIRECTION IN WHICH HE WAS OPERATING THE

22   BOAT?

23             MR. WEEKS:  AT WHAT POINT IN TIME?

24        Q.   AFTER IT WAS TURNED OVER TO JOHN HYDE?

25        A.   I'M NOT SURE I AM UNDERSTANDING THE SPECIFICS OF

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1   WHAT YOU'RE ASKING ME.

2          Q.    YOU'VE ALREADY AGREED THAT YOU DIDN'T TELL HIM,

3   DON'T GO OUT IN THE INLET?

4          A.    THAT'S CORRECT.

5          Q.    SO YOU DIDN'T HAVE A PROBLEM WITH THE FACT THAT

6   HE WAS GOING OUT IN THE INLET?

7          A.    I DIDN'T KNOW HE WAS GOING OUT IN THE INLET,

8   THAT'S CORRECT.

9          Q.    WHEN DID YOU FIND OUT THAT HE WAS GOING IN THE

10  INLET?

11         A.    I DIDN'T REALIZE UNTIL HE TURNED AT A CERTAIN

12  POINT IN FRONT OF FORT MACON WHERE WE WERE, BECAUSE I WASN'T

13  WATCHING WHERE WE WERE.

14         Q.    SO WHEN YOU SAW HIM TURNING LEFT TO GO OUT TO

15  THE INLET, YOU KNEW HE WAS GOING OUT TO THE INLET, ISN'T THAT

16  CORRECT?

17         A.    YES.

18         Q.    ISN'T THAT CORRECT?

19         A.    YES.

20         Q.    YOU HAD NO OBJECTION TO IT?

21         A.    NO, IT HAPPENED SUDDENLY.

22         Q.    WELL, HOW MUCH TIME PASSED FROM THE TIME THAT

23  JOHN HYDE TOOK OVER THE OPERATING OF THE BOAT AND THE

24  ACCIDENT?

25         A.    I WOULD SAY, IF HE TOOK OVER THE BOAT IN

213

Case 4:09-cv-00003-BR     Document 40-3     Filed 01/01/10     Page 17 of 32

1    FRONT - HE TOOK OVER THE BOAT IN FRONT OF SHACKLEFORD BANKS

2    AND PROBABLY DROVE THE BOAT FOR LESS THAN FIVE MINUTES.

3         Q.   DID YOU EVER - YOU HAD SAID SOMETHING IN THE

4    COMPLAINT ABOUT WHILE HE WAS IN SHACKLEFORD HE WAS DOING A

5    CERTAIN SPEED, DO YOU REMEMBER THAT?

6         A.   NO, I DON'T REMEMBER THAT.

7         Q.   WELL, DID YOU EVER SEE THE COMPLAINT, I'LL SHOW

8    YOU A COPY HERE.  TAKE A LOOK AT THAT AND SEE IF YOU'VE EVER

9    SEEN IT BEFORE?

10        A.   DO YOU HAVE A PAGE YOU WANT ME TO LOOK AT

11   SPECIFICALLY, BECAUSE IT'LL TAKE ME A WHILE TO READ

12   SOMETHING.

13        Q.   WHY DON'T YOU LOOK AT THE WHOLE THING.

14        A.   (PAUSE - PERUSES DOCUMENT.)

15        Q.   HAVE YOU SEE IT BEFORE?

16        A.   YES, SIR.

17        Q.   DID YOU SUPPLY ANY OF THE INFORMATION THAT'S IN

18   THERE?

19        A.   YES, SIR.

20        Q.   YOU WERE HERE YESTERDAY WHEN JOHN HYDE TESTIFIED

21   ABOUT THE ROUTE THAT HE TOOK AND IT'S ON EXHIBIT NUMBER [9],

22   I DON'T KNOW IF YOU CAN PAN OVER HERE, DO YOU REMEMBER HE

23   TESTIFIED ABOUT THE ROUTE THAT HE TOOK AND HE MARKED IT OUT

24   ON EXHIBIT [9]?

25        A.   YES, SIR.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    Q.   AM I CORRECT THAT HE PICKED YOU UP AT OLDE

2 TOWNE, ACTUALLY, HE CAME THIS GREEN ROUTE, IF YOU WILL, AND I

3 WON'T DESCRIBE THE ROUTE, BUT YOU CAN SEE IT, PICKED YOU UP

4 AT OLDE TOWNE AT YOUR DOCK, AND THEN THE RED SIGNIFIES THE

5 ROUTE THAT YOU-ALL TOOK, DO YOU AGREE THAT THAT'S THE ROUTE

6 YOU TOOK?

7    A.   I CAN'T SAY WHERE HE WAS.  I JUST KNOW THAT I

8 STARTED OUT DRIVING AT OLDE TOWNE DOCK.  I DON'T WHERE ALL HE

9 GOT THERE, BUT . . .

10    Q.   I'M ONLY ASKING YOU ABOUT . . .

11    A.   ASK ME AGAIN THEN, I'M SORRY.

12    Q.   SO HE PICKED YOU UP AT OLDE TOWNE, AND IF YOU

13 FOLLOW THIS RED ROUTE, YOU ENDED UP GOING THROUGH THE CHANNEL

14 AND UP BEHIND SHACKLEFORD ISLAND, IS THAT CORRECT?

15    A.   YES, SIR, THAT'S WHERE I WAS DRIVING, FROM THE

16 OLDE TOWNE YACHT CLUB FUEL DOCK TO BEHIND SHACKLEFORD BANKS.

17    Q.   SO THE DOTTED LINE SHOWS THE PATH . . .

18    A.   THAT I TOOK.

19    Q.   . . . THAT YOU WERE DRIVING, OPERATING THE BOAT?

20    A.   YES, SIR.

21    Q.   THEN THERE'S A CIRCLE AND A SOLID LINE THAT'S

22 HEADING OUT TOWARD THE INLET, AND THAT'S THE PATH THAT JOHN

23 HYDE TOOK AS HE WAS OPERATING THE BOAT, IS THAT CORRECT?

24    A.   NO, SIR.

25    Q.   TELL ME WHY IT'S NOT CORRECT?

215

1   A.   HIS PATH WAS NORTH, AND WENT ACROSS NORTH OF

2   THAT SOLID RED LINE, AND HIS PATH WAS ACROSS THE SHIP'S

3   CHANNEL, RATHER THAN ENDING IN THE MID CHANNEL.

4   Q.   I'M GOING TO ASK YOU, WITH THE YELLOW MARKER, IF

5   YOU COULD . . .

6   MR. WEEKS:  I'M GOING TO ASK THAT YOU NOT WRITE

7   ON THAT EXHIBIT, THAT WAS MY EXHIBIT.  YOU CAN DEMONSTRATE,

8   BUT DO NOT WRITE ON THAT EXHIBIT.

9   MR. JOHNSTON:  DON'T WE HAVE A MINIATURE?

10   MR. PION:  HE CAN ZOOM IN TIGHT, IF YOU WANT,

11   AND IF DOCTOR HINES DOESN'T MIND SHOWING US ON THE VIDEO THE

12   PATH THAT HE BELIEVES . . .

13   A.   CAN YOU GIVE ME THIS ONE FOR A MINUTE AND LET ME

14   LOOK AT THIS ONE SO I WON'T HAVE TO STAND THERE, BECAUSE I'M

15   NOT FEELING GOOD, AND I CAN KIND OF STUDY THIS ONE FOR A

16   SECOND BEFORE I STAND UP, BECAUSE IT'S HARD TO CONCENTRATE.

17   Q.   SURE.

18   A.   (PAUSE - PERUSES CHART) - DO YOU WANT ME TO KIND

19   OF POINT WITH A POINTER OR SOMETHING?

20   Q.   IF YOU COULD DO IT HERE, IF YOU COULD STAND UP,

21   AND WE CAN HAVE THE CAMERA . . .

22   A.   CAN I TAKE THIS MIKE OFF?

23   Q.   CAN YOU CARRY IT?

24   A.   OKAY.

25   Q.   WHAT WE'RE TALKING ABOUT, BEFORE YOU DO THIS,

216

WE'RE TALKING ABOUT THE ROUTE THAT JOHN HYDE TOOK, AND,

AGAIN, HE HAS NOTED IN RED, A SOLID LINE - A CIRCLE AND A

SOLID LINE, THE PATH THAT HE SAID HE TOOK, AND YOU SAY HE

TOOK A DIFFERENT ROUTE, I THINK?

    A.   RIGHT.

    Q.   OKAY.  SO MAYBE YOU COULD POINT TO WHERE HE TOOK

OVER THE OPERATION OF THE BOAT?

    A.   (INDICATING ON EXHIBIT.)

    Q.   DID HE TAKE OVER WHERE THE CIRCLE IS, ROUGHLY?

    A.   I WOULD SAY WE WERE DOWN CLOSER TO THE NUN, AND

I DON'T KNOW - THERE'S A JETTY OVER HERE - (INDICATING) - AND

I THINK HE TOOK OVER MORE HERE, BECAUSE I DROVE QUITE A BIT

IN HERE - (INDICATING) - TRYING TO SEE IF THE BOAT WOULD

HANDLE BETTER, AND THEN HE DROVE HERE ON PLANE, ACROSS HERE

NORTH, AND CAME ACROSS HERE - (INDICATING) - AND THIS IS

WHERE HE MADE HIS TURN HERE, AND THAT'S WHERE WE ENCOUNTERED

THE WAVE, IN HERE - (INDICATING.)

    Q.   SO WAS THAT IN THE INLET?

    A.   I'M SORRY, I'M DRAWING WITH PENCIL, I'M SCREWING

UP . . .

    Q.   THAT WAS IN THE INLET?

    A.   YES, THIS IS THE INLET VICINITY, RIGHT

HERE - (INDICATING).

    Q.   SO WHEN YOU SAY HE WAS ON PLANE, HOW FAST WAS HE

GOING, AND THAT WOULD HAVE BEEN BEHIND SHACKLEFORD ISLAND?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1      A.   HE GOT ON PLANE THERE, AND HE MADE THE TURN ON

2 PLANE HERE - (INDICATING) - AND THAT WAS TWENTY, TWENTY-FIVE

3 MILES AN HOUR AT LEAST.

4      Q.   HOW MANY TIMES DID YOU LOOK AT THE SPEEDOMETER,

5 IF THAT'S WHAT WAS PRESENT ON THE BOAT?

6      A.   I HAD NOTICED IT WHEN I WAS DRIVING, BECAUSE I

7 WAS TRYING TO SEE WHEN THE BOAT WOULD GET ON PLANE.

8      Q.   DID YOU GET IT UP TO TWENTY-FIVE TO THIRTY MILES

9 AN HOUR?

10      A.   I GOT IT UP TO PLANE, AND IT TOOK OVER TWENTY TO

11 GET THE BOAT ON PLANE, AND THAT'S IMPORTANT TO ME TO KNOW HOW

12 FAST YOU HAVE TO GO TO GET ON PLANE.

13      Q.   THAT WAS IN THE CALM WATER AT SHACKLEFORD,

14 CORRECT?

15      A.   NO, I DROVE NUMEROUS PLACES ON PLANE, OUT AT THE

16 WAKE ZONE, COMING AWAY FROM OLDE TOWNE, OUT TO WHERE IT

17 STARTED GETTING CHOPPY, OUT IN THE MIDDLE OF THE SOUND, TO

18 THE SHIP'S CHANNEL, AND THEN I SLOWED DOWN AND CAME OFF

19 PLANE, CROSSED ENOUGH TO WHERE I'M OUT OF THE TURMOIL, AND

20 THEN RIGHT BEFORE YOU GET BACK TO SHACKLEFORD, I GOT BACK ON

21 PLANE, AND THEN STAYED ON PLANE ALL BACK IN HERE TO SEE HOW

22 FAST IT TAKES TO GET ON PLANE.

23      Q.   BACK IN HERE MEANING, BEHIND SHACKLEFORD ISLAND?

24      A.   COME FURTHER WEST, ALL IN THERE I'M ON PLANE

25 COMING ALL THE WAY BACK.

218

1    Q.    THAT WAS - THERE WEREN'T WAVES 3 TO 4 FEET

2    THERE, WERE THERE?

3         A.    I DON'T RECALL. I WOULD TELL YOU THAT IF YOU'VE

4    GOT AN OPENING HERE - (INDICATING) - ALL OF THIS IS 3 TO 4,

5    ALL OF THIS IN HERE.  ANYTHING OPEN TO THE WIND AND THE

6    CURRENT COMING THIS WAY IS ALL GOING TO BE 3 TO 4.  YOU'RE

7    NOT PROTECTED UNTIL YOU'RE BACK IN HERE - (INDICATING) - AND

8    IF THE WIND WERE BLOWING THAT WAY THAT DAY, THAT WOULD BE

9    CHOPPY TOO.

10        Q.    WHAT'S YOUR CLAIM THAT JOHN HYDE DID WRONG?

11        A.    JOHN DROVE TOO FAST FOR THE CONDITIONS OVER THE

12   SHOAL, AND DROVE RIGHT PERPENDICULAR INTO THAT WAVE, AND

13   DIDN'T TELL US WHAT WAS HAPPENING AS HE SAW IT HAPPENING.

14        Q.    SO YOU WEREN'T EVEN LOOKING AHEAD THEN?

15        A.    NO, SIR, I WAS WATCHING HIM.  I FELT THE BOW

16   COME UP, LOOKED UP, IT WAS TOO LATE THEN.

17        Q.    WHAT ABOUT NEIL WAGONER, WAS HE LOOKING FORWARD?

18        A.    I DON'T KNOW WHAT NEIL WAS DOING.

19        Q.    DIDN'T NEIL, IN HIS STATEMENT, SAY THAT HE HAD

20   BEEN OUT IN THOSE SAME CONDITIONS NUMEROUS TIMES AND FELT

21   THERE WAS NO PROBLEM WITH OPERATING THE BOAT UNDER THOSE

22   CONDITIONS THE WAY JOHN HYDE DID, ISN'T THAT WHAT HE SAID?

23        A.    I DON'T REMEMBER WHAT HE SAID, BUT IF YOU'RE

24   QUOTING HIM, I'M SURE THAT HE DID SAY THAT.  BUT, AGAIN, I

25   DON'T AGREE WITH THAT STATEMENT IF HE SAID THAT.

219

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

Q. SO YOU LAST LOOKED AT THE SPEEDOMETER AT WHAT POINT IN TIME?

A. I NOTICED THE SPEEDOMETER AS I DROVE THE BOAT, SIMPLY TO SEE HOW FAST I HAD TO DRIVE THE BOAT TO GET IT UP ON PLANE.

Q. DID YOU EVER SEE THE SPEEDOMETER WHILE JOHN HYDE WAS OPERATING THE BOAT?

A. I DON'T RECALL LOOKING AT IT, I JUST KNEW WHAT IT TOOK TO GET ME UP ON PLANE, AND I KNEW THAT WHEN WE WERE ON PLANE, WE HAD TO BE GOING OVER TWENTY, TWENTY-FIVE MILES AN HOUR, BECAUSE I COULD FEEL ACCELERATION RIGHT AS WE LAUNCHED INTO THAT WAVE. SO I KNOW WE WERE GOING OVER TWENTY MILES AN HOUR, AND I WOULD GUESS, IN MY ESTIMATE, WE WERE GOING TWENTY-FIVE MILES AN HOUR.

Q. BUT YOU REALLY DON'T KNOW THAT, DO YOU?

A. I CAN'T TELL YOU THE EXACT SPEED, NO, SIR.

Q. HE COULD HAVE BEEN DOING FIFTEEN MILES AN HOUR?

A. YOU COULDN'T GET ON PLANE AT FIFTEEN MILES AN HOUR, THAT, I DO KNOW.

Q. YOU MEAN IN THE SHOAL OR . . .

A. NO, PERIOD. YOU COULDN'T GET THAT BOAT ON PLANE AT FIFTEEN MILES AN HOUR.

Q. JOHN HYDE TESTIFIED THERE WERE THREE WAVES IN SUCCESSION THAT YOU HIT PERPENDICULAR RIGHT BEFORE THE ACCIDENT, IS THAT CORRECT?

220

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1  A. I ONLY CAN RECOUNT THAT ONE WAVE WE WENT OVER.

2  Q. SO YOU THINK IT WAS JUST ONE WAVE THEN?

3  A. NO, I CAN ONLY RECOUNT THAT ONE WAVE.

4  Q. COULD JOHN HYDE SEE THAT WAVE COMING?

5  A. WHEN I FELT THE BOW LIFT, I COULD SEE IT.  COULD

6 HE SEE IT AT THAT MOMENT, ABSOLUTELY.

7  Q. HOW MUCH BEFORE HE . . .

8  A. I HAVE NO IDEA.

9  Q. MY QUESTION IS, HOW MUCH BEFORE HE HIT THAT WAVE

10 PERPENDICULARLY DID HE SEE IT, OR COULD HE HAVE SEEN IT?

11  A. I CAN'T TELL YOU.

12  Q. I MEAN, LIKE, ONE SECOND, THREE SECONDS?

13  A. I DON'T KNOW BECAUSE I WASN'T LOOKING WHEN HE

14 WAS LOOKING THE WHOLE TIME TO DRIVE THE BOAT, OBVIOUSLY, THE

15 DRIVER'S LOOKING ALL THE TIME.  I'M NOT WATCHING HIM LOOK

16 STRAIGHT AHEAD, I'M LOOKING AT HOW HE'S DRIVING THE BOAT.

17 BUT WHEN I FELT THE BOAT LIFT UP, I SAW THE - IF YOU SAID,

18 HINES, WHERE DO YOU THINK THE WAVE WAS, I'M SURE IT WAS

19 LIFTING UP IN FRONT OF HIM FOR BOAT LENGTHS AHEAD OF THE

20 BOAT.

21  Q. YOU WEREN'T SMASHING INTO WAVES BEFORE THAT,

22 THAT WAS THE FIRST ONE THAT YOU REALLY SMASHED INTO?

23  A. I RECOUNT THAT ONE WAVE.

24  Q. JUST ONE?

25  A. JUST THAT ONE WAVE IS THE ONE I RECOUNT LIFTING

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1    UP OVER.

2          Q.   SO YOU WEREN'T ON PLANE WHEN YOU HIT THAT ONE

3    WAVE?

4          A.   I'M SORRY?

5          Q.   YOU WERE NOT ON PLANE . . .

6          A.   NO, WE WERE ON PLANE.

7          Q.   SO YOU'RE SAYING THAT THE BOAT WAS SITTING RIGHT

8    ON TOP OF THAT WAVE, THE CREST OF THAT WAVE?

9          A.   OH, YES, WE WENT OVER THAT WAVE, DEFINITELY OVER

10   THAT WAVE.

11         Q.   BUT THERE WAS NO INDICATION BEFORE THAT THAT YOU

12   WERE GOING TO HIT A WAVE LIKE THAT ON PLANE?

13              MR. HARDEE:   OBJECTION.   YOU CAN ANSWER, BEN.

14         A.   ASK ME AGAIN?

15         Q.   THERE WAS NO NOTICE BEFORE YOU HIT THAT WAVE

16   THAT YOU HAD PLANED OVER THAT WAVE?

17              MR. HARDEE:   NOTICE TO WHOM?

18         Q.   NOTICE TO WHOEVER'S ON THE BOAT?

19              MR. HARDEE:   OBJECTION TO THE QUESTION, BUT YOU

20   MAY ANSWER, BEN.

21         A.   I STILL DON'T UNDERSTAND THE QUESTION, I'M

22   SORRY.

23         Q.   THAT'S FINE.

24         A.   DO IT ONE MORE TIME, I'LL TRY TO PAY ATTENTION.

25         Q.   THERE WAS NO WAY FOR JOHN HYDE TO KNOW THAT HE

222

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

WAS GOING TO GO ON PLANE ON THAT WAVE, WAS THERE?

         MR. HARDEE: OBJECTION. GO AHEAD.

    A.  WE WERE ON PLANE WHEN WE WENT OVER THE WAVE, AND THAT'S NOT ANSWERING YOUR QUESTION, I DON'T UNDERSTAND THE QUESTION, I'M GETTING CONFUSED. YOU CAN ASK ME AGAIN, BECAUSE I'M NOT ANSWERING, FOR SOME REASON I DON'T UNDERSTAND IT.

    Q.  IF I UNDERSTAND YOU CORRECTLY, WHAT YOU'RE SAYING THAT JOHN HYDE DID WRONG, AND YOU CORRECT ME IF I'M WRONG, IS THAT HE WAS GOING TOO FAST AT THE TIME THIS INCIDENT OCCURRED?

    A.  YES, SIR.

    Q.  IS THAT IT?

    A.  YES, SIR.

    Q.  ANYTHING ELSE?

    A.  AND THE FACT THAT WE WERE GOING TOO FAST IN THAT SHOAL AREA, AND IN COMBINATION, THAT WE'RE HITTING A WAVE HEAD ON, ON PLANE.

    Q.  SO HOW ARE YOU SUPPOSED TO HIT A WAVE IF NOT HEAD ON?

    A.  AT AN ANGLE.

    Q.  SO HITTING A WAVE PERPENDICULAR IS NOT THE WAY TO DO IT?

    A.  NO, SIR.

    Q.  IS THAT WHAT YOU'RE SAYING?

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570

1          A.    YES, SIR.

2          Q.    SO HOW DO YOU HIT A WAVE THEN?

3          A.    AT AN ANGLE.

4          Q.    ALWAYS?

5          A.    YES.  NOT ALWAYS, NOT A 1 FOOT WAVE.

6          Q.    HOW HIGH OF A WAVE?

7          A.    A WAVE THAT WOULD CAUSE DISCOMFORT TO MY WIFE,

8    HIT IT AT AN ANGLE.

9          Q.    HAD YOU EVER DONE THAT IN THE PAST, OVER THE

10   YEARS?

11         A.    ALWAYS HIT THEM AT AN ANGLE WITH HER, YES.

12         Q.    WHAT ABOUT IF SHE'S NOT IN THE BOAT, YOU

13   DON'T . . .

14         A.    I USUALLY GO AT AN ANGLE.  I BOAT AS IF SHE'S IN

15   THE BOAT, BECAUSE I'M ON COUMADIN, I HAVE TO BOAT CAREFULLY.

16         Q.    WHAT DO YOU MEAN, YOU BOAT CAREFULLY BECAUSE

17   YOU'RE ON COUMADIN?

18         A.    I'M ON COUMADIN.

19         Q.    WHAT DOES THAT MEAN?

20         A.    I BOAT JUST LIKE I'D BOAT WITH HER IN THE BOAT,

21   ALL THE TIME.

22         Q.    I DON'T UNDERSTAND WHAT YOU MEAN, THAT YOU

23   BOAT . . .

24         A.    I'M ON COUMADIN, I'M ON A BLOOD THINNER, I'M NOT

25   GOING TO JUMP WAVES AND BE AIRBORNE VOLUNTARILY.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1    Q.    WHAT KIND OF SHOES WERE YOU WEARING THAT DAY?

2    A.    I BELIEVE THEY WERE THE BRAND THAT BEGINS WITH A

3  "T," LIKE HIKING BOOTS.

4    Q.    WERE THEY DOCKSIDERS, OR . . .

5    A.    THEY WERE MORE THAN THAT.  IN THE BACK OF MY

6  MIND THERE'S A BOOT THAT BEGINS WITH A "T."

7    Q.    TIMBERLAND?

8    A.    YES, LIKE TIMBERLAND.

9    Q.    HOW WAS NEIL WAGONER HOLDING ON RIGHT BEFORE THE

10 ACCIDENT?

11   A.    NEIL HAD MOVED TO BEHIND THE HELM.

12   Q.    COULD YOU HAVE HELD ON INSTEAD OF - I UNDERSTAND

13 YOU HAD BOTH HANDS ABOVE YOUR HEAD?

14   A.    THIS ARM WAS LIKE THIS, AND THIS ARM WAS LIKE

15 THIS - (INDICATING.)

16   Q.    SO YOUR LEFT ARM WAS LIKE STRAIGHT OUT, PARALLEL

17 WITH . . .

18   A.    I DON'T KNOW THAT IT WAS PARALLEL, BUT IT WAS

19 OUT MORE HORIZONTAL THAN VERTICAL, AND THE RIGHT ARM WAS MORE

20 VERTICAL, WAS VERTICAL, BASICALLY.

21   Q.    SO YOU'RE SAYING THE LEFT ARM WAS OUT IN FRONT

22 OF YOU?

23   A.    YES, YES.

24   Q.    AND THE RIGHT ARM WAS STRAIGHT UP, LIKE IF YOU

25 WERE RAISING YOUR HAND IN CLASS?

225

1      A.    YES, SIR.

2      Q.    WHAT HAPPENED WHEN YOU HIT THE WAVE?

3      A.    WHEN WE WENT OFF THE WAVE, THE BOAT, ON MY SIDE,

4  THAT I COULD SEE, WAS COMING OUT OF THE WATER.  THE BOW WAS

5  ALREADY OVER THE WAVE AND OVER THE WATER, AND I REMEMBER,

6  ABOUT THE LAST THING I REMEMBER, WAS STRIKING THE T-TOP WITH

7  MY HEAD, NOW, WHERE, I DON'T KNOW AT ALL.  I REMEMBER HOLDING

8  ON AND THEN HEARING, WHICH IS PROBABLY MAYBE NOT A REAL SOUND

9  BUT A FEELING, A CRACK, AS I IMPACTED THE DECK, AND THEN

10  FALLING TO THE DECK.

11      Q.    DID YOU EVER TELL JOHN HYDE THAT YOU THOUGHT HE

12  WAS GOING TOO FAST?

13      A.    NO, SIR.  NO, I DID NOT.

14      Q.    WHY NOT?

15      A.    IT WAS HAPPENING TOO FAST, IT HAPPENED BEFORE I

16  KNEW EVEN WHAT WAS HAPPENING.  WHEN I LOOKED UP, THE WAVE WAS

17  ON US, HE MADE THE TURN, ACCELERATED, AND IT JUST HAPPENED SO

18  FAST.

19      Q.    HOW LONG WAS HE TRAVELING AT THE SPEED THAT YOU

20  SAID HE WAS PLANING, EVEN . . .

21      A.    WE WERE ON PLANE COMING ACROSS THE SHIP'S

22  CHANNEL, SO I WOULD SAY WE WERE GOING AT LEAST TWENTY MILES

23  AN HOUR AT THAT POINT IN TIME.  MY ESTIMATION, TO BE ON

24  PLANE, AT LEAST TWENTY.  HE TURNS, AND ACCELERATES, AND WE'RE

25  GOING TWENTY-FIVE MILES AN HOUR WHEN WE HIT THE WAVE, AND

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570

1  WHAT WAS YOUR QUESTION, I'M SORRY?

2      Q.   WELL, YOU SAID THAT HE WAS GOING TWENTY OR

3  TWENTY-FIVE AND HE WAS PLANING?

4      A.   RIGHT.

5      Q.   DID YOU EVER SAY, HEY, JOHN, SLOW DOWN?

6      A.   NO, WHEN HE MADE THAT TURN AND ACCELERATED, IT

7  HAPPENED SO FAST . . .

8      Q.   WHAT ABOUT BEFORE YOU MADE THE TURN?

9      A.   NO.  WHEN HE WAS TRAVELING ON PLANE, IT TOOK

10 TWENTY TO STAY ON PLANE ACROSS THE CHANNEL, AND I'D REALLY

11 DONE THE SAME THING, I DIDN'T FEEL IN PERIL THEN.  THE ONLY

12 TIME I FELT IN PERIL WAS WHEN HE TURNED, ACCELERATED IN THAT

13 SHOAL AREA, SUDDENLY I FELT THE BOW LIFT UP.  I DON'T MIND

14 GETTING ON PLANE, THAT WASN'T THE PROBLEM.

15     Q.   YOU MEAN IN THE SHOAL AREA?

16     A.   NO.  I DON'T MIND GETTING ON PLANE AS HE CROSSED

17 THE SHIP'S CHANNEL, I HAD DONE THE SAME THING.

18     Q.   SO TWENTY WAS OKAY THERE?

19     A.   TWENTY WAS OKAY TO PUT THE BOAT ON PLANE,

20 BECAUSE THAT'S WHAT CAUSED THE BOAT TO PORPOISE, AND I WANTED

21 TO SEE WHAT WOULD MAYBE - WHAT WOULD STOP THE BOAT FROM

22 PORPOISING, YOU HAVE TO GET THE BOAT ON PLANE TO STOP THE

23 BOAT FROM PORPOISING.  SO THE TWENTY WAS FINE, IT WAS THE

24 TWENTY-FIVE OVER A WAVE IN THE SHOAL, PERPENDICULAR INTO THE

25 WAVE, THAT WAS THE PROBLEM, IN MY ESTIMATION, MY OPINION,

227

1    THAT LED TO THE DAMAGE.

2         Q.   SO WHAT SPACE OF TIME WAS THERE BETWEEN THE TIME

3    HE WAS AT TWENTY AND THE TIME YOU SAY YOU THINK HE WAS AT

4    TWENTY-FIVE?

5         A.   GOSH, IT SEEMED LIKE AN HOUR WHEN I SAW THE WAVE

6    AND WE LAUNCHED, BUT IT WAS PROBABLY, FROM THE TIME HE TURNED

7    AND ACCELERATED, IT WAS TWO SECONDS, BUT IT'S HARD FOR ME TO

8    KNOW.

9         Q.   DID YOU EVER TALK TO JOHN HYDE AFTER THE

10   ACCIDENT?

11        A.   NO, SIR.

12        Q.   OR ANYBODY AT BOATS UNLIMITED?

13        A.   NO, SIR.  CAN WE TAKE A QUICK BREAK.

14             MR. JOHNSTON:  YES.

15             (A BRIEF RECESS WAS TAKEN.)

16        Q.   HOW LONG WOULD YOU SAY THAT JOHN HYDE AND YOU

17   WERE TOGETHER ON THE DAY OF THE ACCIDENT, FROM THE TIME HE

18   PICKED YOU UP UNTIL THE ACCIDENT?

19        A.   AN HOUR AND A HALF, MAX.  YOU SAID UNTIL THE

20   ACCIDENT, I'M SORRY, YOU DON'T MEAN UNTIL THE AMBULANCE?

21        Q.   CORRECT.  WELL, EVEN THEN, LET'S EVEN INCLUDE

22   THAT?

23        A.   I WOULD SAY, IF HE GOT THERE - FOR SOME REASON I

24   THINK HE WAS LATE, SO IF HE GOT THERE AT 2:30, AN HOUR AND

25   FIFTEEN MINUTES.

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina  28570