# EXHIBIT G



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CIVIL ACTION NO. 4:09-CV-3-BR

| | | |
|---|---|---|
| BENJAMIN G. HINES, JR., | ) | |
| | ) | |
| PLAINTIFF, | ) | D-E-P-O-S-I-T-I-O-N |
| | ) | |
| VS. | ) | OF |
| | ) | |
| TRIAD MARINE CENTER, INC., ET AL, | ) | DONALD W. DAVIS |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

NOVEMBER 12, 2009, AT THE LAW OFFICES OF WHEATLY, WHEATLY, WEEKS & LUPTON, P.A., 710 CEDAR STREET, BEAUFORT, NORTH CAROLINA

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF - STEVENSON L. WEEKS, ESQ.

WHEATLY, WHEATLY, WEEKS & LUPTON, P.A.
ATTORNEYS AT LAW
710 CEDAR STREET
NEW BERN, NC 28516

FOR THE DEFENDANTS - J. LAWSON JOHNSTON, ESQ.

DICKIE, MCCAMEY & CHILCOTE, P.C.
ATTORNEYS AT LAW
TWO PPG PLACE, SUITE 400
PITTSBURGH, PA 15222

COURT REPORTER - SHERRY HOPKINS

COASTAL COURT-REPORTING AGENCY, INC.
P.O. BOX 788
NEWPORT, NORTH CAROLINA 28570
TEL: (252) 223-4045
FAX: (252) 223-3663

Q. WOULD THEY TELL YOU WHAT KIND OF EVIDENCE THAT YOU WOULD NEED IN ORDER TO DETERMINE THE OPERATION OF A VESSEL, WHETHER IT WAS IN ACCORDANCE WITH STANDARD OF CARE OR REGULATIONS OR INDUSTRY ACCEPTED PRINCIPLES?

A. THEY HAVE A - PART OF THE COURSE OF STUDY IS TAUGHT BY AN ADMIRALTY ATTORNEY, AND I'M SURE THAT'S MENTIONED IN THE COURSE OF STUDY, BUT THAT'S DONE, NOT IN THE MANUAL, BUT AT THE TRAINING SEMINARS.

Q. IS THERE A PARTICULAR ATTORNEY THAT YOU RECALL THAT GAVE THE COURSE?

A. I HAVE HIS NAME AT HOME.

Q. WHEN YOU MADE THESE OPINIONS IN THESE OTHER CASES THAT THE OPERATOR OF THE BOAT WAS GOING TO FAST, I THINK YOU SAID, FOR CONDITIONS AND FAILED TO KEEP A PROPER LOOKOUT, ARE THERE ANY HARD AND FAST STANDARDS THAT YOU RELIED UPON IN MAKING THOSE OPINIONS IN THOSE CASES?

A. I DON'T UNDERSTAND HARD AND FAST STANDARD.

Q. FOR EXAMPLE, IT'S EASY WHEN YOU HAVE AN OPERATOR OF A MOTOR VEHICLE AND THERE'S A SPEED LIMIT THAT SAYS 35 MILES PER HOUR AND YOU'RE DOING 40, YOU KNOW YOU'RE OVER THE LIMIT, SO YOU CAN SAY THAT PERSON IS SPEEDING OR IN VIOLATION OF THE SPEEDING LAWS.

IS THERE ANY SUCH THING IN BOATING?

A. THE BOATING STANDARDS ARE RELYING MORE AND MORE ON THE JUDGEMENT OF THE OPERATOR AND NOT - THERE WAS NO SPEED

LIMITS IN ANY OF THE CASES THAT I'M SPEAKING OF, THEY WERE NOT IN A NO WAKE ZONE. SO THEREFORE, IT'S MORE THE DUE CARE FROM AN EXPERIENCED SEAMAN AND HOW A COMPETENT SEAMAN SHOULD ACT UNDER SIMILAR CIRCUMSTANCES.

Q. WHAT KINDS OF INFORMATION DO YOU NEED IN ORDER TO MAKE AN OPINION THAT SOMEONE IS GOING TOO FAST FOR CONDITIONS?

A. WHAT HAPPENED DURING THE ACCIDENT.

Q. YES, WHAT KINDS OF INFORMATION . . .

A. THAT'S MY ANSWER, WHAT HAPPENED DURING THE ACCIDENT. THE SEA CONDITIONS AT THE TIME OF THE ACCIDENT, THE SPEED OF THE VESSEL AT THE TIME OF THE ACCIDENT, IF THAT CAN BE ASCERTAINED.

Q. IF IT CAN BE ASCERTAINED, IS THAT WHAT YOU SAID?

A. YES, SIR. OF COURSE, THE FINAL RESULTS, AS I SAID, ARE PARAMOUNT.

Q. WHAT DO YOU MEAN BY THAT?

A. IF YOU RUN A VESSEL INTO HEAVY WEATHER AND SOMEONE IS THROWN FROM THE DECK, THEN TO ME, THAT TELLS ME THAT SOMEONE DIDN'T DO WHAT THEY SHOULD HAVE DONE.

Q. IS THERE ANY OTHER INFORMATION THAT YOU NEED IN ORDER TO MAKE YOUR OPINION THAT SOMEONE WAS GOING TOO FAST FOR CONDITIONS?

A. THE VESSEL ITSELF, OF COURSE, IS IMPORTANT TO EXAMINE. SOME VESSELS - OF COURSE, SIZE, DESIGN, HAVE A LOT

TO DO WITH WHETHER A VESSEL - SOME VESSELS CAN OPERATE IN CERTAIN SEA CONDITIONS WHERE OTHER ONES CANNOT, THAT'S THE BASICS, YES, SIR.

Q. WOULD YOU SAY THAT IF SOMEONE WENT OVER A WAVE, LIKE IN THESE SEVERAL CASES THAT YOU'VE REFERENCED, AND SOME OF THEM THEN CAME DOWN OFF THE WAVE AND WAS INJURED, THAT THE OPERATOR WAS NOT USING DUE CARE?

A. YES, SIR.

Q. WOULD YOU NEED ANY OTHER INFORMATION OR WOULD THAT BASICALLY BE SUFFICIENT FOR YOU TO SAY THAT THE OPERATOR WAS GOING TO FAST FOR CONDITIONS?

MR. WEEKS: ARE YOU REFERRING TO THE FACTORS HE ENUMERATED OR JUST THE FACT THAT . . .

MR. JOHNSTON: I'M GOING TO WITHDRAW THAT LAST QUESTION.

Q. WHEN YOU INVESTIGATE - LET'S TAKE THESE CASES THAT YOU'VE TOLD US ABOUT, NOT DOCTOR HINES' CASE, BUT THE ONES WHERE PEOPLE WERE INJURED GOING OVER WAVES, WHAT WAS THE PURPOSE FOR WHICH YOU WERE HIRED?

A. TO EXAMINE THE EVIDENCE, AND TO PROVIDE AN OPINION AS TO WHAT WAS THE CAUSE OF THE INJURIES.

Q. SO YOU WERE PRETTY MUCH THEN, AT LEAST IN THOSE KIND OF CASES, HIRED TO DETERMINE THE CAUSE OF THE INJURY?

A. IF POSSIBLE, THE MARITIME SIDE OF IT, NOT THE - WHETHER THEY HAVE A BROKEN LIMB OR THAT TYPE OF THING,

THAT'S NOT MY AREA OF EXPERTISE, IT'S THE OPERATION OF THE VESSEL.

Q. RIGHT, YOU'RE NOT A MEDICAL DOCTOR OR ANYTHING?

A. THAT'S CORRECT.

Q. THAT'S WHAT YOU'RE SAYING?

A. YES, SIR.

Q. YOU'RE LOOKING TO FIND THE CAUSE OF THE ACCIDENT?

A. THAT'S CORRECT.

Q. WHETHER IT'S BOATER OR OPERATOR ERROR OR WHATEVER?

A. CORRECT.

Q. WITH REGARD TO GATHERING EVIDENCE, YOU SAID THAT YOU NEED - AS PART OF YOUR INVESTIGATION, YOU WOULD FIND OUT WHAT THE SEA CONDITIONS WERE?

A. YES.

Q. AND YOU WOULD DO THAT BY GETTING DOCUMENTS?

A. YES.

Q. ANY OTHER METHOD?

A. NO.

Q. JUST GETTING THE DOCUMENTS?

A. YES.

Q. THAT WOULD BE WEATHER REPORTS, TIDE REPORTS, THAT SORT OF THING?

A. YES, SIR.

Q. THEN YOU SAID YOU WOULD DETERMINE THE SPEED OF THE VESSEL IF POSSIBLE, CORRECT?

A. YES.

Q. HOW DO YOU DETERMINE THAT?

A. IF THERE'S ANY WITNESSES TO THE SPEED, IF ANYONE WILL TELL US WHAT THE SPEED WAS. IN A CASE OF IT'S ELECTRONICALLY RECORDED, THEN YOU WOULD LOOK AT THAT.

Q. I UNDERSTAND, AND YOU CORRECT ME IF I'M WRONG, IN DOCTOR HINES' CASE, THAT WAS NOT ELECTRONICALLY PRESERVED?

A. NOT TO MY KNOWLEDGE.

Q. SO YOU HAD TO RELY ON WITNESSES FOR SPEED?

A. YES.

Q. THE FINAL RESULT, YOU SAID YOU LOOK AT THAT, IF IT'S HEAVY WEATHER AND SOMEONE IS HURT, THEN SOMEONE DID WHAT THEY SHOULDN'T HAVE DONE?

A. A GOOD CHANCE OF IT, YES, SIR.

Q. MEANING THE OPERATOR?

A. DID NOT SHOW DUE CARE, YES.

Q. I THINK YOU SAID IF THAT DID HAPPEN, THEN THERE WAS NO DUE CARE?

MR. WEEKS: I'M GOING TO OBJECT TO THE FORM OF THE QUESTION.

A. I APPRECIATE THAT. I'M GETTING A LITTLE CONFUSED ON WHERE YOU'RE GOING WITH THIS.

MR. JOHNSTON: LET ME WITHDRAW THAT QUESTION.

Q. IF SOMEONE GOES OVER A WAVE, AS IN THOSE CASES THAT YOU HANDLED THAT WE TALKED ABOUT, THE FACT THAT SOMEONE CAME DOWN IN THE BOAT AND WAS INJURED, DOES THAT MEAN THAT THE OPERATOR DID NOT USE DUE CARE?

A. NOT ALWAYS, NO.

Q. HOW DO YOU DETERMINE WHETHER THE OPERATOR USED DUE CARE?

A. WHAT WERE THE CONDITIONS PRIOR TO, WHAT WAS HIS KNOWLEDGE OF THE CONDITIONS OR WAS IT SOME KIND OF ROGUE WAVE THAT NO ONE COULD HAVE FORESEEN, WOULD BE AN EXAMPLE.

Q. HOW DO YOU DETERMINE WHETHER THE OPERATOR KNEW ABOUT THE CONDITIONS?

A. HE SHOULD BE SEEING THOSE CONDITIONS. ON A CLEAR DAY WITH GOOD VISIBILITY, THEN HE SHOULD BE AWARE OF WHAT'S IN FRONT OF HIM THAT HE'S APPROACHING.

Q. UNLESS THERE'S A ROGUE WAVE?

A. IT COULD BE A ROGUE WAVE, IT COULD BE AT NIGHT.

Q. HOW DO YOU TELL THAT, I MEAN, HOW DO YOU DETERMINE WHETHER THE OPERATOR KNEW OF THE CONDITIONS, LET'S SAY, LIKE, A ROGUE WAVE, YOU'RE SAYING NOBODY COULD FORESEE THAT, I GUESS?

MR. WEEKS: I'M GOING TO OBJECT TO THE FORM OF THE QUESTION.

MR. JOHNSTON: I'LL WITHDRAW THE QUESTION.

Q. WHEN YOU SAY A ROGUE WAVE, WHAT DO YOU MEAN BY

THAT?

MR. WEEKS: I'M GOING TO OBJECT TO THE FORM OF THE QUESTION.

Q. WHAT'S A ROGUE WAVE?

A. A ROGUE WAVE IS AN UNUSUALLY MOUNTAINOUS WAVE THAT OCCURS IN MID OCEAN.

Q. AN UNUSUALLY WHAT?

A. MOUNTAINOUS.

Q. I'M NOT SURE OF THAT WORD?

A. IT'S THE THINGS THAT ARE REAL HIGH.

Q. MOUNTAINOUS?

A. MOUNTAINOUS, YES, SIR.

Q. DO THEY OCCUR IN THE INLET?

A. NO, SIR, IT'S TOO SHALLOW.

Q. HOW DEEP DOES IT HAVE TO BE TO BE A ROGUE WAVE?

A. THE LATEST DATA THAT'S AVAILABLE SAYS OFF THE CONTINENTAL SHELF.

Q. YOU DO LOOK AT THE FINAL RESULT, AND THAT HELPS YOU DETERMINE WHETHER DUE CARE WAS USED?

A. YES.

Q. MEANING, IF THERE WAS AN INJURY, RIGHT, THAT'S THE FINAL RESULT?

A. IF THAT'S THE FINAL RESULT, YES, SIR, IT COULD BE DAMAGE TO A VESSEL.

Q. I'M JUST TALKING ABOUT PERSONAL INJURY CASES FOR

NOW.

A. OKAY.

Q. INSPECTING THE VESSEL, YOU MENTIONED THAT AS ANOTHER THING YOU LOOK AT, WHAT MIGHT THAT TELL YOU?

A. I DON'T KNOW WHAT YOU'RE SAYING.

Q. WHEN WE TALKED ABOUT THE THINGS THAT YOU LOOK AT WHEN YOU INVESTIGATE CASES, YOU GAVE FIVE PARTICULAR ITEMS, ONE WAS WHAT HAPPENED, TWO WAS SEA CONDITIONS, THREE WAS SPEED OF THE VESSEL, IF POSSIBLE, FOUR WAS THE FINAL RESULT, AND FIVE WAS INSPECTING THE VESSEL?

A. YES, SIR.

Q. MY QUESTION IS, WHAT MIGHT THAT TELL YOU RELATIVE TO THE ACCIDENT?

A. AN EXAMPLE WOULD BE HANDHOLDS, WERE THERE SUFFICIENT HANDHOLDS FOR THE PERSONS, SAY, IF WE'RE TALKING PERSONAL INJURY, WAS THERE ADEQUATE SEATING AVAILABLE IN SOME INSTANCES, WERE THE PEOPLE ON BOARD GIVEN SAFETY INSTRUCTIONS, WOULD BE AN EXAMPLE OF SOMETHING THAT I WOULD LOOK AT.

Q. THE FIRST ONE YOU MENTIONED IN WHAT YOU WOULD INVESTIGATE IS WHAT HAPPENED, HOW DO YOU DETERMINE THAT NUMBER ONE ITEM THAT YOU GAVE AS TO WHAT HAPPENED, HOW DO YOU DETERMINE THAT WHEN YOU INVESTIGATE?

A. FROM ALL AVAILABLE DATA.

Q. WHAT DATA MIGHT THAT BE?

A. IT MIGHT BE WITNESSES, IT MIGHT BE REPORTS FROM THE COAST GUARD, IT MIGHT BE REPORTS FROM THE WILDLIFE OFFICERS, IT MIGHT BE DAMAGE TO THE VESSEL THAT YOU CAN EXAMINE.

Q. IN DOCTOR HINES' CASE, DID YOU INVESTIGATE THE ACCIDENT?

A. I ASSUME YOU'RE REFERRING TO WHAT MY ACTIONS WERE IN REGARD, AND THAT WOULD BE AN INVESTIGATION, YES.

Q. I MEAN, DID YOU CONSIDER THAT WAS AN INVESTIGATION?

A. YES.

Q. AND YOU TOOK THE STEPS THAT YOU NORMALLY WOULD TAKE?

A. WITH THE AVAILABLE INFORMATION, YES, SIR.

Q. SO YOU WOULD TRY TO GET WITNESS STATEMENTS?

A. NO, SIR, I DIDN'T DO THAT.

Q. IS THAT PART OF YOUR NORMAL INVESTIGATION?

A. IT IS, FROM TIME TO TIME. YOU ASKED ME FOR A GENERALIZATION, AND THAT'S A GENERALIZATION, NOT ALWAYS DO YOU DO ALL THE STEPS, NO, SIR.

Q. WHEN DO YOU DETERMINE IF - IN WHAT KIND OF SITUATION WOULD YOU DETERMINE WHETHER YOU WANTED TO GET WITNESS STATEMENTS?

A. I SPOKE TO THE ONE WITNESS THAT I HAD AVAILABLE AND THAT, OF COURSE, WAS DOCTOR HINES.

Q. I'M JUST ASKING GENERALLY NOW, YOU SAY THAT ONE OF THE THINGS YOU - I GUESS YOU'D LIKE TO DO, AND CORRECT ME IF I'M WRONG, IS YOU'D LIKE TO GET WITNESS STATEMENTS, IS THAT CORRECT OR NOT?

A. YES, I'D LIKE TO SEE THEM, BUT I DON'T TAKE THE WITNESS STATEMENTS AS FAR AS WRITTEN RECORDED STATEMENTS, I'M NOT A P.I.

Q. I MEAN, IF THERE ARE WITNESSES, YOU'D LIKE TO GET THEIR VIEW OR THEIR ACCOUNT?

A. YES, SIR.

Q. WHY DO YOU DO THAT?

A. TO TRY TO GATHER ALL OF THE INFORMATION TO DETERMINE WHAT THE CAUSE WAS.

Q. IN DOCTOR HINES' CASE, DO YOU KNOW IF THERE WERE ANY WITNESSES TO THE ACCIDENT OTHER THAN DOCTOR HINES?

A. I UNDERSTAND THERE WERE TWO OTHER INDIVIDUALS ON BOARD THE VESSEL.

Q. DID YOU TRY TO GET INFORMATION OR ACCOUNTS AS TO WHAT THEIR ACCOUNTS WERE?

A. NO.

Q. WHY NOT?

A. I WASN'T ASKED TO.

Q. WHAT WERE YOU ASKED?

A. I WAS ASKED TO SPEAK TO DOCTOR HINES.

Q. DID YOU THINK THAT THE INVESTIGATION WAS

COMPLETE BY HAVING ONLY THE ACCOUNT OF ONE PERSON OUT OF THE THREE PEOPLE PRESENT?

A. THE FACT THAT OTHER PEOPLE WERE GOING TO SPEAK TO THOSE PEOPLE AND THERE INFORMATION WOULD BE AVAILABLE TO ME, THEN THAT WAS FINE WITH ME.

Q. SAY THAT AGAIN, I DIDN'T UNDERSTAND THAT.

A. THE FACT THAT SOMEONE ELSE WAS GOING TO GET THE INFORMATION FROM THE OTHER WITNESSES AND THEN THAT INFORMATION, I WOULD BE MADE PRIVY TO IT, THEN THAT WAS OKAY.

Q. DID YOU EVER GET THAT INFORMATION?

A. I DON'T THINK SO.

Q. WHO WAS GOING TO GET THE INFORMATION FROM THE OTHER TWO WITNESSES AND GIVE IT TO YOU?

A. I KNOW MISTER HARDEE WAS ATTEMPTING TO WHEN HE ASKED ME TO SPEAK TO DOCTOR HINES.

Q. SO THE FACT THAT YOU DIDN'T GET THE ACCOUNT OF THE OTHER TWO PEOPLE ON BOARD, OTHER THAN DOCTOR HINES, WOULD YOU SAY YOUR INVESTIGATION WAS NOT COMPLETE?

A. NO.

Q. WHAT MAKES IT COMPLETE?

A. I BELIEVE DOCTOR HINES, HIS ACCOUNTS, THE PHYSICAL EVIDENCE, THE WEATHER REPORTS, THE OTHER THINGS I LOOKED AT, I FIND NO INCONSISTENCIES OR ANYTHING THAT WOULD MAKE ME THINK ANYTHING OTHER THAN WHAT I HAVE BEEN TOLD.

Q. I'D LIKE YOU TO, IF YOU WOULD, TELL ME

EVERYTHING THAT DOCTOR HINES TOLD YOU ABOUT THE ACCIDENT, I KNOW YOU DON'T HAVE NOTES, SO WE CAN'T LOOK AT THAT, BUT I'D LIKE TO KNOW EVERYTHING THAT HE TOLD YOU?

A. TO THE BEST OF MY RECOLLECTION, DOCTOR HINES TOLD ME THAT ON THE 21ST OF MARCH OF 2006, IN THE AFTERNOON, SOMEWHERES AROUND 1600, THAT HE WAS ON BOARD A TRITON CENTER CONSOLE VESSEL THAT HE WAS THINKING ABOUT PURCHASING, THAT ON BOARD THAT VESSEL WAS A GENTLEMAN FROM THE DEALERSHIP WHO WAS DEMONSTRATING THE VESSEL FOR HIM, AND THERE WAS ANOTHER GENTLEMAN ON BOARD WHO WAS AN ACQUAINTANCE OF HIS THAT LIVED IN THE SAME CONDOS. THAT THEY LEFT THE PIER AT OLDE TOWNE, PROCEEDING OUT OF THE BULKHEAD CHANNEL INTO THE AREA OF THE MOREHEAD CITY SHIP CHANNEL.

Q. CAN I STOP YOU FOR A SECOND, THEY CAME OUT OF THE BULKHEAD CHANNEL?

A. YES, SIR.

Q. AND THEN WHERE?

A. PROCEEDED INTO THE MOREHEAD CITY SHIP CHANNEL.

Q. DO YOU HAVE ANY - I THINK WE CAN LOOK AT THE DOCUMENTS YOU BROUGHT, CAN'T WE?

A. SURE.

MR. WEEKS: WHY DON'T YOU JUST LET HIM ANSWER THE QUESTION?

Q. GO AHEAD, I INTERRUPTED YOU, I'M SORRY?

A. THEY TURNED IN A GENERALLY EASTERLY DIRECTION

AND PROCEEDED BEHIND SHACKLEFORD BANKS. SOMEWHERE IN THAT PROCESS DOCTOR HINES WAS GIVEN THE CONTROLS OF THE VESSEL BEHIND SHACKLEFORD BANKS, NEAR THE WEST END OF SHACKLEFORD BANKS, HE MANEUVERED THE VESSEL, STEERED THE VESSEL, OPERATED THE THROTTLE AND TRIM ON THE VESSEL, HAD SOME QUESTIONS ABOUT THE WAY THE VESSEL WAS HANDLING. HE HAD TOLD ME, HIS WORDS WERE PORPOISING, THE VESSEL WANTED TO PORPOISE AND HE DIDN'T KNOW WHY.

THE INDIVIDUAL FROM THE DEALERSHIP TOOK THE CONTROLS OF THE VESSEL, HEADED IN A GENERALLY WESTERLY DIRECTION BACK INTO THE SHIP'S CHANNEL AT THE CUTOFF, TURNED THE VESSEL TO THE SOUTH, PROCEEDING INTO THE AREA OF BEAUFORT INLET ON THE WESTERN SIDE, ENCOUNTERED WAVES AT LEAST 4 FEET HIGH AT A SPEED OF 20 KNOTS OR GREATER. THE VESSEL WAS THROWN INTO THE AIR, HE WAS THROWN OFF OF HIS FEET, AND WHEN HE MET THE VESSEL COMING BACK UP ON THE NEXT WAVE, IT CRUSHED HIS ANKLE AND HE FELL TO THE FLOOR OF THE VESSEL, AND FROM THERE HE WAS TAKEN BACK TO THE CONDO AND TAKEN TO THE HOSPITAL.

Q. IS THAT IT OR IS THERE MORE?

A. THAT'S IT.

Q. CAN YOU REPEAT THE PART WHERE YOU SAID ABOUT THE 4 FOOT WAVE, I DON'T KNOW IF YOU SAID WAVE OR WAVES?

A. THEY RAN INTO WAVES WHICH WERE 4 FEET HIGH OR GREATER.

Q. IS THAT WHAT HE TOLD YOU?
A. YES.
Q. HE DIDN'T TELL YOU 3 TO 4 FEET?
A. NOT TO MY RECOLLECTION.
Q. WHAT DID THE DOCUMENTS SHOW THAT YOU REVIEWED IN TERMS OF THE SIZE OF THE WAVES?
A. THEY WERE RUNNING AT LEAST 4 FEET.
Q. SO THAT'S ALL HE TOLD YOU AND NOTHING MORE?
A. YES.
Q. HE DIDN'T TELL YOU - HOW FAST WOULD 20 KNOTS BE, HOW MANY MILES PER HOUR?
A. I'D HAVE TO CALCULATE IT FOR YOU, SIR.
Q. WHAT DID YOU SAY WAS 20 KNOTS, WHAT WERE YOU REFERRING TO WHEN YOU SAID 20 KNOTS?
A. THAT'S HOW FAST THE VESSEL WAS TRAVELING.
Q. DO YOU HAVE AN APPROXIMATION OF HOW FAST THAT WOULD BE IN MILES PER HOUR?
A. I'D HAVE TO CALCULATE IT.
Q. HOW LONG WOULD IT TAKE YOU?
MR. WEEKS: GIVE ME A SECOND, 23.
A. 23 MILES PER HOUR.
Q. OBVIOUSLY, I MEAN, I TAKE IT THAT YOU BELIEVED EVERYTHING THAT DOCTOR HINES TOLD YOU?
A. YES.
Q. WAS THERE ANYTHING THAT SUPPORTED - STRIKE THAT.

WHEN YOU WROTE YOUR REPORT, WHAT INFORMATION DID YOU HAVE, IF ANYTHING, OTHER THAN DOCTOR HINES' STATEMENT?

A. I REVIEWED THE NOAA CHARTS OF THE AREA OF THE ACCIDENT, THAT WOULD BE 11547 AND 11545. I HAD REVIEWED THE NAVIGATION RULES, WHICH WAS COMMANDANT'S INSTRUCTION M16672.2D, I HAD THE VERBAL INTERVIEW WITH DOCTOR HINES, WHICH WE JUST SPOKE ABOUT. I LOOKED AT THE NOAA TIDE AND CURRENT INFORMATION FOR BEAUFORT INLET NEAR FORT MACON FOR THAT DATE, I LOOKED AT THE NOAA WEATHER DATA FOR THE RECORDING STATION AT CAPE LOOKOUT FOR THAT DATE, I LOOKED AT THE NOAA WEATHER DATA FOR THE STATION BUOY CLOSEST TO THE AREA OF THE ACCIDENT FOR THAT DATE, AND I INSPECTED THE VESSEL INVOLVED.

Q. ALL OF THOSE THINGS ARE WHAT YOU HAD WHEN YOU WROTE YOUR REPORT?

A. YES.

Q. YOU SUBMITTED THIS TO MISTER HARDEE OR DOCTOR HINES' COUNSEL ON OR ABOUT NOVEMBER 24, 2008, CORRECT?

A. YES.

Q. IN THE TEACHING THAT YOU DID FOR INVESTIGATIONS, WOULD YOU HAVE INSTRUCTED YOUR PUPILS OR WHOEVER WAS ATTENDING THE COURSE, THAT I THINK YOU SAID YOU DID TWO TIMES FOR THE BOAT AND YACHT COUNCIL, WOULD YOU INSTRUCT THEM TO GATHER THE ACCOUNTS OF WITNESSES TO AN ACCIDENT?

A. NO.

Q. YOU WOULD NOT?

A. NOT IN THAT COURSE, NO.

Q. WHY NOT, IT JUST WASN'T APPROPRIATE FOR THE COURSE?

A. IT WASN'T APPROPRIATE FOR THAT COURSE, WE WERE BASICALLY LOOKING AT THE STRUCTURE.

Q. IF YOU WERE TEACHING A COURSE - WOULD YOU BE QUALIFIED TO TEACH SUCH A COURSE OF ACCIDENT INVESTIGATION THEN OR NO?

A. PROBABLY.

Q. PROBABLY?

A. YES.

Q. WOULD YOU INSTRUCT THAT INDIVIDUALS SHOULD OBTAIN ALL STATEMENTS, ALL ACCOUNTS OF WITNESSES?

A. THAT THEY COULD AT THE TIME, YES, SIR.

Q. WHAT DO YOU MEAN, THAT THEY COULD AT THE TIME?

A. SOME THINGS AREN'T AVAILABLE. I REMEMBER MISTER HARDEE WAS TRYING TO FIND THE OPERATOR OF THE VESSEL AND NO ONE COULD FIND HIM. IT'S KIND OF HARD TO GET A STATEMENT FROM HIM WHEN HE'S NOT AVAILABLE.

Q. IF HE HAD GIVEN A STATEMENT, WOULD YOU HAVE ENTERTAINED THAT STATEMENT?

A. SURE.

Q. LET'S ASSUME, JUST HYPOTHETICALLY, LET'S SAY THAT YOU DID NOT HAVE A STATEMENT FROM DOCTOR HINES BUT YOU

HAD ONE FROM HIS FRIEND NEIL WAGONER, HE WAS THE NEIGHBOR AND FRIEND OF DOCTOR HINES, ASSUME HE GAVE A STATEMENT AND HE SAID THAT THE OPERATOR OF THE BOAT WAS OPERATING THE BOAT PROPERLY AND DID NOTHING WRONG, AND WAS NOT AT FAULT, THAT'S THE STATEMENT THAT YOU HAD, WHAT WOULD YOUR OPINION BE IN THAT SITUATION?

A. I WOULD TAKE THAT UNDER - SURE, I WOULD LISTEN TO HIM AND I WOULD TAKE WHAT HE SAID AT FACE VALUE, AND THEN AS MY INVESTIGATION INTO THE PHYSICAL EVIDENCE, I.E., THE WEATHER, THE CONDITIONS, WHAT WAS GOING ON, I WOULD THEN JUDGE THAT AGAINST WHAT HE HAD SAID.

Q. LET'S SAY THAT EVERYTHING'S THE SAME IN YOUR INVESTIGATION EXCEPT YOU DON'T HAVE DOCTOR HINES' STATEMENT, BUT YOU HAVE NEIL WAGONER'S STATEMENT?

A. I DON'T HAVE HIS STATEMENT.

Q. I KNOW YOU DON'T, BUT I'M ASKING YOU TO ASSUME.

A. THAT'S HARD.

Q. WELL, I'M ASKING YOU TO DO IT AS AN EXPERT, BECAUSE I'M SURE THAT YOU EVALUATE STATEMENTS?

A. NOT THAT I HAVEN'T SEEN. I CAN'T EVALUATE SOMETHING THAT I HAVEN'T SEEN.

Q. I UNDERSTAND THAT, BUT I'M ASKING YOU THE QUESTION THAT IF YOU HAD - THE ONLY THING THAT WAS DIFFERENT IN YOUR INVESTIGATION IS YOU DON'T HAVE DOCTOR HINES' STATEMENT, BUT YOU HAVE A STATEMENT FROM NEIL WAGONER, AND

HIS STATEMENT IS AS I JUST SAID . . .

MR. WEEKS: IS THAT HIS STATEMENTS OR HIS CONCLUSIONS?

MR. JOHNSTON: HIS STATEMENT, THAT'S WHAT HE SAID.

A. WHAT DID HE SAY. I DON'T MEAN TO ASK YOU A QUESTION, BUT . . .

Q. THAT'S FINE. I'M ASKING YOU TO ASSUME THAT NEIL WAGONER SAID THAT THE CONDITIONS THAT DAY WERE NOT UNUSUAL AND THAT THE OPERATOR OF THE BOAT DIDN'T DO ANYTHING WRONG, IT WAS JUST A FREAK ACCIDENT, AND THAT'S THE STATEMENT YOU HAD, EVERYTHING ELSE IS THE SAME, WHAT WOULD YOUR OPINION BE?

A. THE SAME AS IT IS NOW.

Q. THE SAME?

A. YES.

Q. WITHOUT DOCTOR HINES' STATEMENT?

A. CORRECT.

Q. WHY IS THAT?

A. BECAUSE THE PHYSICAL EVIDENCE, I.E., THE WEATHER CONDITIONS, THE SEA CONDITIONS, THE ACCIDENT AS IT OCCURRED, WHETHER DOCTOR HINES TOLD ME OR NOT, IT'S A FACT OF HIS INJURY, THEN SOMEONE DID NOT SHOW DUE CARE. SO MISTER WAGONER'S STATEMENT, THEREFORE, IN MY OPINION, WOULD NOT BE CREDIBLE.

Q. YOU'RE BASING IT ON THE WEATHER, LET'S GO

THROUGH THOSE FACTORS, THE WEATHER?

A. YES, SIR.

Q. WHAT WAS IT ABOUT THE WEATHER THAT WOULD STILL MAKE . . .

A. THEY HAD SMALL CRAFT WARNINGS.

Q. IS THAT SHOWN IN THE DOCUMENTS YOU HAVE, THE SMALL CRAFT WARNING?

A. THE SEA CONDITIONS ARE THERE, YES, SIR.

Q. DOES IT SAY SMALL CRAFT WARNING?

A. I DON'T THINK THEY SAY SMALL CRAFT WARNINGS, NO, SIR.

Q. WHAT DID THE SMALL CRAFT WARNING MEAN TO YOU?

A. IT MEANT THAT YOU'RE GOING TO HAVE WINDS FROM AT LEAST 21 TO UP INTO 38 MILES PER HOUR.

Q. DIDN'T THE REPORT SHOW THAT THEY WERE 14 TO 16 MILES PER HOUR?

A. NO.

Q. WHAT WERE THEY?

A. THEY WERE OVER 20.

Q. IS THAT SOMETHING THAT THE PEOPLE ON THE BOAT WOULD SEE AS THEY WERE GOING ON THE BOAT?

A. YES.

Q. DID DOCTOR HINES SEE THAT?

A. I DON'T KNOW THAT.

Q. DID HE SEE THE SEA CONDITIONS?

A. I'M SURE HE DID.

Q. WHAT SHOULD HE HAVE DONE IF HE SAW THOSE SEA CONDITIONS?

A. HOLD ON.

Q. OR SHOULD HE SAY, LET'S GET OUT OF HERE, TURN AROUND?

A. HE COULD HAVE SAID THAT, BUT HE'S NOT RUNNING THE BOAT. HE'S IN THE CONTROL OF THE MASTER OF THE VESSEL.

Q. IS HE NOT AN EXPERIENCED BOATER?

A. HE'S AN AMATEUR, HE'S A RECREATIONAL BOATER. THIS GUY HAD A LICENSE, HE SHOULD HAVE KNOWN BETTER.

Q. SO YOU'RE SAYING THAT THE WEATHER REPORT WAS BAD, THAT THEY SHOULDN'T HAVE GONE OUT IN THAT?

A. I WOULDN'T HAVE PROCEEDED IN THE INLET AT THE SPEED APPARENTLY THEY WERE TRAVELING. FROM THE WAY THE ACCIDENT OCCURRED, THE INJURIES THAT I'VE SEEN, KNOWING WHAT THE SEAS WERE COMING IN THE INLET, THE CURRENT, ALL OF THOSE FACTORS IN MY MIND, THAT MAN SHOULD HAVE NEVER HEADED THROUGH THAT INLET AT THAT SPEED.

Q. THE SPEED, ASSUMING THAT THIS NEIL WAGONER SAID THE OPERATOR OF THE BOAT DID NOTHING WRONG, SPEED INCLUDED, AND YOU DIDN'T HAVE DOCTOR HINES' STATEMENT, WOULDN'T YOU CONCLUDE THAT HE WASN'T DOING AN INADEQUATE SPEED OR AN INAPPROPRIATE SPEED?

A. NO, SIR. I JUST SAID A FEW MINUTES AGO THAT I

WOULD HAVE CONSIDERED MISTER WAGONER'S STATEMENT. I WOULD HAVE TAKEN THAT AS NOT VERY CORRECT.

Q. THAT WOULD BE BASED ON THE FACT - JUST THE WEATHER REPORT?

A. THE WEATHER REPORTS, THE CURRENTS, MY KNOWLEDGE OF THAT INLET IN THOSE CONDITIONS.

Q. WASN'T THE CURRENT GOING OUT?

A. YES, SIR.

Q. THE TIDE WAS GOING OUT?

A. YES, SIR.

Q. AND THE WIND WAS GOING IN THE SAME DIRECTION?

A. IT HAD ONLY SHIFTED AN HOUR BEFORE, THAT'S CORRECT.

Q. SO THAT WOULD BE LESS CHOPPY CONDITIONS THAN IF THEY WERE OPPOSING EACH OTHER?

A. NO, IT WOULDN'T.

Q. NO?

A. NO.

Q. WOULD IT BE MORE CHOPPY?

A. IT WOULD MAKE MORE CHOP, BECAUSE THE SEA WAS RUNNING AGAINST THE WIND AND AGAINST THE CURRENT.

Q. SO WHEN YOU'RE SAYING HE WENT TOO FAST FOR CONDITIONS OR WAS GOING TO FAST, YOU'RE BASING THAT ON THE SEA CONDITIONS?

A. YES, SIR, AND MY KNOWLEDGE OF THAT INLET IN

THOSE CONDITIONS.

Q. IF THE OPERATOR SAID HE WAS GOING 15 MILES PER HOUR, YOU WOULD DISREGARD THAT?

A. IT MAY HAVE BEEN TOO MUCH FOR THOSE CONDITIONS.

Q. BUT WOULD YOU CONSIDER THAT IF HE SAID HE WAS ONLY GOING 15 MILES PER HOUR, WOULD YOU TAKE THAT INTO ACCOUNT?

A. I WOULD LISTEN TO HIM, SURE.

Q. WOULD YOU BELIEVE IT?

A. POSSIBLY, BUT IT WOULD BE HARD TO.

Q. WHY IS THAT?

A. BECAUSE OF THE WAY THE ACCIDENT OCCURRED.

Q. WHAT DO YOU MEAN BY THAT?

A. TO DRIVE THIS VESSEL INTO THAT SEA, TO THROW THE VESSEL IN THE AIR THE WAY IT APPARENTLY DID TO INJURE DOCTOR HINES THE WAY HE WAS INJURED, I WOULD THINK THAT WE'D HAVE A GREATER SPEED.

Q. HOW FAR INTO THE AIR WAS IT?

A. HIGH ENOUGH TO EJECT HIM FROM THE DECK TO WHERE HE CAME DOWN AND CRUSHED HIS ANKLE.

Q. SO ARE YOU SAYING THAT IF THE GUY - IF HE'S INJURED, THAT THERE'S SOME INAPPROPRIATE CONDUCT ON BEHALF OF THE OPERATOR?

MR. WEEKS: OBJECTION TO THE FORM OF THE QUESTION, THAT IS NOT WHAT HE SAID. HE SAID THERE WAS

NUMEROUS FACTORS INVOLVED.

MR. JOHNSTON: I DON'T WANT YOU TO GIVE . . .

MR. WEEKS: YOU KEEP PLAYING THIS GAME, YOU WANT TO COME BACK AND SAY THIS ONE THING.

MR. JOHNSTON: YOU CAN OBJECT.

MR. WEEKS: I'VE OBJECTED, YOU'VE ASKED THE SAME THING OVER AND OVER. HE'S TOLD YOU THERE WERE NUMEROUS FACTORS.

MR. JOHNSTON: YOU'RE ANSWERING FOR HIM.

MR. WEEKS: I DON'T HAVE TO ANSWER FOR HIM.

Q. I'M ASKING HIM THE QUESTION, THE FACT THAT THIS MAN WAS INJURED AND THAT HE CAME DOWN OVER A WAVE, IS THAT SUFFICIENT FOR YOU TO SAY THAT THE BOAT OPERATOR WAS GOING TOO FAST FOR CONDITIONS?

A. IT'S A FACTOR.

Q. IS THAT SUFFICIENT IN AND OF ITSELF?

A. IT'S A FACTOR. I ANSWERED YOU EARLIER THAT IT COULD BE A ROGUE WAVE AT SEA AND IT WOULDN'T NECESSARILY MEAN THE OPERATOR DIDN'T SHOW DUE CARE. IN THIS CASE, IT'S MY OPINION HE DID NOT SHOW DUE CARE IN THE CONDITIONS THAT WERE IN THE INLET AT THE TIME OF THIS ACCIDENT, AND THIS INJURY IS THE RESULT OF THAT, THAT IS MY OPINION.

Q. HOW FAST DO YOU THINK HE WAS GOING?

A. I DON'T KNOW.

Q. WHAT WOULD BE . . .

A. CAN I GO BACK TO DOCTOR HINES AGAIN, HE SAYS THE BOAT WAS GOING OVER 20. HE SAID THE BOAT WOULD NOT PLANE UNTIL IT WENT 20 AND HE SAID HE SAW THE SPEEDOMETER, AND THE VESSEL WAS GOING GREATER THAN 20.

Q. WASN'T THAT BACK AT SHACKLEFORD WHERE HE SAID HE WAS GOING 20?

A. THE LAST TIME HE SAW IT, YES, SIR. HE DIDN'T TELL ME THE MAN SLOWED DOWN, SO THAT'S THE ONLY INFORMATION I HAVE.

Q. DID YOU ASSUME HE DIDN'T SLOW DOWN?

A. I MADE NO ASSUMPTION.

Q. IF HE WERE DOING 15 MILES PER HOUR . . .

A. THAT STILL COULD BE TOO GREAT.

Q. IT COULD BE?

A. YES, SIR.

Q. IT MIGHT OR MIGHT NOT BE?

A. YES, SIR.

Q. IN REACHING YOUR OPINION THAT HE WAS GOING TOO FAST, YOU RELIED UPON DOCTOR HINES' STATEMENT THAT HE WAS DOING 20, GREATER THAN 20 KNOTS?

A. AND WHAT YOU JUST SAID, IT COULD HAVE BEEN LESS THAN THAT, BUT THE SEA CONDITIONS WERE SUCH THAT HE SHOULD NOT HAVE PROCEEDED, WHICHEVER OR WHATEVER SPEED HE ENTERED THAT INLET WAS TOO GREAT.

Q. SO YOU'RE SAYING THAT WITH THE CONDITIONS OF THE

INLET, HE SHOULDN'T HAVE BEEN THERE PERIOD, NO MATTER WHAT SPEED HE WAS TRAVELING?

A. I DID NOT.

Q. I'M ASKING YOU?

A. NO, HE COULD HAVE GONE THROUGH THAT INLET AT A SLOWER SPEED, YES, SIR.

Q. WHAT SPEED?

A. IDLE.

Q. HOW FAST WOULD THAT BE?

A. I DON'T KNOW WHAT THAT BOAT IDLES. AT A SLOW SPEED, AT A PRUDENT SPEED FOR THE EXISTING CONDITIONS.

Q. LET ME ASK YOU TO ASSUME YOU HAVE TWO PIECES OF EVIDENCE THAT ARE DIFFERENT, LET'S SAY YOU DON'T HAVE DOCTOR HINES' STATEMENT BUT EVERYTHING ELSE IS THE SAME. ONE PIECE OF EVIDENCE IS ABOUT NEIL WAGONER'S STATEMENT THAT I MENTIONED TO YOU BEFORE, IN ADDITION TO THAT IS THE TESTIMONY OR STATEMENT OF THE OPERATOR THAT HE WAS DOING 10 TO 15 MILES PER HOUR GOING OVER THE WAVES IN THE INLET AT THE TIME OF THIS ACCIDENT, ASSUMING THAT'S THE EVIDENCE THAT YOU HAD, WOULD THAT CHANGE YOUR OPINION THAT HE WAS NOT KEEPING A PROPER LOOKOUT?

MR. WEEKS: I'M GOING TO OBJECT TO THE FORM OF THE QUESTION, BECAUSE THAT IS NOT THE EVIDENCE BEFORE THIS EXPERT.

Q. I DON'T KNOW THAT IT IS, BUT YOU CAN ANSWER THE

QUESTION?

A. IT WILL NOT CHANGE MY OPINION.

Q. SO YOU WOULD DISBELIEVE THE STATEMENTS OF WAGONER AND THE OPERATOR OF THE BOAT?

A. YES.

Q. AND PART OF THE REASON WOULD BE BASED ON DOCTOR HINES' STATEMENT?

A. YOU JUST TOLD ME I WAS SUPPOSED TO DISREGARD THAT.

Q. I DID.

A. I ANSWERED YOU THAT IT WOULD NOT CHANGE MY OPINION, AND WITH HIS STATEMENT, IT JUST REINFORCES MY OPINION.

Q. YOU'RE NOT AN ENGINEER, AM I CORRECT?

A. CORRECT.

Q. NOT A NAVAL ARCHITECT?

A. I AM NOT.

Q. OR A SMALL BOAT NAVAL ARCHITECT?

A. NO, SIR.

Q. HAVE YOU ANY EXPERIENCE IN DESIGNING SMALL BOATS?

A. NO.

Q. DO YOU HAVE ANY EXPERIENCE IN OPERATING OUTBOARD POWERED BOATS, FISHING BOATS OF 22, 23 FEET?

A. I DO.

Q. WHAT'S YOUR EXPERIENCE?

A. A LIFETIME. I OWN A 21 FOOT CENTER CONSOLE OUTBOARD.

Q. YOU'VE BEEN A YACHT CAPTAIN?

A. I HAVE.

Q. FOR BOATS OVER 23 FEET?

A. YES.

Q. ANY UNDER 23 FEET?

A. NOT AS A CAPTAIN OF A YACHT UNDER 23 FEET, NO, SIR.

Q. HAVE YOU BEEN THROUGH THE BEAUFORT INLET MANY TIMES?

A. THE HOME I WAS RAISED IN IS IN BEAUFORT, IT'S ON FRONT STREET IN BEAUFORT, IN THE 900 BLOCK. MY BEDROOM IS ON THE SECOND FLOOR, EVERY MORNING OF MY LIFE WHEN I GOT UP IN THE MORNING AND LOOKED OUT MY FRONT WINDOW, I LOOKED AT THE AREA WHERE THIS ACCIDENT OCCURRED, EVERY MORNING. I HAVE OPERATED VESSELS THERE, AS IN RECREATIONAL ASPECTS, ALL OF MY CHILDHOOD AND MOST OF MY ADULT LIFE. I HAVE RECORDED OVER 700 TRIPS THROUGH THAT AREA ON VESSELS, OCEAN GOING SHIPS OF OVER ANY GROSS TONS, I'VE OPERATED THE PILOT VESSEL PAST THE AREA WHERE THIS HAPPENED MANY HUNDREDS OF TIMES. I PROBABLY CONSERVATIVELY TRANSITED THAT AREA OVER 2,000 TIMES.

Q. AND IN SMALL BOATS?

A. IN SMALL BOATS AND LARGE BOATS, IN ALL KINDS OF

WEATHER.

Q. WERE THE WAVES, ON THAT PARTICULAR DAY OF THE ACCIDENT, PERPENDICULAR TO THE INLET?

A. YES, SIR.

Q. CAN YOU SHOW ME ON THE CHARTS THE WIND AND TIDE DETAILS?

A. ON THE CHART?

Q. IN YOUR FILE?

A. ON THE CHARTS?

Q. DIDN'T YOU HAVE DOCUMENTATION . . .

A. I HAVE DOCUMENTATION AND I HAVE CHARTS, THEY'RE NOT ONE IN THE SAME.

Q. I DIDN'T MEAN CHARTS, BUT THE DOCUMENTATION, CAN YOU SHOW ME THAT?

A. I CAN.

Q. THE WIND AND TIDE DETAILS?

A. WHICH WOULD YOU PREFER FIRST?

Q. LET'S TAKE THE WIND, THAT'S APPLICABLE?

A. OKAY.

Q. IS IT 10 TO 15 MILES PER HOUR FROM THE NORTHEAST AND OUTGOING?

MR. WEEKS: THE WIND?

A. ARE WE TALKING NOW ABOUT THE TIDE OR WIND?

Q. I'M SORRY, I'M TALKING ABOUT TIDE NOW?

A. THE TIDE DOESN'T GO OUT, SO I CAN'T DO THAT,

THE TIDE RISES AND FALLS.

Q. LET'S SAY FALL?

A. AT WHAT TIME WOULD YOU LIKE, SIR?

Q. LET'S TAKE THE TIME OF THE ACCIDENT?

A. AND THAT TIME WAS?

Q. IT WAS AROUND 3:30?

A. I'M GOING TO ASK FOR YOUR INDULGENCE FOR JUST A SECOND. I'VE GOT THE - LET ME GO GET YOU - I DON'T HAVE THAT, IT'S THE WRONG ONE IN MY FILE. LET ME GO GET YOU THE ONE FOR THE DATE OF THE ACCIDENT, I NEED A GLASS OF WATER ANYWAY.

MR. JOHNSTON: LET'S TAKE A SHORT BREAK.

(A BRIEF RECESS WAS TAKEN.)

Q. HAVE YOU GOT THE CORRECT TIDE REPORT?

A. YES, I DO.

Q. WHERE DID YOU GET IT?

A. I GOT IT FROM MISTER WEEKS' OFFICE, THE ONE I HAD BROUGHT TO HIM.

Q. SO YOU HAD THE ONE WITH THE WRONG DATE OR SOMETHING?

A. I DID, I JUST HAD ONE FOR SOMETHING ELSE, IT WAS THE WRONG DATE.

Q. GO AHEAD?

A. YOU SAID AT 3:30?

Q. IT WAS ROUGHLY AROUND THERE?

A. THIS TIDE REPORT SHOWS THAT WE HAD 1 FOOT OF TIDE REMAINING AND THE TIDE WOULD HAVE BEEN EBBING, FALLING.

Q. DO LAYMEN SAY THE TIDE'S GOING OUT?

A. THAT WOULD BE CORRECT.

Q. WHAT ABOUT THE WIND?

A. I HAVE ONE FOR TWO DIFFERENT STATIONS THAT I LOOKED AT, I LISTED THEM ON MY REPORT. THE FIRST STATION THAT I LOOKED AT IS THE CLOSEST NOAA STATION RECORDING TO THE SITE, WHICH IS CAPE LOOKOUT AT STATION CLKN7, THAT'S ITS DESIGNATOR, AND THIS IS FOR MARCH 21ST, 2006.

Q. IS THAT AT 3:30?

A. DO I HAVE A 3:30 TIME, NO, SIR, I HAVE A 3:00 O'CLOCK AND A 4:00 O'CLOCK, THEY DID NOT . . .

Q. WHAT'S THE 3:00 AND THE 4:00?

A. THE ONE AT 3:00 WAS READING 10.5 WITH GUSTS TO 12.4 AND AT 4:00 O'CLOCK WERE READING 10.8 WITH GUSTS TO 12.7.

Q. IS THAT THE ONE THAT YOU RELIED UPON?

A. IT IS.

Q. WHAT DID YOU TAKE THAT TO MEAN IN TERMS OF YOUR OPINION IN THIS CASE?

A. THAT WE HAD WINDS THAT WERE SMALL CRAFT VELOCITY.

Q. WERE THEY COMING OUT OF THE NORTHEAST?

A. THEY HAD SHIFTED TO THE NORTH AT 2:00 O'CLOCK.

Q. WHAT ABOUT THE OTHER - I GUESS YOU DIDN'T RELY UPON THE OTHER WIND REPORT, WHERE WAS THAT TAKEN, YOU SAID YOU TOOK IT AT TWO LOCATIONS?

A. YES. THE OTHER LOCATION IS STATION ONSLOW BAY, ITS STATION DESIGNATOR IS 41035, DO YOU WANT IT FOR THE SAME TIME?

Q. YES, PLEASE?

A. IT'S 8.6 TO 10.2, WOULD BE THE 3:00 O'CLOCK READING AND THEN 6.6 TO 7.9 WOULD HAVE BEEN THE 4:00 O'CLOCK READING.

Q. WHEN DO THE SMALL CRAFT WARNINGS COME INTO PLAY, AT WHAT LEVELS?

A. 21.

Q. 21?

A. YES.

Q. I THOUGHT YOU SAID 10.5 TO GUSTS OF 12.4?

A. I DID.

Q. WHAT'S THE 21?

A. 21 MILES PER HOUR.

Q. WHAT IS THE 10.5?

A. METERS PER SECOND.

Q. IS THAT GIVEN IN MILES PER HOUR?

A. IT IS NOT.

Q. HOW DID YOU FIGURE THAT?

A. IT'S A MULTIPLE.

Q. WHAT DID YOU MULTIPLY?

A. 2.23.

Q. TIMES WHAT?

A. TIMES THE NUMBER I GAVE YOU, 10.5, 10.8, WHATEVER I GAVE YOU. 10.5, 12.4, IF YOU MULTIPLY THAT TIMES 2.23, IT WILL CONVERT TO MILES PER HOUR.

Q. WERE THERE ANY OTHER BOATS OUT WHERE DOCTOR HINES WAS THAT DAY?

A. I DON'T KNOW THAT.

Q. WOULD THAT BE SOMETHING YOU'D WANT TO KNOW?

A. NO.

Q. DID YOU SAY NO?

A. NO, THERE COULD HAVE BEEN OTHER BOATS OUT THERE, LOTS OF DIFFERENT KINDS OF BOATS.

Q. BOATS OF THE SAME SIZE, WOULD THAT MEAN ANYTHING TO YOU?

A. YES, THAT PEOPLE WERE OPERATING THE BOAT THE WAY THEY SHOULD, YES. IF THEY DIDN'T GET INJURED, THEN THEY MUST HAVE DONE WHAT THEY SHOULD HAVE.

Q. WHAT ARE YOU SAYING ABOUT THE FACT THAT DOCTOR HINES WAS INJURED THEN?

A. THEN THE OPERATOR WAS NOT SHOWING DUE CARE, MOST ESPECIALLY IF THERE WERE OTHER BOATS OUT THERE THE SAME SIZE THAT DIDN'T HAVE A PROBLEM.

Q. I KNOW YOU WROTE YOUR REPORT BACK IN NOVEMBER OF

'08, BUT IF YOU HAD THE STATEMENTS OF NEIL WAGONER AND THE OPERATOR OF THE BOAT AT THIS TIME, KNOWING THAT THEY'RE THERE, WOULD YOU THINK THAT IT WOULD BE NECESSARY TO REVIEW THOSE STATEMENTS IN ORDER TO HAVE A COMPLETE INVESTIGATION?

A. I WOULD BE GLAD TO READ THEM.

Q. THAT'S NOT MY QUESTION?

A. YOU'VE HAD ME ASSUME SOME THINGS THAT THEY SAID AND I ASSUME THAT'S WHAT'S IN THE REPORT, AND THAT DIDN'T CHANGE MY OPINION, SO, NO.

Q. I'M JUST SAYING, IF YOU HAD THOSE REPORTS, WOULD YOU WANT TO REVIEW THEM IN ORDER TO COMPLETE THE INVESTIGATION?

A. I WOULD REVIEW THEM, BUT YOU'VE ALREADY TOLD ME - YOU'VE HAD ME ASSUME SOME THINGS AND I ASSUME THAT YOU'RE - WHAT'S FAVORABLE TO YOU, SO, NO. I'LL READ THEM, AND IF THEY CHANGE MY OPINION, SURE.

Q. WOULDN'T YOU WANT TO READ THEM, THOUGH?

A. SURE.

Q. I MEAN, WOULDN'T THAT MAKE YOUR INVESTIGATION COMPLETE, THAT YOU GATHERED ALL THE EVIDENCE YOU COULD AND YOU'VE EVALUATED IT ALL?

A. SURE.

Q. ISN'T THAT PART OF A PROPER INVESTIGATION?

A. YES.

Q. WOULD YOU EXPECT THE SEAS CLOSE TO THE SHORE TO

BE 4 FEET IN THE AREA WHERE - THE BEAUFORT INLET ON IN TOWARD THE SHORE?

MR. WEEKS: WHICH SHORE ARE YOU REFERRING TO?

A. YES, I'M CONFUSED.

Q. WHERE OLDE TOWNE YACHT CLUB IS, WHY DON'T YOU TAKE THAT ONE?

A. OKAY. YOUR QUESTION IS?

Q. WOULD YOU EXPECT THE SEAS THAT ARE CLOSE TO THE SHORE AT THAT POINT TO BE 3 TO 4 FEET?

A. NO.

Q. WHY NOT?

A. BECAUSE THEY WOULD HAVE RUN THROUGH SHOAL WATER AND THEY WOULD HAVE DISSIPATED.

Q. IN ORDER TO HAVE WAVES 3 TO 4 FEET, WHAT CONDITIONS WOULD BE NECESSARY?

A. A PARTICULAR VELOCITY OF WIND. A WAVE TRAIN IS CREATED BY A VELOCITY OF WIND FOR A PERIOD OF TIME OVER A DISTANCE.

Q. ANYTHING ELSE?

A. THE WAVES WILL REACT WITH THE SEA FLOOR, THEY REACT WITH SHOALS, THEY WILL REACT WITH CURRENTS, THEY WILL REACT WITH OTHER WAVE TRAINS.

Q. WHAT ABOUT THE DEPTH OF THE WATER, DOES THAT HAVE ANY EFFECT AS TO HOW HIGH THE WAVES MIGHT BE?

A. IT HAS AN EFFECT ON HOW HIGH THEY CAN BE.

Q. WHAT IS THAT EFFECT, WHAT IS THAT PHENOMENON?

A. AFTER A CERTAIN DEPTH - WAVES CAN ONLY REACH A CERTAIN HEIGHT IN A DEPTH, BECAUSE THEY DRAG ON THE BOTTOM, SIMPLY.

Q. SO IF YOU HAD WATER 2 FEET, YOU COULDN'T HAVE WAVES 3 FEET?

A. CORRECT.

Q. IS BEAUFORT INLET CONSIDERED A NARROW INLET?

A. NO.

Q. WHAT WOULD YOU CONSIDER A NARROW INLET?

A. I DON'T KNOW HOW TO ANSWER THAT.

Q. ARE THERE ANY STANDARDS OR ANY IN YOUR EXPERIENCE THAT YOU WOULD CONSIDER A NARROW INLET?

A. NO, NOT THAT I'M AWARE OF.

Q. IN THAT INLET, SHOULD BOATS IN THE INLET STAY TO THE RIGHT TO ALLOW BOATS TO PASS PORT TO PORT?

A. IN THE SHIP'S CHANNEL, THAT'S STANDARD. THAT'S A REQUIREMENT OF THE RULES OF THE ROAD, FOR VESSELS TO STAY TO THAT SIDE OF THE CHANNEL, IF THEY CAN NAVIGATE WITHIN THE CONFINES OF THAT CHANNEL. IN THIS CASE, NO, BECAUSE THEY COULD OPERATE OUTSIDE THE CONFINES OF THE CHANNEL.

Q. IF YOU WERE TRAVELING OVER THESE WAVES AT 3 TO 4 FEET, WHAT COULD HAPPEN IF YOU GO TOO SLOW?

A. IF WHAT?

Q. IF YOU'RE TRAVELING TOO SLOW OVER WAVES 3 TO 4

FEET?

A. IN WHAT?

Q. WHAT DO YOU MEAN, IN WHAT, IN WAVES 3 TO 4 FEET, LET'S TAKE . . .

A. AM I IN A CANOE, IN A STEAMSHIP, WHAT KIND OF VESSEL?

Q. WE'RE NOT TALKING ABOUT A 100 FOOT BOAT, WE'RE TALKING ABOUT THE 22 FOOT TRITON?

A. SO WE'RE TALKING ABOUT THE VESSEL INVOLVED IN THIS?

Q. CORRECT, CAN YOU ANSWER?

A. IF YOU GO ACROSS THOSE TOO SLOW?

Q. RIGHT?

A. I DON'T KNOW OF ANYTHING.

Q. DO YOU KNOW WHAT A BROACH IS?

A. YES, SIR.

Q. WHAT IS A BROACH?

A. A BROACH OF VESSEL IS LAYING SIDE TO A WAVE AND YOU CAN ROLL THE VESSEL OVER, IT'S CALLED A BROACH.

Q. CAN THAT HAPPEN IF YOU'RE GOING TOO SLOW OVER THE WAVES?

A. IN THAT SIZE WAVE IN A 22 FOOT BOAT, NOT LIKELY.

Q. IT COULD HAPPEN?

A. NOT THAT I'VE EVER SEEN.

Q. DID DOCTOR HINES TELL YOU WHY THEY WERE GOING OUT INTO THE INLET?

A. NO.

Q. DID YOU ASK?

A. NO. THE BOAT WAS BEING DEMONSTRATED, THAT'S ALL HE SAID.

Q. SO YOU DON'T KNOW WHETHER DOCTOR HINES ACTUALLY WANTED TO GO OUT IN THE INLET?

A. I DO NOT.

Q. TO TEST THE BOAT TO SEE IF IT WOULD REMAIN DRY?

A. I DON'T KNOW THAT.

Q. WOULD THAT BE A GOOD TEST TO SEE IF THE BOAT WOULD REMAIN DRY, TO GO OUT IN THE INLET IN THOSE CONDITIONS?

A. SURE.

Q. I'D LIKE TO TURN TO YOUR REPORT, ON PAGE 2, AND IT HAS A HEADING OF "OPINIONS."

A. OKAY.

Q. PARAGRAPH 1 SAYS "THE ACCIDENT OCCURRED"?

A. YES.

Q. AND "THE FACTUAL BASIS OF MY OPINION IS AS FOLLOWS, VERBAL INTERVIEW WITH DOCTOR HINES"?

A. YES, SIR.

Q. IF WE GO TO 2, "THE ACCIDENT OCCURRED ON NAVIGABLE WATERS OF THE UNITED STATES"?

A. CORRECT.

Q. THAT WAS BASED ON DOCTOR HINES' INTERVIEW?
A. WHERE HE TOLD ME THE ACCIDENT OCCURRED, YES, SIR.
Q. THAT AT THE TIME OF THE ACCIDENT, DOCTOR HINES WAS A PASSENGER ON BOARD WITH THIS HULL IDENTIFICATION NUMBER THAT YOU'VE LISTED?
A. THAT'S MY UNDERSTANDING, YES, SIR.
Q. THAT WAS BASED ON DOCTOR HINES' INTERVIEW?
A. THAT'S CORRECT.
Q. THE ONE THAT YOU HAD IN THE LIVING ROOM OR WHEN YOU WERE OUT AT SEA?
A. I DON'T RECALL AT WHICH TIME.
Q. BECAUSE WHEN YOU SAY VERBAL INTERVIEW, IT DOESN'T - IT JUST MEANS, I TAKE IT THEN, EITHER ONE OR THE OTHER INTERVIEWS THAT YOU HAD WITH HIM?
A. THAT WOULD BE CORRECT, YES, SIR.
Q. NUMBER 4, THAT JOHN HYDE WAS THE OPERATOR AT THE TIME OF THE ACCIDENT, THE BASIS WAS DOCTOR HINES' INTERVIEW?
A. WHAT HE TOLD ME, THAT'S CORRECT.
Q. THEN NUMBER 5, I'M NOT GOING TO READ IT ALL, BUT YOU TALK ABOUT EXCESSIVE SPEED, ET CETERA, AND YOU'RE SAYING THE EXCESSIVE SPEED - THE FACTUAL BASIS FOR THAT OPINION WAS THE INTERVIEW WITH DOCTOR HINES?
A. YES, SIR.
Q. LET'S GO TO NUMBER 6, YOU HAVE CITED THIS RULE,

ARE THESE ALSO CALLED THE COREGS?

A. NO, THEY ARE NOT.

Q. ANYWAY, THE NAVIGATION RULES YOU CITE, COMDTINST M16672.2D, RULE NUMBER 6, "SAFE SPEED," AND THIS RULE 6 THAT YOU QUOTE, I'LL READ IT, "EVERY VESSEL SHALL AT ALL TIMES PROCEED AT A SAFE SPEED SO THAT SHE CAN TAKE PROPER AND EFFECTIVE ACTION TO AVOID COLLISION AND BE STOPPED WITHIN A DISTANCE APPROPRIATE TO THE PREVAILING CIRCUMSTANCES AND CONDITIONS. IN DETERMINING A SAFE SPEED, THE FOLLOWING FACTORS SHALL BE AMONG THOSE TAKEN INTO ACCOUNT," AND THEN IT SAYS "(A) BY ALL VESSELS," AND THEN "(V)," FOR FIVE, "THE STATE OF WIND, SEA AND CURRENT, AND THE PROXIMITY OF NAVIGATIONAL HAZARDS."

A. CORRECT.

Q. MY QUESTION IS, THIS RULE 6, IS THAT - WHEN THEY TALK ABOUT AVOIDING A COLLISION, IS THAT AVOIDING A COLLISION WITH ANOTHER BOAT, ANOTHER OBJECT, SOMETHING ELSE?

A. FOR THE COLLISION PART, YES, SIR, I WOULD SAY THAT THAT IS WHAT IT SAYS, TO AVOID A COLLISION.

Q. WHAT'S YOUR UNDERSTANDING OF WHAT THAT MEANS?

A. COLLISION WITH ANOTHER VESSEL, OR AN OBJECT, OR IN THIS CASE, WITH A WAVE.

Q. IS THAT THE WAY YOU INTERPRET IT?

A. IT IS.

Q. WHAT'S YOUR BASIS FOR SAYING THAT?

A. MY STUDIES, MY TRAINING.

Q. HAS ANYBODY EVER SAID THAT THAT'S WHAT THAT MEANS, IT MEANS AVOID COLLISION WITH A WAVE?

A. IT GOES ON TO SAY "AND BE STOPPED WITHIN A DISTANCE APPROPRIATE TO THE PREVAILING CIRCUMSTANCES AND CONDITIONS."

Q. WOULDN'T YOU TAKE THAT TO BE AN OBJECT RATHER THAN A WAVE?

A. NO, SIR, IT CAN BE A SEA.

Q. HAVE YOU EVER SEEN THAT QUOTED IN THAT CONTEXT ANYWHERE?

A. I HAVE SEEN IT INTERPRETED AS SUCH, YES.

Q. IN WHERE?

A. I DON'T RECALL AS I SIT HERE, BUT I HAVE.

Q. YOU DON'T REMEMBER THE . . .

A. I TOLD YOU I DID NOT, NO, SIR. I DON'T RECALL AS I SIT HERE, NO, SIR.

Q. HOW MANY TIMES HAVE YOU SEEN IT USED IN THAT CONTEXT "TO AVOID A COLLISION WITH A WAVE"?

A. I DON'T RECALL.

Q. HAVE YOU SEEN IT IN CONTEXT WITH COLLISION WITH OTHER OBJECTS?

A. YES.

Q. WHAT KINDS OF OBJECTS, OTHER SHIPS, OTHER VESSELS?

A. BUOYS, LAND, BOTTOM, PILINGS, DOCKS, PIERS, BARGES, SHALL I GO ON?

Q. IF YOU HAVE OTHERS, YES, SURE?

A. THE LAND, ROCKS.

Q. IN NUMBER 6, YOU GAVE AN OPINION ABOUT THE PROPER LOOKOUT, AND THE FACTUAL BASIS OF THAT OPINION WAS YOUR VERBAL INTERVIEW WITH DOCTOR HINES?

A. YES.

Q. IN NUMBER 7, YOU TALKED ABOUT DOCTOR HINES NOT BEING NEGLIGENT, NOT CONTRIBUTING, BUT LET ME JUST ASK YOU, WOULD HE HAVE ANY RESPONSIBILITY TO ASCERTAIN THE WEATHER CONDITIONS AND THE SEA CONDITIONS THAT DAY?

A. AS A PASSENGER?

Q. YES?

A. NO.

Q. NONE WHATSOEVER?

A. NO.

Q. WHAT ABOUT THE WAY HE WAS HOLDING ON, DID HE TELL YOU HOW HE WAS HOLDING ON TO THE . . .

A. NOT SPECIFICALLY.

Q. DO YOU KNOW IF HE COULD HAVE DONE ANYTHING DIFFERENTLY TO PROTECT HIMSELF?

A. NOT TO MY KNOWLEDGE.

Q. YOU DON'T KNOW ONE WAY OR THE OTHER?

A. I DO NOT.

Q. IF I'VE ASKED THIS, PLEASE EXCUSE ME. WHEN YOU WENT TO INSPECT THE BOAT, WHAT, IF ANY, FINDINGS DID YOU MAKE ABOUT THE BOAT?

A. BESIDES ITS PHYSICAL FEATURES, ITS SIZE, LENGTH, IT WAS A CENTER CONSOLE VESSEL, IT HAD A T-TOP, THAT IT HAD HANDRAILS OR RAILINGS AROUND THE T-TOP THAT PEOPLE COULD HOLD ONTO, THERE WAS A HANDRAIL BEHIND THE LEANING POST. THAT IT HAD A 250 HORSEPOWER YAMAHA FOUR-STROKE OUTBOARD MOTOR, EXTRA LONG SHAFT, THAT'S ABOUT IT.

Q. WERE THE HANDHOLDS APPROPRIATE, DID YOU THINK?

A. I THOUGHT SO.

Q. WAS THERE ANYTHING INAPPROPRIATE ABOUT THE BOAT?

A. NOT THAT I SAW, EXCEPT THAT I DIDN'T LIKE WHAT THEY HAD DONE MOUNTING THE ENGINE, BUT THAT'S A - PUTTING AN EXTRA LONG SHAFT ENGINE ON A LONG SHAFT TRANSOM, IT WAS JUST A COBBLED UP LOOKING THING TO ME.

Q. WHERE WAS DOCTOR HINES STANDING WHEN HE WAS INJURED?

A. TO MY KNOWLEDGE, HE WAS STANDING TO THE LEFT OF THE OPERATOR.

Q. IN WHAT PART OF THE BOAT, FRONT, BACK?

A. TO THE LEFT OF THE OPERATOR.

Q. FRONT, BACK, MIDDLE?

A. WHERE THE OPERATOR STATION IS, HE WAS TO THE LEFT OF, WHICH IS APPROXIMATELY THE CENTER OF THE VESSEL.

Q. NEAR THE CENTER?

A. ON THE PORT SIDE.

Q. AS THE BOAT WAS GOING OUT TOWARD THE INLET, DO YOU KNOW WHICH DIRECTION THE OPERATOR WAS FACING?

A. DO NOT.

Q. DO YOU KNOW IF HE SAW THE CONDITIONS AHEAD?

A. DON'T KNOW.

Q. WOULD THAT BE IMPORTANT FOR YOU TO KNOW IN MAKING YOUR OPINION?

A. SURE.

Q. WHEN YOU WENT TO THE - I THINK YOU WERE ON THE PREMISES OF BOATS UNLIMITED WHEN YOU SAW THE BOAT, WHEN YOU INSPECTED IT?

A. CORRECT.

Q. DID YOU HAVE PERMISSION TO GO THERE?

A. YES.

Q. BY WHOM?

A. MISTER HARDEE CONTACTED THE PEOPLE AND GOT OUR PERMISSION TO GO THERE. WE TOLD THE PEOPLE WE WERE THERE AND WE WERE ALLOWED TO LOOK AT THE VESSEL.

Q. DID YOU PHOTOGRAPH IT?

A. I DID.

Q. WHERE ARE THE PHOTOGRAPHS?

A. I DON'T HAVE THEM.

Q. DO YOU KNOW WHERE THEY ARE?

A. I THINK MISTER WEEKS HAD THEM, OR MISTER HARDEE.

Q. WHEN YOU WRITE YOUR REPORTS, DO YOU USE THE TERM NEGLIGENCE?

A. NOT NORMALLY.

Q. YOU DID IN THIS CASE THOUGH, CORRECT?

A. I DID, I THINK. I THINK I SAID THAT IT WAS - LET ME READ EXACTLY WHAT I DID SAY - (PAUSE - PERUSES REPORT.)

MR. WEEKS: HE SAID, "DID NOT EXERCISE DUE CARE."

MR. JOHNSTON: HE USED IT AT THE END IN TALKING ABOUT DOCTOR HINES IN PARAGRAPH 7.

A. I FELT THAT HE WAS NOT NEGLIGENT.

Q. WHY DID YOU SAY HE WASN'T NEGLIGENT INSTEAD OF USING DUE CARE?

A. HE WAS NOT REQUIRED TO BE THE PERSON THAT WOULD HAVE GIVEN DUE CARE, AND HE DID NOT, BY HIS ACTIONS, THAT I KNOW OF, DO ANYTHING THAT WOULD HAVE CAUSED HIM TO SUSTAIN THE INJURIES THAT HE DID.

Q. YOU'RE NOT AN ACCIDENT RECONSTRUCTIONIST, ARE YOU?

A. I AM NOT.

Q. IF YOU DID NOT HAVE DOCTOR HINES' STATEMENT AT ALL, YOU HAD NO WITNESS STATEMENTS, BUT KNEW HE WAS INJURED, WOULD YOU BE ABLE TO GIVE AN OPINION AS TO THE FAULT OF THE

OPERATOR OF THE BOAT, BASED ON THE OTHER INFORMATION YOU REVIEWED, THE DOCUMENTS?

MR. WEEKS: I'M GOING TO OBJECT TO THE FORM OF THE QUESTION.

A. I DID NOT UNDERSTAND WHAT YOU JUST ASKED ME AT ALL.

Q. LET'S ASSUME YOU DIDN'T HAVE DOCTOR HINES' STATEMENT, BUT YOU KNEW HE WAS IN A BOAT, WENT OVER A WAVE, CAME DOWN AND WAS INJURED, THEN YOU HAD THE OTHER INFORMATION THAT YOU HAD IN YOUR FILE, THE CHARTS, THE WIND REPORT, THE TIDE REPORT, WOULD THAT BE ENOUGH FOR YOU TO MAKE AN OPINION THAT THE OPERATOR OF THE BOAT DID NOT USE DUE CARE?

A. NO.

Q. IT WOULD NOT BE?

A. NO.

Q. SO YOU NEED DOCTOR HINES' STATEMENT?

A. YES, SIR, I NEED TO KNOW WHERE IT WAS.

Q. WHERE IT WAS?

A. YES, WITHOUT HIM, HOW WOULD I KNOW?

Q. SUPPOSE YOU DID KNOW WHERE IT WAS, LET'S ADD THAT IN, BUT YOU DIDN'T HAVE THE OTHER . . .

A. NOW I WOULD HAVE ENOUGH INFORMATION, YES.

Q. JUST THE PLACE WHERE IT HAPPENED, THE DOCUMENTS, THE . . .

A. CONDITIONS, YES, SIR.

Q. AND THE FACT THAT HE WAS INJURED?

A. YES.

Q. THAT WOULD GIVE YOU ENOUGH INFORMATION . . .

A. IF I KNEW HOW HE WAS INJURED, WHETHER HE WAS DROPPED ON THE DECK, IN OTHER WORDS, HE DIDN'T CUT HIS HAND WITH A KNIFE. SO THERE'S A LOT OF THINGS THAT YOU'RE ASSUMING HERE THAT I DON'T KNOW AND I CAN'T ANSWER THAT.

Q. WE'RE ASSUMING IN THE CONTEXT OF . . .

A. I CAN'T ASSUME. I MEAN, WE'VE PLAYED THAT GAME AND IT DOESN'T SEEM TO COME OUT CORRECTLY, SO I WOULD PREFER NOT TO ASSUME.

Q. YOU'VE SAID THAT IF HE FELL THE WAY - YOU KNOW, HE CAME DOWN OVER A WAVE . . .

A. I WOULD GET THAT INFORMATION FROM SOMEWHERE, AND I DON'T KNOW WHERE I WOULD GET THAT UNLESS I WAS . . .

Q. IS IT POSSIBLE TO HAVE AN INJURY LIKE THIS WITHOUT SOMEBODY BEING AT FAULT IN THE OPERATION OF THE BOAT?

A. SURE.

Q. HOW, HOW SO?

A. YOU COULD SLIP DOWN A SET OF STEPS ON A SHIP AND YOU CAN GET HURT THAT WAY.

Q. I'M TALKING ABOUT THE WAY DOCTOR HINES WAS INJURED?

A. NO.

Q. IT'S NOT POSSIBLE?

A. NOT IN MY OPINION.

MR. JOHNSTON: THAT'S ALL THE QUESTIONS I HAVE. THANK YOU.

MR. WEEKS: I HAVE NO QUESTIONS.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

END OF DEPOSITION

89

Coastal Court-Reporting Agency, Inc.
P.O. Box 788, Newport, North Carolina 28570