IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
In Admiralty
CIVIL ACTION NO. 4:09-CV-3-BR

| | | |
|---|---|---|
| BENJAMIN G. HINES, JR., | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM IN** |
| v. | ) | **RESPONSE TO DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| TRIAD MARINE CENTER, INC. | ) | **JUDGMENT** |
| dba BOATS UNLIMITED NC and | ) | |
| JOHN BANISTER HYDE, | ) | |
| Defendants | ) | |

The Plaintiff, Benjamin G. Hines, Jr., submits this Memorandum pursuant to Rule 7.2(a) of the <u>Local Rules of Practice and Procedure</u>, in response to the Defendants' Motion for Summary Judgment.

## STATEMENT OF THE CASE

The Plaintiff, Benjamin G. Hines, Jr., initiated this admiralty action for personal injuries and damages sustained on March 21, 2006 while on a demonstration ride, as a prospective purchaser, on a vessel owned by Triad Marine Center, Inc. and operated by its employee John Banister Hyde. This incident occurred on the navigable waters near Beaufort Inlet, Carteret County, North Carolina. Plaintiff alleges that John Banister Hyde, an agent and employee of Triad Marine Center, Inc., was negligent in the operation of the vessel.

## STATEMENT OF THE FACTS

Benjamin G. Hines, Jr., at the time of the accident of March 21, 2006 was a medical doctor, licensed in the State of North Carolina and specializing in the filed of urology. He practiced urology with Eastern Urological Associates in Greenville, North Carolina. (Hines depo.

p. 10). He resided in Greenville, North Carolina and had a condominium at Olde Towne Yacht Club in Beaufort, North Carolina. (Hines depo. p. 18-19) (See also Hines Affidavit attached hereto as Exhibit A).

On Monday, March 20, 2006, Dr. Hines worked his regular schedule at Eastern Urological Associates. He planned to spend Tuesday, his day off, at his condominium in Beaufort. On Monday afternoon, while enroute to Beaufort from Greenville, he stopped at the business of Boats Unlimited NC on Highway 70, east of New Bern, as he was shopping for a new boat for his wife. His wife had a skiff and they were looking for a boat that would be more comfortable to her. (Hines depo. p. 202) (See also Hines Affidavit attached hereto as Exhibit A).

At Boats Unlimited NC Dr. Hines met with John Bannister Hyde, a salesman for Boats Unlimited NC. Dr. Hines told Mr. Hyde that he was looking for a boat for his wife. That the purpose was "…I needed a boat that wouldn't beat my wife up as the skiff did, that I needed a boat that was dry in ride." (Hines depo. p. 203). Dr. Hines looked at 2 boats at Boats Unlimited NC. Mr. Hyde recommended the Triton model boat stating that since it was a heavier boat, it would be drier and wouldn't pound like the skiff would pound, that she would find it a more comfortable riding boat. (Hines depo. p. 203, line 22-p. 204, line 2). Dr. Hines expressed a desire to take the Triton boat on a demonstration ride (sea trial) to see if this boat met his requirements. He advised Mr. Hyde that he would be available the next day, Tuesday, March 21, as it was his day off and that he would be at his condo in Beaufort. It was agreed between Mr. Hyde and Dr. Hines that Mr. Hyde would bring the boat to Beaufort for a sea trial on Tuesday, March 21, Dr. Hines' day off. (Hines depo. pp. 202-205) (See also Hines Affidavit attached hereto as Exhibit A).

On Monday, March 20, 2006 at 7:02 p.m. the National Weather Service at Newport/Morehead City, North Carolina issued its coastal marine forecast for the area from south of Currituck Beach Light to north of Surf City, NC out 20 nautical miles including the Albemarle and Pamlico Sounds and the Monitor National Marine Sanctuary. This forecast read as follows:

> SYNOPSIS for Eastern North Carolina Coastal Waters…Low pres will develop off the Carolina Coast tonight. The low will move NE Tue and drag a cold front across the waters Tue night. High pres will build into the waters Wed through Friday.
> …South of Cape Lookout to north of Surf City, NC out to 20 nautical miles. SMALL CRAFT ADVISORY NOW IN EFFECT from 5 am EST Tuesday through Wednesday afternoon…Overnight variable winds 5 to 10 knots becoming NE 15 to 20 knots after midnight. Seas 2 to 3 feet building to 4 to 6 ft late. Tues afternoon seas 5 to 8 ft.
> Tides for Atlantic Beach: March 21, 1006 High tide 10:58 am, low tide 4:58 pm. See National Weather Service Marine Forecast attached hereto as Exhibit B.

A "small craft advisory" is to alert mariners to sustained weather or sea conditions, either present or forecast, that might be hazardous to small boats. A small craft advisory for the Eastern U.S. from Maine to South Carolina is issued for sustained winds ranging from 20 to 25 knots and/or seas or waves 5 to 7 feet or greater. (See NOAA'S NATIONAL WEATHER SERVICE, Marine Forecasts, Definition – Small Craft Advisory, attached hereto as Exhibit C.)

Early in the afternoon of Tuesday, March 21, 2006 John Banister Hyde took the Triton model 2286 motorboat to the dock of Olde Towne Condominium near Beaufort to demonstrate the vessel to Dr. Hines. The Triton 2286 had a center console type layout, was 22 feet in length and powered by a single 250 hp Yamaha outboard motor. (See Hines Affidavit attached hereto as Exhibit A)

Dr. Hines and Neil Wagoner, a friend of Dr. Hines who has previously purchased a Triton motorboat from Boats Unlimited NC met John Banister Hyde at the dock. After inspecting the vessel the three of them departed from the Olde Town Condominium dock for a demonstration ride on the vessel. Dr. Hines was operating the vessel when they left the dock at Olde Towne Condominiums. (Hines Affidavit; Wagoner depo. p. 10, lines 6-11, Hines depo. p. 182, lines 13-15).

Upon leaving the Olde Towne dock Dr. Hines operated the boat in a southerly direction through Bulkhead Channel to the Morehead City Channel. Upon reaching the Morehead City Channel he made a left turn towards Beauford Inlet. After making the left turn he powered the boat up until it reached a plane. In order to get the boat on a plane it had to be going over 20 miles per hour according to the boat's speedometer. Dr. Hines proceeded with the Morehead City Channel towards Shackleford Banks. When he reached the area known as Cutoff Channel he continued on towards the inland side of Shackleford Banks. The course that he took did not take them through Beaufort Inlet, they remained some distance north of the inlet. As they were passing between Bogue Banks and Shackleford Banks, north of the inlet, they could see the waves in the inlet which were approximately 4 feet in height. The winds were blowing out of the northeast approximately 20 to 25 miles per hour, the tide and the current was running out of the inlet. (See Hines Affidavit attached hereto as Exhibit A).

After reaching the sound area just north of Shackleford Banks Dr. Hines drove the boat around making various turns to see how it handled. He noticed during his operation of the boat that the boat's bow tended to go up and down while the boat was on a plane. He referred to this as porposing. The boat did not have trim tabs and Dr. Hines was unable to eliminate the porposing by trimming the engine. He advised John Banister Hyde that he did not like the way

the boat handled because he could not keep it from porposing. (See Hines Affidavit attached hereto as Exhibit A, Hines depo. p. 208, line 22-p. 209 line 21).

Dr. Hines turned the operation of the boat over to John Banister Hyde while they were in the inland waters north of Shackleford Banks in the vicinity of the red nun buoy marking the jetty. Dr. Hines asked Mr. Hyde to show him how to operate the boat as he thought Mr. Hyde may be able to operate it in a manner so that it would not porpoise. When Dr. Hines turned the boat over to Mr. Hyde, Dr. Hines moved to his left and stood on the left side of the center console holding onto the T-top frame. His left hand was on one of the uprights for the T-top and his right hand was holding onto a frame on the top. Dr. Hines was facing towards Mr. Hyde so he could see how he manipulated the controls when he operated the boat. (See Hines Affidavit attached hereto as Exhibit A, Hines depo. p. 208, line 12-p. 211, line 25)

Mr. Hyde powered the vessel up to a plane and they headed from Shackleford Banks in a westerly direction towards Morehead City. In Dr. Hines' opinion Mr. Hyde was operating the vessel at a speed in excess of 20 miles per hour. As they entered the eastern leg of the Morehead City Channel, Mr. Hyde turned the vessel to the left towards the inlet immediately after passing green buoy number 19. This turn took the vessel out of the deep water of the ship channel into the shoal area. Immediately afterwards, according to Dr. Hines, the vessel struck a large wave, the bow lifted and the vessel appeared to go airborne. Dr. Hines was thrown up in the air with his head striking the T-top. He was still holding on when he came crashing down to the deck. On impact with the deck he heard, what he described as "probably not a real sound but a feeling, a crack as I impacted the deck" and then he fell to the deck. He immediately knew that his lower left leg was broken and his immediate concern was whether it was a compound fracture or if he had sustained any cuts as he was on the blood thinner Coumadin. (See Hines Affidavit attached

hereto as Exhibit A, Hines depo. p. 217, line 24-p. 218, line 12, p. 219, lines 10-13, p. 223, line 1-p. 224, line 25).

After ascertaining Dr. Hines' condition, a telephone call was made from the vessel for an ambulance. An ambulance from the Morehead City Fire and EMS Department was waiting at the dock when they returned. Dr. Hines was transferred to Carteret General Hospital. Medical treatment revealed a severe fracture to the left lower leg and ankle and another fracture to the right lower leg.

The testimony of Neil Wagoner and John Banister Hyde differs somewhat from Dr. Hines' recollection. Both Wagoner and Hyde indicated that the vessel was still in the channel as they were heading out of the inlet. (Wagoner depo. p. 12, line 6). Wagoner indicated that they were going out of the inlet and the waves were coming straight in and because the tide was going out, the waves were shorter and steeper and that the bow of the boat was raising up and was hitting hard on the water. That they had struck more than one wave in this manner before Dr. Hines' injury. (Wagoner depo. p. 12, lines 6-17, p. 34, lines 1-24). Wagoner testified that John Banister Hyde never advised them that he intended to go out of the inlet. (Wagoner depo. p. 26, lines 22-24). Wagoner testified that when the vessel started striking the waves in the inlet he moved aft to a position of safety, (Wagoner depo. p. 29, line 21, p. 31, line 23) and at the time of the incident he was standing behind the operator. Wagoner did not feel that the entire boat was airborne at the time of Dr. Hines' injury but he agreed that the bow of the vessel was approximately 6 feet out of the water before slamming down into the trough of the next wave. (Wagoner depo. p. 17, lines 10-13, p. 34, lines 1-25, p. 36, lines 1-3).

After Dr. Hines was thrown to the floor John Banister Hyde reduced speed. (Wagoner depo. p. 36, lines 8-11). After he slowed the boat down the bow wasn't going up in the air as

they crossed the waves and slamming down hard like it did before slowing it down. (Wagoner depo. p. 43, lines 2-14). Neil Wagoner stated in his testimony that had the vessel been operated at 5 knots instead of 15 or 20 knots the vessel would not have gone over the waves in the same violent manner. (Wagoner depo. p. 43, lines 14-20). On cross-examination Neil Wagoner agreed that had the vessel been operated at 5 knots that this accident would not have happened. (Wagoner depo. p. 44, lines 3-7).

After the incident, John Banister Hyde, who held a US Coast Guard license as an Operator of Uninspected Passenger Vessels, (Hyde depo. p. 9, lines 1-21) did not report this serious marine incident to the United States Coast Guard or the North Carolina Department of Wildlife Resources. (Hyde depo. p. 70, lines 2-14). At no time after this accident did John Banister Hyde submit to chemical tests for alcohol or dangerous drugs. (Hyde depo. p. 72, line 12-p. 73, line 5).

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is an appropriate remedy only if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is not a genuine issue as to any material fact."

Summary judgment is appropriate when there exists no issue of genuine material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986); Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513.

7

The remedy is such that a court must exercise great care and caution in its review of the facts before granting summary judgment. "Summary judgment is an extreme remedy and not to be granted unless the moving party has established his right to judgment with such clarity as to leave no room for controversy and the other party is not entitled to recover under any discernable circumstance." Mandel v. U.S., 719 F.2d 963 (8th Cir. 1983), citing, Portis v. Folk Construction Company, Inc., 694 F.2d 520, 522, (8th Cir. 1982). The severity of the remedy was also noted in Tippins v. Celotex Corp., 804 F.2d 949 (11th Cir. 1986), wherein the Court stated, "summary judgment is such a lethal weapon, depriving the litigant of a trial on the issues, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." Tippins, at 952.

Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). There is no issue of trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250, 106 S.Ct. at 2511. The moving party can bear his burden either by presenting affirmative evidence, or by demonstrating that the non-movant's evidence is insufficient to establish his claim. Celotex Corp., 477 U.S. at 331, 106 S.Ct. at 2557 (Brennan, J., dissenting). If the moving party makes a sufficient showing that there is an absence of evidence to support the non-moving party's case, the non-moving party may not rest upon mere allegations or denials in his pleadings, but must set forth specific facts showing that there is a genuine issue of trial. Anderson, 477 U.S. at 256, 106 S.Ct. at 2514.

Summary judgment for a claimant is possible if the record shows the claimant to have satisfied the elements of the claim without need for judicial evaluation of conflicting material. Anderson, 477 U.S. at 250.

**APPLICABLE LAW**

I.     **NEGLIGENCE**

A passenger is a person who travels in a public conveyance by virtue of a contract, express or implied, which involves paying a fare or some other consideration to the carrier. A visitor is a person other than a passenger or a member of the crew who is on board with the express or implied consent of the shipowner or operator of the vessel. Schoenbaum, Admiralty and Maritime Law, Vol. 1, Section 5-5 p. 169 (2d ed 1994).

Under general maritime law a passenger or visitor (guest passenger) may recover damages for personal injuries by proving the traditional elements of a negligence claim in admiralty:

1.      The existence of a duty owed by the vessel owner or operator;

2.      breach of the duty;

3.      proximate causation; and

4.      injury and damages.

Schoenbaum, Id at 171.

A.      STANDARD OF CARE

Negligence is conduct which involved creating a risk of harm to others. It is a failure to observe that degree of care, precaution, and vigilance which the circumstances demand, and the failure to observe the ordinary degree of care which people of ordinary prudence would use under the same circumstances. Traditional common law principles of negligence apply to claims under general maritime law. Douglas, et al v. Mercer, et al. 4:06-CV-138-BR and 4:06-CV-139-BR citing Virginia Int'l Terminals, Inc. v. M/V Katsuragi, 263 F.Supp. 2d 1025, 1035 (E.D. Va. 2003). Plaintiffs must show "by a preponderance of the evidence: that the defendant owed the plaintiff a duty, that this duty was breached, and that a causal connection existed between the breach and the plaintiff's injury." Id.

"It is a settled principle of maritime law that a shipowner or vessel operator owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Kermarec v. Compagnie Generals Translantic, 358 US 625, 79 S. Ct. 406, 3 L. Ed. 2250 (1959). Courts following the Kermarec case have expanded upon the notion of reasonable care under the circumstances. Differing circumstances necessitate differing levels of degree of care. "The extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger, will determine how high a degree of care is reasonable in each case." Rainey v. Paquet Cruises, Inc., 709 F. 2d 169, 172 (2nd Cir. 1983) see also Monteleone v. Bahama Cruise Line, Inc., 838 F. 2d 63, 65 (2nd Cir. 1988). "[I]n some instances reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less." Smith v. Southern Gulf Marine Co. No 2, Inc., 791 F. 2d 416, 421 (5th Cir. 1986). Factors to consider when determining what degree of care is required include, among others, 1) the experience of the operator, 2) the type of operator involved, 3) the dangers to the passenger, and 5) the operator's ability to take precautions against such danger. Id. at 421. In the Matter of the Petition of Catalina Cruises, Inc., 930 F. Supp. 1384 at 1391 (C.D. Cal. 1996).

Reasonable care includes the duty to warn of dangers which are not apparent and obvious. Since the duty is one of reasonable care under the circumstances, the circumstances of each case may vary. The extent to which circumstances surrounding maritime travel are different than those encountered in daily life and involve more danger to passengers and visitors, will determine how high a degree is reasonable in each case. Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318 (11th Cir. 1989).

The Court may determine the precise scope of the duty by taking into account particular circumstances, such as the special needs or disabilities of a passenger or visitor, and the extent to which circumstances surrounding Maritime travel are different from those encountered in overland travel. Schoenbaum, supra at 170.

**I.    Duties**

**A.    RULES OF NAVIGATION**

Congress has adopted the International Regulations for Preventing Collisions at Sea, 33 U.S.C. 1601, et. seq. which pertain to the operation and navigation of vessels on the sea in the area seaward of the Colregs Demarcation Line.   In addition, Congress has adopted the Inland Rules of Navigation, 33 U.S.C. 2001, et seq. which pertains to the operation and navigation of vessels within the inland waters of the United States. In this case, there is some question whether the incident occurred on the inland waters of Beaufort Inlet or beyond the Colregs Demarcation Line. However, it makes little difference which rules apply as the inland rules and the international rules that apply in this care are identical. The following Rules have a bearing on this action:

> Rule 5. **Look-Out.** Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision.  33 U.S.C. 2005.
>
> Rule 6. **Safe Speed.** Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.
>
> In determining a safe speed the following factors shall be among those taken into account:

... (v)   The state of wind, sea and current, and the proximity of navigational hazards; 33 U.S.C. 2006.

Rule 2.   **Responsibility.**

(a)      **Exoneraton**

Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b)      **Departure from rules when necessary to avoid immediate danger**

In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

The proper speed of the vessel is relative to the circumstances of the vessel and is directly related to the state of the body of water and the lookout being kept by the operator. The degree of care required in looking for possible hazards varies with the situation. Red Star Barge Line v. Lizza Asphalt Construction Company, 264 F.2d 467 (1959), . Woodford v. Carolina Power and Light Company, 798 F.Supp 307 (EDNC 1992). A vessel operator must always anticipate another vessel either stopped or approaching from any direction, as well as debris and other obstructions floating on or submerged just beneath the water. Constant vigilance is required. Woodford v. Carolina Power and Light Company, supra at 312.

The duty of keeping a proper lookout is of the highest importance, upon nothing else does the safety of those concerned so much depend. In the performance of this duty, the law requires indefatigable care and sleepless vigilance. A moment's negligence in failing to keep a proper lookout may involve the loss of the vessel and the lives of all on board. A lookout is specially

charged with the duty of observing any obstruction to navigation with that thoroughness that the circumstances permit. Farwell's, Rules of the Nautical Road, 6th ed. (1982) A Proper Lookout, p. 367.

## B. WEATHER

The ship operator in the exercise of his duty for the safety of passengers must warn passengers of the dangers which the vessel's employees may reasonably anticipate from weather conditions or other reasons, which are not readily apparent to passengers, and the vessel is liable for injuries to such passengers which may have been avoided had due warning of the danger been given. Summers v. The Motor Ship Big Ron Tom, 262 F. Supp. 400 (1967).

A vessel owner/operator is obligated to monitor weather broadcasts for the voyage he intends to take and is chargeable with the knowledge of such broadcasts. In the Matter of the Complaint of Tweed Towing Inc., For Exoneration from or Limitation of Liability, 1992 AMC 37

## C. POST-SERIOUS MARINE INCIDENT DUTIES.

### 1. Notice

Immediately after the addressing of resultant safety concerns, the owner, agent, master, operator or person in charge, shall notify the nearest Marine Safety Office, Marine Inspection Office or Coast Guard Group Office whenever a vessel is involved in a marine casualty consisting in an injury that requires professional medical treatment (treatment beyond first aid). 46 C.F.R. 4.05-1(a) and (a6)

### 2. Written report

In addition to the immediate notice requirement the owner, agent, master, operator, or person in charge shall within five (5) days file a written report of any marine casualty required to be reported. This written report must be provided on Form CG-2692 (Report of Marine Accident,

13

Injury, or Death) and supplemented by Form CG-2692B (Report of Required Chemical Drug and alcohol testing following a serious marine incident.) These written reports must be delivered to a U.S. Coast Guard Marine Safety Office or Marine Inspection Office, 46 C.F.R. §4.05-10(a).

### 3. Post-Incident Testing

**46 C.F.R. §16.240 – Serious Marine Incident Testing Requirements.**
The marine employer shall ensure that all persons directly involved in a serious marine incident are chemically tested for evidence of dangerous drugs and alcohol in accordance with the requirements of 46 C.F.R. 4.06.

Any individual engaged or employed on a vessel who is determined to be directly involved in a serious marine incident must provide a blood, breath, saliva or urine test. 46 C.F.R. §406-5. The alcohol testing must be conducted within two hours of when the serious marine incident occurred, unless precluded by safety concerns directly related to the incident. 46 C.F.R. §406-3(a)(i). The collection of drug test specimens of each individual must be conducted within 32 of when the serious marine incident occurred, unless precluded by safety concerns directly related to the incident. 46 C.F.R. §406-3 (b)(i). The results of the testing shall be provided on C.G. Form 2292(b), Report of Required Chemical, Drug and Alcohol Testing Following a Serious Marine Incident.

### D. SPOLIATION OF EVIDENCE

The failure of the master of the vessel and his employer to conduct alcohol and drug testing post accident, as required by the United States Coast Guard regulations, may constitute spoliation of evidence. From the spoliation of evidence the trier of fact may draw an inference that the evidence would have been unfavorable to the party who suppressed the evidence. In Douglas v. Mercer, et al, 4:06-CV-138-BR and Douglas v. Mercer, et al, 4:06-CV-139-BR, the Court concluded that the defendants' failure to conduct any drug and alcohol testing post

14

accident as required by the United States Coast Guard regulations constituted spoliation of evidence. From this spoliation of evidence, the Court drew the inference that the evidence would have been unfavorable to the defendants. Specifically, the Court inferred from these defendants' failure to conduct required drug and alcohol testing that the influence of drugs and/or alcohol of either the master or the crew was a proximate cause of the Plaintiffs' injuries.

## ARGUMENT

Summary judgment is mandated where the facts and the law will reasonably support only one conclusion. If reasonable persons, applying the proper legal standard, could differ as to whether or not John Banister Hyde breached one of the numerous legal duties he owed to his passenger, Benjamin G. Hines, Jr., then it is a question for the finder of fact.

In the case before this Court, the Plaintiff Benjamin G. Hines, Jr. contends, viewing the evidence and all reasonable inferences there from in the light most favorable to him, that the Defendant, John Banister Hyde, and by respondeat superior, the Defendant, Triad Marine Center, Inc., breached their duty of exercising reasonable care under the circumstances not to negligently injure him and to warn him of dangers which they knew or should have known.

The Defendant, John Banister Hyde breached the aforesaid duties by operating the vessel at a speed too great for the conditions that existed, by failing to keep a proper lookout, by failing to reduce speed, by failing to advise the passengers on board that he was going to proceed through the inlet, by failing to warn of the approaching wave, by failing to monitor the weather forecast, by failing to warn his passengers of the dangers which he may reasonably anticipate from the weather conditions and by failing to submit to alcohol and drug test following a serious marine accident. The Plaintiff will address each one of these contentions individually.

15

## A.    Weather

The vessel operator, John Banister Hyde, has a duty to monitor weather broadcasts for the voyage he intended to take and is chargeable with the knowledge of such broadcast. In the Matter of the Complaint of Tweed Towing, Inc., Supra. He has a duty to warn his passengers of the dangers which he may reasonably anticipate from weather conditions. Summers v. The Motor Ship Big Ron Tom, Supra.

In his deposition, Capt. Hyde, testified that he checked the weather forecast on the NOAA website on March 20 or 21 prior to the sea trial and the weather for the area was the winds were forecasted to be 10 to 15 knots out of the northeast. (Hyde depo. p. 33, lines 14-22).

On Monday, March 20, 2006 at 7:02 p.m. the National Weather Service at Newport/Morehead City, North Carolina issued its Coastal Marine Forecast for the area from South of Currituck Beach Light to north of Surf City, NC out 20 nautical miles including the Albemarle and Pamlico Sounds and the Monitor National Marine Sanctuary. This forecast was as follows:

> SYNOPSIS for Eastern North Carolina Coastal Waters…Low pres will develop off the Carolina Coast tonight. The low will move NE Tue and drag a cold front across the waters Tue night. High pres will build into the waters Wed through Friday.
> …South of Cape Lookout to north of Surf City, NC out to 20 nautical miles. SMALL CRAFT ADVISORY NOW IN EFFECT from 5 am EST Tuesday through Wednesday afternoon…Overnight variable winds 5 to 10 knots becoming NE 15 to 20 knots after midnight. Seas 2 to 3 feet building to 4 to 6 ft late. Tues afternoon seas 5 to 8 ft.
> Tides for Atlantic Beach: March 21, 1006 High tide 10:58 am, low tide 4:58 pm. See National Weather Service Marine Forecast attached hereto as Exhibit B.

A "small craft advisory" is to alert mariners to sustained weather or sea conditions, either present or forecast, that might be hazardous to small boats. A small craft advisory for the Eastern

16

U.S. from Maine to South Carolina is issued for sustained winds ranging from 20 to 25 knots and/or seas or waves 5 to 7 feet or greater. See NOAA'S NATIONAL WEATHER SERVICE, Marine Forecasts, Definition – Small Craft Advisory, attached hereto as Exhibit C.

Capt. Hyde either did not listen to the NOAA weather forecast as testified to in his deposition or he chose to ignore it, as he took the 22 foot Triton motorboat from the protected inland waters into large waves in the Beaufort Inlet without advising his passengers. It is clear that Capt. Hyde failed to exercise his duty to monitor the weather broadcast, or to take heed to the broadcast or to warn his passengers of such dangers that could have been anticipated of the weather and sea conditions.

### B.   Rules of Navigation

Rule 5.  **Look-Out.**  Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision.  33 U.S.C. 2005.

Rule 6.  **Safe Speed.**  Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

... (v)  The state of wind, sea and current, and the proximity of navigational hazards; 33 USC 2006.

Rule 2.  **Responsibility.**

**(a)  Exoneration**

Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

**(b)  Departure from rules when necessary to avoid immediate danger**

In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

The proper speed of a vessel is relative to the circumstances of a vessel and is directly related to the state of the sea and the lookout being kept by the operator.  In this case the operator, John Banister Hyde was operating the vessel at approximately 20 mph, when without warning or instructing his passengers he made a turn to port in an attempt to go out of Beaufort Inlet where seas had been forecast to be 5 to 6 feet in height and were actually approaching that height. In addition when Capt. Hyde made his turn he turned on the wrong side of green buoy number 19 and left the deep channel and entered shoal water. This incident occurred when the tide and current were going out and with the wind direction opposite the direction of the waves, all of which made the waves taller and steeper. When the vessel encountered these tall, steep waves at a speed of approximately 20 miles per hour, the vessel went airborne throwing Dr. Hines in the air with his head striking the T-top and then his body came crashing to the deck resulting in fractures to both his left and right lower legs.

Capt. Hyde failed to keep a proper lookout by failing to scan the inlet's surface for large waves, which he knew, or should have known, presented an immediate hazard.  This improper lookout, when combined with his speed of approximately 20 mph, his failure to reduce speed or change course when confronted with a large wave or waves head-on to his vessel was a violation of the reasonable duty of care.

This Court has tried several cases factually similar to the present case, where a vessel operator while entering an inlet continued to operated the vessel in a planing mode and failed to decrease the vessel's speed when encountering waves resulting in passenger's being thrown up in the air and then down to the vessel's deck, resulting in personal injury. See William Douglas v. Donald

18

Mercer, et al, 4:06-CV-138-BR, Stephen Douglas v. Donald Mercer, et al, 4:06-CV-139-BR and Roscoe Baker v. Frederick Clark Langdon, 5:00-CV-489-BR. In these cases the court found the vessel operator negligent by failing to keep a proper lookout and by failing to operate the vessel at a safe speed which fell below the standard of care, that degree of care, precaution and vigilance which the circumstances demanded. See Douglas v. Mercer, et al.

In another case similar to the one before the Court, Seaboard Properties v. Bunchman, 278 F. 2d 679 (5th Cir 1960), a vessel operator was found to be negligent when a passenger was injured when the boat in which he was riding hit a high wave and he was thrown out of his seat and crashed back down on the seat as the boat rose to meet his fall. See also Gilreath v. Silverman, 245 N.C. 51 (1956).

### C.      Post-Serious Marine Incident Duties

After this incident neither Capt. John Banister Hyde, a licensed Captain holding an Operator of Uninspected Passenger Vessels document issued by the United States Coast Guard nor his employer, Triad Marine Center, Inc., gave notice of this serious marine incident to the United States Coast Guard as required by 46 C.F.R. 4.05-1(a) and (a6).

After this incident neither Capt. Hyde nor his employer, Triad Marine Center, Inc., filed with the United States Coast Guard the required written report of marine casualty on United States Coast Guard Form 2692 (Report of Marine Accident, Injury or Death) nor did they file United States Coast Guard Form 2692B (Report of Required Chemical Drug and Alcohol Testing Following a Serious Marine Incident).

United States Coast Guard Regulations require all persons directly involved in a serious marine incident to be chemically tested for evidence of dangerous drugs and alcohol in accordance with the requirements of 46 C.F.R. 4.06. Any individual engaged or employed on a

vessel who is determined to be directly involved in a serious marine incident must provide a blood, breath, saliva or urine test. 46 C.F.R. §406-5. The alcohol testing must be conducted within two hours of when the serious marine incident occurred, unless precluded by safety concerns directly related to the incident. 46 C.F.R. §406-3(a)(i). The collection of drug test specimens of each individual must be conducted within 32 hours of when the serious marine incident occurred, unless precluded by safety concerns directly related to the incident. 46 C.F.R. §406-3(b)(i). The results of the testing shall be provided on C.G. Form 2292(b). Report of Required Chemical, Drug and Alcohol Testing Following a Serious Marine Incident.

After this incident John Banister Hyde nor his employer, Triad Marine Center, Inc., conducted alcohol or drug testing as required by the United States Coast Guard Regulations. John Banister Hyde, as a licensed Coast Guard Captain, knew or should have known, that he was required to conduct an alcohol test within two hours of when the serious marine incident occurred and that a drug test specimen was required to be conducted within thirty-two hours of the serious marine incident.

The failure of John Banister Hyde and his employer, Triad Marine Center, Inc., to conduct alcohol and drug testing post-accident as required by the United States Coast Guard Regulations may constitute spoliation of evidence. From the spoliation of evidence the trier of fact may draw an inference that the evidence would have been unfavorable to the party who suppressed the evidence. From this the Court may infer that these Defendants' failure to conduct required drug and alcohol testing that the influence of drugs and/or alcohol of the vessel operator was a proximate cause of Plaintiff's injury. Douglas v. Mercer, et al, 4:06-CV-138-BR and Douglas v. Mercer, et al, 4:06-CV-139-BR.

### D. Expert Testimony

The Defendants contend that not only does the Plaintiff's own testimony fail to make a prima facie showing of negligence, but the opinions of Plaintiff's expert, Capt. Donald W. Davis, should be excluded for being unreliable, as the methodologies and principles he employed in reaching is opinions are flawed. The Defendants' contentions are without merit on both accounts. The Plaintiff's testimony alone makes a prima facie showing of negligence, as does the testimony of Neil Wagoner, the other occupant of the vessel, who testified in deposition that the vessel struck several waves at approximately 15 to 20 miles per hour, the bow of the vessel went approximately six (6) feet in the air after striking a wave immediately before the Plaintiff's injury. That after the Plaintiff's injury the vessel reduced speed, and after reducing speed the vessel no longer pounded violently. Mr. Wagoner also testified that had the vessel been operated at 5 knots instead of the speed it was being operated the incident would have never occurred. (Wagoner depo. p. 44, lines 3-7).

With regards to Captain Donald W. Davis, the Plaintiff's expert, he has been qualified and admitted as an expert in the United States District Court for the Eastern District of North Carolina on numerous occasions as an expert in the area of boat handling and seamanship, as is evidenced by his Rule 26(a)(2) Disclosures which are attached hereto as Exhibit D.

Capt. Davis entered the United States Coast Guard in 1966 and had 28 years of service in the regular Coast Guard and Reserve. (Davis depo. p. 12). He received the Coast Guard Commendation medal for writing and teaching heavy weather rescue for the United States Coast Guard. (Davis depo. p. 13). When he left the active duty Coast Guard in 1970 he went to work for Carteret Towing Company for one (1) year as a tug captain operating out of the Morehead City Port and Beaufort Inlet. (Davis depo. p. 14). He then went to work for the Morehead City

Pilots Association as pilot boat captain carrying bar pilots through Beaufort Inlet to put them on ships entering the harbor and to pick up bar pilots off of ships after exiting the harbor. He worked at this position for approximately two (2) years. (Davis depo. p. 14). He then became master of a vessel for the West Indies Fruit and Steamship Company. (Davis depo. p. 15). In 1974 he returned to the Morehead City area and went to work on the tug boats and with the pilot's association bringing ships through Beaufort Inlet. He did his apprenticeship to obtain his federal pilot's license in the Beaufort Inlet area. His apprenticeship required him to make seven hundred (700) trips through the Beaufort Inlet to obtain his federal pilot's license. (Davis depo. p. 69). In 1978 he went to work as the master of a ferry/supply boat for the Cape Lookout National Seashore Park. He remained in that position until 1986. (Davis depo. p. 16). In Capt. Davis' opinion he has transited Beaufort Inlet in the area where this incident occurred over 2,000 times. He holds a document as the United States Merchant Marine Officer, Unlimited Tonnage; Master 1600 tons; first class pilot of steam and motor vessels, any gross ton and operator of towing vessels. Capt. Davis is extremely familiar with the Beaufort Inlet area, its channels, its shoals, its currents and its sea conditions in all types of weather and currents.

In order for Capt. Davis to formulate opinions in this case, he met with and interviewed the Plaintiff, Dr. Benjamin G. Hines, Jr. (Davis depo. p. 4, line 20-p. 5, line 10). He then obtained nautical charts of the Beaufort Inlet that were in effect at the time of the accident. He next obtained the National Weather Service weather forecast and weather data from the two (2) closest official NOAA weather stations to Beaufort Inlet, Station CLKN7 Cape Lookout and 41035 Onslow Bay, for the time preceding and the time of the incident. He also obtained NOAA tide data and NOAA current data for the Beaufort Inlet near Fort Macon for the time of the accident. (Davis depo. p. 3, line 12-p. 4, line 8). Capt. Davis also located, inspected and

photographed the vessel involved in the incident. (Davis depo. p. 3, lines 5-12). After obtaining this information he then traveled by vessel with Dr. Hines to retrace the course and the events of the date of the incident. (Davis depo. p. 5, lines 3-12; p. 7, line 22-p. 11, line 7; see also Report of Capt. Donald Davis attached to his deposition as Exhibit 24).

The NOAA weather forecast for the Beaufort Inlet area indicated that a small craft advisory was in effect which indicated winds ranging from 20 to 25 knots and/or seas or waves from 5 to 7 feet or greater. (See Exhibits B and C). From the weather records, in particular, the Onslow Bay station, Capt. Davis determined wave heights, wave direction and wind information, including direction, velocity and changes. From the weather records from the Cape Lookout station, he obtained wind information, including direction, velocity and changes. (Davis depo. p. 46, lines 7-15). This information indicated that wave heights were at least four (4) feet and winds were 20 knots or 23 miles per hour. (Davis depo. p. 56). From the NOAA tide and current data, he determined the state of the tide, the direction and velocity of the currents. He took this information and his extensive knowledge of Beaufort Inlet to determine whether or not it was consistent with Dr. Hines' description of the weather and sea conditions, which he found was consistent. (Davis depo. p. 53). He then considered Dr. Hines statement as to the speed of the vessel in these sea conditions and Dr. Hines' description of the incident. Capt. Davis also took into consideration the nature of the injuries sustained to determine whether those injuries were consistent with Dr. Hines' description of the accident, which he concluded they were. (Davis depo. p. 53). Capt. Davis was unable to review any reports filed with the Coast Guard or North Carolina Wildlife as the Defendants had not complied with their duties. Capt. Davis did not interview the operator of the vessel, John Banister Hyde, or the passenger, Neil Wagoner, as they were not available.

After reviewing all of this information, and applying his extensive knowledge of Beaufort Inlet and its sea conditions in various states of weather, current and tide, Capt. Davis reached the opinion that John Banister Hyde did not exercise due care under the circumstances as he was operating the vessel at an excessive speed for the existing conditions and that he was not maintaining a proper lookout. He also reached an opinion with regards to lookout that the operator should have observed the oncoming waves and sea conditions in sufficient time to warn his passengers of the approaching dangers and to take appropriate action to lessen the exposure of his vessel to that danger which would include a reduction in speed and an alteration of course which would have resulted in greatly lessening the amplitude of the forward area of the vessel as it encountered the waves and therefore lessened the impact on the vessel and the passengers. (See Report of Capt. Donald Davis attached to his deposition as Exhibit 24).

The Defendants have taken several statements from Capt. Davis' deposition out of context in an attempt to argue that his opinions are unreliable. A review of his deposition as a whole shows this argument to be without merit. The opinions of Capt. Davis are based upon sufficient facts and data, are the product of reliable principles and methods and Capt. Davis has applied the principles and methods reliably to the case as is required by the Federal Rule of Evidence 702. His expert testimony is relevant and reliable and is based on the facts, not on subjective belief or unsupported speculation. See Kumho Tire Company v. Carmichael, 526 U.S. 137 (1999).

## CONCLUSION

For all of the foregoing reasons, the Plaintiff, Benjamin G. Hines, Jr., respectfully submits that not only has he made out a prima facie claim in negligence against the Defendants but that he has satisfied all of the elements of a claim for the Defendants' negligence without

need for judicial evaluation of conflicting material and therefore the Defendants' summary judgment should be denied and summary judgment should be entered for the Plaintiff on the issue of the negligence of the Defendants.

The 19th day of January, 2010.

/s/ Stevenson L. Weeks
Stevenson L. Weeks
Attorney for Plaintiff
Wheatly, Wheatly, Weeks & Lupton, PA
710 Cedar Street
Post Office Box 360
Beaufort, NC 28516
(252) 728-3158
slw@wwnwpa.com
NC State Bar No. 9515

/s/ Charles R. Hardee
Charles R. Hardee
Attorney for Plaintiff
Hardee & Hardee, LLP
202 E. Arlington Blvd., Suite W
Greenville, NC 27835-0924
(252) 355-1998
Fax (252) 321-2948
crh@hardeeandhardee.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2010, I electronically filed the foregoing Plaintiff's

Memorandum in Response to Defendants' Motion for Summary Judgment with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following:

Susan H. Briggs, Esq.                    John T. Pion, Esq.
John T. Holden, Esq.                     J. Lawson Johnston, Esq.
DICKIE, McCAMEY & CHILCOTE, P.C.         DICKIE, McCAMEY & CHILCOTE, P.C.
2115 Rexford Road, Suite 210             Two PPG Place, Suite 400
Charlotte, NC 28211-5453                 Pittsburg, PA 15222


                                         <u>/s/ Stevenson L. Weeks</u>
                                         Stevenson L. Weeks
                                         Attorney for Plaintiff
                                         Wheatly, Wheatly, Weeks & Lupton, PA
                                         710 Cedar Street
                                         Post Office Box 360
                                         Beaufort, NC  28516
                                         (252) 728-3158
                                         slw@wwnwpa.com
                                         NC State Bar No. 9515

26