UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO: 4:09-CV-003-BR

| | |
|---|---|
| BENJAMIN G. HINES, JR., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) ORDER |
| | ) |
| | ) |
| TRIAD MARINE CENTER, INC. | ) |
| d/b/a BOATS UNLIMITED NC and | ) |
| JOHN BANISTER HYDE, | ) |
| | ) |
| Defendants. | ) |

This is a maritime action arising out of an incident occurring on 21 March 2006 on a Triton model 2286 motorboat in Beaufort Inlet, Carteret County, North Carolina. A non-jury trial was held before the undersigned beginning 14 September 2010 and ending 20 September 2010. Appearing for plaintiff Benjamin G. Hines, Jr. were Stevenson L. Weeks and Charles R. Hardee. Appearing for defendants Triad Marine Center, Inc. dba Boats Unlimited NC ("Boats Unlimited NC") and John Banister Hyde were J. Lawson Johnston, John T. Pion, and Shannon S. Frankel. From the stipulations of the parties and evidence presented at trial, the court now makes the following findings of facts and conclusions of law:

    1. All parties are properly before the court.

    2. The court has jurisdiction of the parties and the subject matter. All parties have been correctly designated.

    3. There is no question as to misjoinder or nonjoinder of parties.

    4. Hines is a citizen and resident of Pitt County, North Carolina.

    5. Boats Unlimited NC is a corporation duly organized and existing by virtue of the laws

of the State of North Carolina.

6. Hyde is a resident of Craven County, North Carolina.

7. Boats Unlimited NC is engaged in the sales and service of motor boats in four different locations in North Carolina under the name of Boats Unlimited NC, with one of the locations being at 4316 Hwy 70 East, New Bern, Craven County, North Carolina.

8. At all times relevant to this action, Hyde was working as an employee of Boats Unlimited NC, within the course and scope of his employment relationship with Boats Unlimited NC.

9. Hyde worked at the New Bern location of Boats Unlimited NC as a sales person where, among other things, he would meet potential customers and, at their request, take qualified customers on demonstration rides in an attempt to sell them their products.

10. As of March 21, 2006, Hines was a medical doctor, licensed in the State of North Carolina and specializing in the filed of urology. He practiced urology with Eastern Urological Associates, PA Greenville, North Carolina. He resided in Greenville, North Carolina and had a condominium at Olde Towne Yacht Club in Beaufort, North Carolina.

11. After work on Monday, March 20, 2006, Hines stopped at the New Bern location of Boats Unlimited NC where he met with Hyde and explained that he was looking for a boat for his wife. After Hyde showed Hines a Triton model 2286 boat, Hines expressed a desire to take this boat on a demonstration ride (sea trial). It was then agreed that Hyde would bring the boat to the dock at Hines' condominium in Beaufort for a sea trial on Tuesday, March 21, 2006.

12. The National Weather Service issued a small craft advisory for the area south of Cape Lookout to north of Surf City, North Carolina out 20 nautical miles (an area encompassing

the area at issue here) effective 5:00 a.m., Tuesday, March 21, 2006 through Wednesday afternoon, March 22, 2006.

13. On Tuesday, March 21, 2006, Hyde put the Triton model 2286 motorboat in the water and motored it to the dock of Olde Towne Condominium to demonstrate the vessel to Hines. The Triton 2286 had a center console type layout, was 22 feet in length, and was powered by a single 250 hp Yamaha outboard motor.

14. Hines and Neil Wagoner, a friend of Hines who had previously purchased a Triton motorboat from Boats Unlimited NC, met Hyde at the dock. After Hines inspected the vessel, the three of them departed from the Olde Town Condominium dock for a demonstration ride on the vessel.

15. After operating the boat in the vicinity of Shackleford Banks, Hines turned the operation of the boat over to Hyde.

16. Hyde powered the vessel up to a plane and proceeded from Shackleford Banks in a westerly direction towards Morehead City. Hyde was operating the vessel at a speed in excess of 20 miles per hour. As they entered the eastern leg of the Morehead City Channel, Hyde, without advising the passengers on his vessel, turned the vessel to the left toward the Beaufort Inlet (the "Inlet").

17. At that time, the waves in the Inlet were approximately four feet high and were coming off the ocean, i.e., from the south/southeast. The wind was blowing from the north/northeast at a speed of 20-25 miles per hour. The tide was falling, and the current was traveling out of the Inlet, to the southeast. Winds opposing the waves and an outgoing current made the waves in the Inlet steeper and the interval between waves shorter.

18. Upon entering the Inlet, the vessel approached a series of waves which caused it to

rise and fall as each wave passed underneath. The vessel struck a large wave and the bow lifted, throwing Hines up in the air where his head struck the T-top. The bow then slammed down, causing Hines to crash to the deck, receiving injury to his ankles.

19. Prior to the vessel's striking the series of waves, Hyde did not change course or speed of the vessel and did not warn his passengers of the oncoming waves.

20. While Hyde was operating the boat, Hines sustained an obvious left lower leg injury.

21. A telephone call was made from the vessel for an ambulance, and an ambulance from the Morehead City Fire and EMS Department was waiting at the dock when they returned. Hines was transferred to Carteret General Hospital where it was determined that he had sustained a bimalleolar fracture of his left ankle and an injury to his right ankle. Surgery was subsequently performed on Hines' left ankle at Pitt County Memorial Hospital, and Hines continues to be seen by his medical providers.

22. As a result of the accident, Hines has a 20% permanent partial impairment rating of his left ankle, and based on his chronic pain and swelling and use of narcotic pain medication (and the side effects thereof), he can no longer engage in any gainful employment.

23. Negligence is conduct which involves creating a risk of harm to others. It is a failure to observe that degree of care, precaution, and vigilance which the circumstances demand, and the failure to observe the ordinary degree of care which people of ordinary prudence would use under the same circumstances. Traditional common law principles of negligence apply to claims under general maritime law. Virginia Int'l Terminals, Inc. v. M/V Katsuragi, 263 F. Supp. 2d 1025, 1035 (E.D. Va. 2003). A plaintiff must show "by a preponderance of the evidence: that the defendant owed the plaintiff a duty, that this duty was breached, and that a causal connection existed between the breach and the plaintiff's injury." Id. (citations omitted).

4

Case 4:09-cv-00003-BR    Document 98    Filed 01/03/11    Page 4 of 7

24. Hyde failed to exercise due care under the circumstances. Specifically, he failed to reduce speed when necessary, failed to properly navigate the waves in the Inlet, and failed to keep a proper lookout. Hyde operated the vessel negligently, and such negligence was a proximate cause of Hines' personal injuries and economic harm.

25. Hyde's negligence is imputed to his then-employer, Boats Unlimited NC, by the doctrine of *respondeat superior*. See Workman v. City of New York, 179 U.S. 552, 565 (1900).

26. As a result of the accident, Hines has sustained medical treatment and supply expenses of $28,862.94, (Exs. 75-86), and prescription medication expenses of $5907.64,[1] (Exs. 87, 88).

27. As a result of the accident, Hines has lost $3,067,138 in after-tax wages and fringe benefits. (Zimmerman Test.; Ex. 100.)

28. As a result of the accident, Hines has lost the ability to provide household services in the amount of $29,087. (Pl. Test.; Zimmerman Test.; Ex. 100.)

29. Hines has been subjected to pain and suffering as a result of his injuries and is entitled to recover $100,000 therefor.

30. As a result of the accident, Hines will incur $962 for medical treatment, $3564 for

---

[1] Exhibit 87 appears to be an itemization of all Hines' prescriptions filled with Walgreens pharmacy from the date of the accident through approximately the beginning of trial. Exhibit 88 appears to be an itemization of all Hines' prescription claims, including claims for prescriptions filled at Walgreens among other pharmacies, processed through his insurance provider from the date of the accident through 18 January 2010. Because the majority of the expenses contained in Exhibit 87 are duplicated in Exhibit 88, the court has relied primarily on Exhibit 88 in calculating the prescription expenses. The court did, however, rely upon Exhibit 87 for expenses after 18 January 2010. In its calculation, the court included only the drugs prescribed by Drs. Boyette and Cole of Orthopaedics East, Dr. Long and Physician Assistant Savoie of Carteret Pain Medicine, Dr. Lowry of EMP of Carteret County, and Dr. Crosswell (Androgel only).
    The court notes that it has not reduced the amount Hines is entitled to recover for the medical and prescription expenses to account for the fact that his insurance has paid a portion of these amounts. Pursuant to "the 'collateral source' rule, . . . 'compensation from a collateral source should be disregarded in assessing tort damages[.]'" Chisholm v. UHP Products, Inc., 205 F.3d 731, 741 (4th Cir. 2000) (footnote omitted; alteration in original). The rule applies in admiralty actions. See id.

pain medications, and $7008 for Androgel, or a total of $11,534 annually. (Neulicht 8/26/10 Dep. at 52-53.) Based on Hines' remaining life expectancy of 25.9 years, the present value of these costs is $305,280. (Zimmerman Test.; Ex. 100.)

31. Based on Hines' remaining life expectancy of 25.9 years, he will lose the ability to provide household services in the amount of $151,252 (present value). Based on the fact Hines could have reasonably been expected to work until age 65, his future after-tax lost wages reduced to present value are $5,809,764. (Zimmerman Test.; Ex. 100.) Hines is entitled to recover $900,000 for future pain and suffering.

32. Hines may recover the costs of this action upon timely application to the Clerk.

33. The court exercises its discretion and awards Hines pre-judgment interest at North Carolina's legal rate, 8%, to accrue from 21 March 2006, the date of the collision. See U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828 (4th Cir. 1992) ("Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic . . . ." (citations omitted)); National Shipping Co. of Saudi Arabia v. United States, 95 F. Supp. 2d 482, 496 (E.D. Va. 2000) ("Pre-judgment interest is awarded customarily from the date of the casualty in admiralty law."); N.C. Gen. Stat. § 24-1. Pre-judgment interest is not awarded on future damages, however. Jauch v. Nautical Servs., Inc., 470 F.3d 207, 215 (5th Cir. 2006); Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 444-45 (1st Cir. 1991). Post-judgment interest shall be awarded on the total amount at the federal legal rate. See 28 U.S.C. § 1961.

34. It is therefore ORDERED, ADJUDGED, and DECREED that Benjamin G. Hines, Jr. have and recover from Triad Marine Center, Inc. dba Boats Unlimited NC and John Banister Hyde, jointly and severally, the amount of $10,397,291.58,

(a) with interest on $3,230,995.58 (total past damages) at the rate of 8.0% per annum from 21 March 2006 until date of entry of this judgment, and

(b) with interest on the total sum at the rate of 0.30% per annum from date of entry of this judgment until paid.

This 3 January 2011.

                                              W. Earl Britt
                                              Senior U.S. District Judge